## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **RAYMOND D. LEAVITT**, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | **Civil Action** |
| v. | ) | **Docket No. 1:08-cv-00132-JAW** |
| | ) | |
| **CORRECTIONAL MEDICAL** | ) | |
| **SERVICES, INC., et al.**, | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S SUPPORTING STATEMENT OF MATERIAL FACTS IN OPPOSITION TO SUMMARY JUDGMENT

Now comes the Plaintiff Raymond Leavitt, by and through undersigned counsel, and submits the following Supporting Statement of Material Facts in Opposition to Summary Judgment:

1.  Before Raymond Leavitt [hereafter "Leavitt"] entered the York County Jail on September 9, 2006, he had been taking his HIV medications, Kaletra and Truvada, on a regular basis. *[Leavitt depo. p. 19, line 19 to p. 23, line 1]*.

2.  At the time of his booking at the York County Jail, Leavitt told the booking officer he was taking his HIV medications. *[Leavitt depo. p. 22, line 22 to p. 23, line 15]*.

3.      At Leavitt's request, Charles Kelley, a friend, brought Leavitt's HIV

        medications to the York County Jail, but a jail officer refused to accept

        them.  *[Charles Kelley depo. p. 8, line 22 to p. 9, line 3; p. 37, lines 4 - 18].*

4.      About four days after his incarceration at the York County Jail, Leavitt

        began experiencing sweats, chills, fevers, nausea, vomiting and general

        malaise, symptoms he believed to be related to his HIV.  *[Leavitt depo. p.*

        *26, lines 6 – 17; p. 49, lines 13 - 17].*

5.      While at the York County Jail and prior to being examined by Physician

        Assistant Alfred Cichon [hereafter "Cichon"], Leavitt wrote one or more

        letters to the jail's medical department, including one to Cichon, requesting

        that his HIV meds be restarted.  *[Leavitt depo. p. 27, line 16 to p. 28, line 2;*

        *p. 32, line 15 to p. 33, line 24; p. 50, lines 3 - 8].*

6.      When Leavitt was finally examined by Cichon at the York County Jail on

        October 5, 2006, Leavitt told Cichon that he was experiencing night sweats,

        chills, fever nausea and vomiting. *[Leavitt depo. p. 39, lines 5 – 15].*

7.      By October 5, 2006, Leavitt was so fatigued, he felt like he couldn't do

        anything and was sleeping about 16 hours a day. *[Leavitt depo. p. 48, line*

        *16 to p. 49, line 2].*

8.      On October 5, 2006, Leavitt told Cichon he had HIV and gave a history of

        his having gone without HIV medications from the time of his incarceration

        at the jail.  *[Leavitt depo. p. 38, line 21 to p. 39, line 4; Cichon depo. p. 29,*

        *line 24 to p. 30, line 19].*

9.      On October 5, 2006, Leavitt told Cichon that it wasn't right he was being kept off his HIV meds since they had been keeping him alive for the past 10 years and keeping his symptoms and a low blood count from claiming him as a victim of AIDS.  *[Leavitt depo. p. 40, line 16 to p. 41, line 2].*

10.     On October 5, 2006, Cichon told Leavitt, "We don't give away [HIV] medications here at this jail because the jail is so small and we are not equipped financially to hold the burden of providing expensive medication, and … [you will] have to wait until you [get] to the Maine State Prison where they are able to pay for these medications."  *[Leavitt depo. p. 42, lines 17 - 24; Leavitt Verified Second Amended Complaint, ¶ 6 (Document 44-4)].*

11.     On October 5, 2006, Cichon also told Leavitt, "You don't need to stay on the [HIV] medications to be healthy, and just as soon as you get to the Maine State Prison they'll fix you right up."  *[Leavitt depo. p. 43, lines 12 - 16; Leavitt Verified Second Amended Complaint, ¶ 8 (Document 44-4)].*

12.     The York County Jail paid for medications and lab tests prescribed for prisoners.  *[Cichon depo. p. 24, line 13 to p. 25, line 15].*

13.     In addition to discussing HIV with Leavitt on October 5, 2006, Cichon told Leavitt he would not be tested or treated for Hepatitis C, because testing for Hepatitis C was quite expensive and because treatment for Hepatitis C was not something that occurred in the jail setting, but that his Hepatitis C might

possibly be treated at the Maine State Prison. *[Cichon depo. p. 107, line 7 to p. 108, line 13].*

14. Cichon denied written requests by Leavitt, dated October 4, and October 8, 2006, for triple antibiotic ointment for psoriasis of Leavitt's hand and face, on each occasion without seeing Leavitt for his complaints. *[Cichon depo. p. 46, line 8 to p. 47, line 11; p. 55, line 20 to p. 56, line 13; exhibits 7 & 8].*

15. Cichon was mindful of the cost of testing and treating inmates for chronic conditions. *[Cichon depo. p. 110, line 4 to p. 112, line 19].*

16. Symptoms of HIV include fevers, night sweats, loss of appetite, loss of weight, wasting syndrome, chronic diarrhea, thrush, leukoplakia, and psoriasis and seborrheic dermatitis. *[Pinsky depo. p. 21, line 13 to p. 22, line 5; Valenti depo. p. 106, lines 8 – 15; p. 106, line 25 to p. 107, line 1].*

17. During Leavitt's incarceration at the York County Jail, Cichon was president and a major shareholder in ARCH, a private company which provided contract health-care services to inmates at the York County Jail, and he was the physician assistant who worked at the jail most frequently, about 16 hours per week. *[Cichon depo. p. 12, line 12 to p. 13, line 3; p. 15, line 15 to p. 17, line 1].*

18. There was no physician providing direct patient care at the jail during Leavitt's incarceration. *[Cichon depo. p. 17, line 25 to p. 18, line 11].*

19.   On October 5, 2006, after examining Leavitt, Cichon instructed the ARCH nursing staff to do a medication verification at the pharmacies Leavitt had utilized and to get his prior treatment records from Androscoggin, Kennebec, Cumberland, Knox and Cumberland County jails and Portland Positive Health Care; Cichon also ordered a complete blood count with a differential, CD4 count and viral load for HIV.  *[Cichon depo. p. 30, line 19 to p. 31, line 16].*

20.   Requests for Leavitt's medical records went out in accordance with Cichon's instructions on October 10, 2006.  *[Cichon depo. p. 57, line 17 to p. 58, line 14].*

21.   Leavitt's prior treatment records from the Androscoggin County Jail were faxed to the York County Jail on October 10, 2006, records from the Cumberland County Jail were faxed to the York County Jail on October 11, 2006, and, records from Positive Health Care were forwarded as part of the Androscoggin County Jail records.  *[Cichon depo. p. 62, line 1 to p. 61, line 1; p. 66, line 6 to p. 67, line 8; p. 68, lines 1 – 11].*

22.   The records from Androscoggin County Jail, York County Jail and Positive Health Care would have been reviewed by Cichon in the ordinary course within a half week to a week after their receipt.  *[Cichon depo. p. 63, lines 2 -14;  p. 66, line 21 to p. 67, line 8; p. 68, lines 1 - 17].*

23.   The records reviewed by Cichon disclosed that Leavitt had a long history of HIV, had been on HIV medications, Truvada and Kaletra, prior to his

5

incarceration at York County Jail and that his labs on April 6, 2006 had shown an undetectable viral load of less than 75 and an abnormal CD4 count of 355. *[Cichon depo. p. 63, line 15 to p. 64, line 25; p. 67, lines 9 - 25; p. 68, lines 18 -25; Cichon exhibit 15, #77, 79; exhibit 16, #86, 87; exhibit 17, #90].*

24.     Leavitt's blood was drawn and sent to a laboratory, which reported a CD4 count of 415 on October 16, 2006, noting it was below normal range, "indicative of immunodeficiency state and/or recent viral infection," and which reported a viral load of 143,000 on October 23, 2006. *[Cichon depo. p. 58, line 17 to p. 59, line 18; Cichon exhibits 13 and 14].*

25.     Both lab reports were sent to Cichon, the CD4 report being addressed to him at the ARCH office in Augusta and the viral load report to him at the York County Jail. *[Cichon depo. p. 58, line 22 to p. 60, line 9; Cichon exhibits 13 and 14].*

26.     In the ordinary course of business, Leavitt's laboratory reports would have been delivered to the York County Jail medical office, where they would have placed on a clip board and reviewed by Cichon each time he went to the jail. *[Cichon depo. p. 60, line 10 to p. 61, line 8].*

27.     Cichon claims not to have seen the lab reports, but he is unable to explain why this happened and asserts that it was the only time in 17 years such an omission had occurred. *[Cichon depo. p. 61, lines 6 -12; p. 74, lines 1-18].*

28.   Cichon would have considered a viral load of 143,000 to be higher "than I would like to see it" and would have considered such a lab result to "have been just cause to move precipitously" to refer Leavitt to an infectious disease specialist.  *[Cichon depo. p. 84, line 8 to p. 85, line 2].*

29.   During the approximate five-month period that elapsed between Cichon receiving Leavitt's blood test results and prior treatment records, and Leavitt's transfer to the Maine State Prison, Cichon never saw Leavitt again, did not order a referral to an infectious disease specialist, or take any other steps to follow up on Leavitt's HIV condition.  *[Cichon depo. p. 73, lines 2 - 23].*

30.   Cichon's understood that HIV was a serious and potentially life threatening medical condition.  *[Cichon depo. p. 75, lines 8 - 14].*

31.   Cichon's understanding was that an HIV positive patient should be kept consistently on HIV medications because of the potential to develop resistance to the medications.  *[Cichon depo. p. 76, lines 3-11].*

32.   Cichon was given a letter of guidance by the Maine State Board of Licensure in Medicine on October 11, 2005 for withholding medications from another patient who had potentially serious medical problems, "without appropriate evaluation" and "with no clear reason that the patient could not receive them."  *[Cichon depo. p. 90, lines 17 - 22, exhibit 14].*

33.   Cichon was also given a letter of guidance by the Maine State Board of Licensure of Medicine on April 11, 2007 for changing the frequency of

dosage of medication of another patient without informing the patient, where the patient's physician had prescribed the medication four times a day, the jail had not wanted medications passed out more than twice a day, and Cichon had changed the prescription frequency to twice a day without informing the patient. *[Cichon depo. p. 86, line 3 to p. 87, line 13; exhibit 22].*

34. Cichon was also reprimanded and his physician assistant license suspended by the Maine State Board of Licensure of Medicine for 90 days, from May 8 to August 8, 2007, for fraud and deceit and unprofessional conduct as a result of "providing medical services as a physician assistant without having a supervisory physician and/or by failing to notify the medical Board that he no longer had a supervisory physician licensed by the Board and/or by misrepresenting to the Medical Board staff the status of his license and supervisory relationship through the Board of Osteopathic Licensure." *[Cichon depo. p. 87, line 16 to p. 88, line 25; exhibit 23].*

35. Cichon entered into a Consent agreement with the Board of Osteopathic Licensure on January 15, 2008 in which he admitted to underlying violations of his physician assistant's license, set forth in paragraphs 32 through 34 above, as well as two other violations. *[Cichon depo. p. 93, line 3 to p. 94, line 2, exhibit 27].*

36. The long delay in the re-initiation of Leavitt's antiretroviral therapy for HIV, starting with his incarceration at York County Jail on September 6,

8

2007 and continuing through his incarceration at Maine State Prison,
constituted a continuum of harm, which led to Leavitt's becoming
immunocompromised and suffering a dramatic drop in his CD4 count by
April of 2008.  *[Valenti depo. p. 91, line 10 to p. 95, line 4; p. 98, lines 9 -
14].*

37.     After his incarceration at Maine State Prison, Leavitt's HIV symptoms got
worse, in that he suffered from thrush, warts and rashes, which he never
had before.  *[Leavitt depo. p. 52, lines 8 - 13; p. 90, line 13 to p. 93, line
10].*

38.     Matthew Turner [hereafter "Turner"], a Correctional Medical Services
[hereafter "CMS"], a physician assistant at the Maine State Prison, did an
initial assessment of Leavitt on February 20, 2007 after Leavitt's transfer to
the prison, ordered a follow-up "ASAP" with Dr. Gonella, an infectious
disease consultant under contract with CMS to visit patients in the prison,
and ordered an HIV viral load and CD4 labs.  The labs were drawn on
February 26, 2007 and reported on March 1, 2007 as showing a CD4 count
of 460 and a viral load over 97,000.  *[Tritch depo. p. 72, line 12 to p. 73,
line 25; Kesteloot depo. exhibit 8].*

39.     Generally when a CMS provider uses the term "ASAP," it is because the
provider some degree of concern about a patient's health.  *[Tritch depo. p.
74, lines 3 -10].*

40.     The follow-up with Dr. Gonella by Turner never took place. *[Tritch depo. p. 73, lines 6 – 16; p. 74, lines 1 – 2].*

41.     On March 25, 2007, Dr. Christopher Short, a CMS physician, wrote an order that Leavitt be "referred to an infectious disease doctor for starting HIV medications." *[Kesteloot depo. p. 74, lines 11 - 18; exhibit 6, #1].*

42.     Dr. Todd Tritch [hereafter "Tritch"], the physician who was CMS's medical director for the Maine State Prison, had to approve all requests to refer patients to outside consultations. *[Tritch depo. p. 29, lines 5 – 11; p. 32, line 4 to p. 33, line 12].*

43.     Leavitt was not seen by an infectious disease specialist until he was examined on May 9, 2007 by a team at the Virology Treatment Center [hereafter "VTC"], headed by Dr. Robert P. Smith, Jr., the clinic's medical director. *[Tritch depo.  p. 75, lines 2 - 12; Smith depo. p. 6, line 17 to p. 7, line 3; p. 7, lines 19 - 21].*

44.     When Leavitt was seen by VTC on May 9, 2007, his lab results from the prior February, showing a CD4 count of 460 and viral load of 97,000, were reviewed by Dr. Smith and interpreted as indicating that the HIV disease was active. *[Smith depo. p. 35, lines 18 - 24].*

45.     A Provider Consultation Report was sent by VTC to CMS, dated May 9, 2007, which stated, "HIV: No urgent indication for … rx with CD4 at 460. Will obtain records from Dr. Kuhn, Dr. Pickus + Dr. Lamire + review." *[Smith depo. p. 32, line 6 to p. 33, line 5; exhibit 8].*

46.    The VTC Provider Consultation Report recommended a "f/u in 1 month to review records and make recommendations," which would have included recommendations for restarting Leavitt on his HIV medications.  *[Smith depo. p. 33, lines 6 - 8].*

47.    VTC had the capacity to reschedule patients in one or, at most, two months. *[Smith depo. p. 33, line 20 to p. 34, line 1].*

48.    The VTC Provider Consultation Report, under the subheading, "To be Completed by CMS Provider," bore the signature of Turner, dated May 24, 2007, and contained a note by Turner which stated: "f/u 1 month." *[Smith depo.  exhibit 8].*

49.    Dr. Smith also sent a letter to Dr. Tritch, dated May 9, 2007, in which he recommended repeating Leavitt's CD4 and HIV viral load and stated, "We are in the process of obtaining prior records to advice or [sic] specifically on antiretroviral therapy, which he will likely need in the near future. We plan to see him again in approximately 6 weeks. Please give me a call in the meantime if there are any questions." *[Smith depo. p. 8, lines 1–7; exhibit 3].*

50.    Dr. Smith's recommendation to repeat the CD4 and viral load labs was in accordance with usual practice to do those tests every three to four months to monitor an HIV patient's condition whether on therapy or not.  *[Smith depo. p. 12, lines 16 -23].*

51.   Dr. Smith's decision to delay treatment to obtain Leavitt's prior treatment record was made for the purpose of obtaining information about Leavitt's immune status, viral loads, antiretroviral drug history and any previous drug resistance testing. *[Smith depo. p. 15, line 2 to p. 16, line 17].*

52.   Though the VTC May 9, 2007 Provider Consultation Report on Leavitt, stated that there was "[n]o urgent indication for RX with CD4 at 460," the phrase was not intended to mean it was acceptable to wait six months to re-examine the patient and determine whether to start his antiretroviral therapy, but meant, at most, a follow-up based on lab results within three months to determine whether therapy should be re-initiated. *[Smith depo. p. 34, line 2 to p. 35 line 17].*

53.   If CMS personnel treating Leavitt had any questions as to VTC's reports or recommendations, Dr. Smith maintained a beeper phone service available so he could be contacted 24/7. *[Smith depo. p. 59, line 7 to p. 60, line 9].*

54.   Dr. Tritch never had a problem reaching VTC to talk to a specialist about HIV. *[Tritch depo. p. 66, lines 17 – 23].*

55.   The CMS "Offsite Consultation Request Form," dated 5/24/07, requesting a follow-up with Dr. York [at VTC], notes that a copy was placed in the patient's chart, but it does not bear the signature of Dr. Tritch for approving the referral. *[Kesteloot depo. exhibit 5].*

56.   Leavitt submitted a prison sick call slip on August 10, 2007 in which he stated: "As a result of being denied meds for HIV+ my immune system is

low resulting in thrush and it seems as though I'm being denied meds for that also." *[Woodward depo. exhibit 3].*

57.    Dr. Tritch examined Leavitt at the prison on August 10, 2007 at which point he concluded Leavitt was suffering from thrush, noted he had HIV and ordered blood work done to assess the disease. *[Tritch depo. p. 38, line 20 to p. 39, line 16; Kesteloot depo. p. 78, line 18 to p. 79, line 2; p. 82, line 23 to p. 84, line 17; p. 84, line 22 to p. 86, line 8; exhibits 6 & 7].*

58.    The lab results for the blood tests Tritch ordered reported on August 22, 2007 that Leavitt's CD4 count was 424 and his viral load was greater than 100,000. *[Tritch depo. p. 39, lines 17 - 25; Kesteloot depo. p. 88, lines 19 - 17; exhibit 8].*

59.    On August 10, 2007, Dr. Tritch had ordered the scheduling of a follow-up visit for Leavitt with himself for September 2007, but he did not see either the patient or his blood tests at that time. *[Tritch depo. p. 40, lines 1 – 13; Kesteloot depo. exhibit 6].*

60.    CMS providers had enough information about Leavitt's HIV, including the CD4 count and HIV viral load, to make a referral to VTC by September 1, 2007, but Tritch did not approve a referral until November 6, 2007, when, without having seen Leavitt again, he noted as the reason for the referral on Leavitt's chart that Leavitt "wants to go to Virology for discussion of HIV/HEP C treatment." *[Tritch depo. p. 49, line 22 to p. 50, line 3; p. 50,*

*line 7 to p. 51, line 5; Kesteloot depo. p. 73, lines 3 - 8; p. 75, line 13 to*

*p. 76, line 2; exhibits 5 & 7].*

61.   Although Dr. Tritch was not a specialist in HIV treatment, he understood

that untreated symptomatic HIV could lead to death.  *[Tritch depo. p. 17,*

*line 18 to p. 18, line 5; Tritch Answer to Interrogatory #21].*

62.   Dr. Tritch believed that symptomatic HIV patients, with symptoms such as

thrush, probably had a severe problem with their immune systems and

needed to be treated sooner rather than later.  *[Tritch depo. p. 16, line 15 to*

*p. 19, line 1].*

63.   Dr. Tritch understood that the introduction of antiretroviral therapy in the

1990s dramatically reduced the mortality rate from HIV.  *[Tritch depo. p.*

*19, line 11 to p. 20, line 11].*

64.   Dr. Tritch understood that, when drugs were stopped for an HIV patient,

whose disease had been under control with the drug therapy, the HIV could

reassert itself.  *[Tritch depo. p. 21, line 15 to p. 22, line 8].*

65.   Edith L.Woodward [hereafter "Woodward"] was a physician assistant who

worked full time at the Maine State Prison under the supervision of Dr.

Tritch through February 2008.  *[Woodward depo. p. 9, lines 6 – 9].*

66.   Woodward examined Leavitt at the prison's chronic care clinic on June 10,

2007, at which time she noted that Leavitt had HIV, that his labs showed a

CD4 count of 460 and a viral load 95,000 and that he was to "follow up

with Dr. York as scheduled," a reference to VTC's recommendation of May

9, 2007 that Leavitt be seen at the clinic again in one month.  *[Woodward depo. p. 44, line 14 to p. 46, line 14; exhibit 3].*

67.    During a prison clinic visit by Leavitt on September 1, 2007, Woodward noted that Leavitt complained about a rash on his under arms which was not improved by using a different soap, that he was feeling tired, and that he had pain between his toes, white and cracked, all of which she recognized could have been HIV symptoms.  *[Woodward depo. p. 49, line 7 to p. 50, line 2; exhibit 3].*

68.    When Woodward saw Leavitt on September 1, 2007, she knew that the one-month follow-up consultation recommended by VTC on May 9, 2007 had not yet occurred.  *[Woodward depo. p. 46, lines 19 - 25].*

69.    Although Woodward was not an HIV expert, she knew, when she saw Leavitt on September 1, 2007, that HIV was a serious condition which, if left untreated, could be fatal.  *[Woodward depo. p. 47, lines 6 - 16; Woodward Answer to Interrogatory #21].*

70.    After seeing Leavitt on September 1, 2007, Woodward did not investigate why the follow-up consultation at VTC had not taken place and took no steps to make sure the visit would occur quickly thereafter.  *[Woodward depo. p. 47, lines 17 - 25].*

71.    Woodward has no explanation as to why the follow-up visit at VTC did not occur until December 19, 2007.  *[Woodward depo. p. 48, line 13 to p. 49, line 3].*

72.     Leavitt was next seen at VTC on December 19, 2007, more than six months after his May 9, 2007 visit there.  *[Smith depo. p. 35, lines 2 - 9].*

73.     On December 19, 2007, VTC recommended a genotype test on Leavitt to determine his resistance to HIV medications, but, if Leavitt had been seen within six weeks of his May 9, 2007 VTC appointment, as requested on May 9, a genotype would probably have been recommended by VTC at the time of that appointment.  *[Smith depo. p. 36, lines 19 -23; p. 38, line 14 to p. 39, line 20].*

74.     On December 19, 2007, VTC, in a Provider Consultation Report to CMS, noted that Leavitt reported chronic fatigue and noted symptoms which were interpreted as symptomatic of immunological decline from HIV, namely recurrent thrush (a yeast infection in his mouth), leukoplakia (a pre-cancerous condition manifested by white protrusions on the lateral side of the tongue) and seborrheic dermatitis.  *[Smith depo. p. 39, line 24 to p. 41, line 19; exhibit 6].*

75.     On December 19, 2007, Leavitt gave VTC a history of having suffered from thrush for several months.  *[Smith depo. p. 41, line 20 – 24; exhibit 6].*

76.     On December 19, 2007, VTC noted in a Provider Consultation report to CMS that Leavitt met the criteria for starting antiretroviral therapy for HIV, requested a repeat viral load as a baseline for treatment, a repeat CD4, as well as a genotype, and asked for a follow-up appointment in one month so

it could recommend antiretroviral therapy.  *[Smith depo. p. 41, line 25 to p. 42, line 15; exhibit 6].*

77.   On January 23, 2008, Woodward noted in her progress notes that the follow-up office visit to the VTC was supposed to have occurred one month from December 19, 2007. *[Woodward depo.  p. 54, lines 15-18].*

78.   Leavitt's follow-up visit to VTC did not take place until March 12, 2008. *[Smith depo. p. 42, line 21 to p. 43, line 6].*

79.   At the time of Leavitt's March 12, 2008 visit to VTC, VTC had not received Leavitt's genotype results.  *[Smith depo. p. 43, lines 21 -24].*

80.   Woodward does not know why Leavitt's genotype report was not produced until April 2008.  *[Woodward depo. p. 54, lines 12-14].*

81.   Woodward is unable to explain why it took so long to re-initiate HIV medication therapy for Leavitt.  *[Woodward depo. p. 57, line 23 to p. 58, line 1].*

82.   Charlene Watkins [hereafter "Watkins"] was a CMS nurse practitioner at the Maine State Prison, who filled Woodward's position when the latter resigned in early 2008.  *[Watkins depo. p. 18, lines 1 - 4].*

83.   Watkins first saw Leavitt on February 26, 2008.  *[Watkins depo. p. 21, lines 4 – 7].*

84.   On February 26, 2008, Watkins was aware that Leavitt had a diagnosis of HIV.  *[Watkins depo. p. 21, lines 5 - 11].*

85.     On February 26, 2008, Leavitt complained to Watkins about a rash. *[Watkins depo. p. 21, lines 8 - 9].*

86.     On February 26, 2008, Watkins was aware that the rash could have been a fungal infection and that fungal infections could be symptomatic of HIV. *[Watkins depo. p. 22, lines 2 - 9].*

87.     On April 14, 2008, Watkins examined Leavitt at the prison's chronic care clinic.  *[Watkins depo. p. 23, lines 14 – 16].*

88.     During Leavitt's visit to the clinic on April 14, 2008, Watkins requested and received from VTC a faxed copy of its March 12, 2008 dictated progress note for Leavitt's VTC visit of that date, which was not found in his CMS chart.  *[Watkins depo. p. 23, line 24 to p. 30, line 10].*

89.     The March 12, 2008 VTC progress note stated, "HIV disease: Needs to restart HIV therapy. Has been on many agents prior and likely has some resistance. Unfortunately we do not have his genotype at this time. Will need to start him back on Truvada/Kaletra now. Will recommend they obtain a CD4, VL and a genotype. F/U in 1 month."  *[Smith depo. p. 43, lines 1- 18; exhibit 7].*

90.     Instead of re-starting Leavitt on his HIV medications immediately, Watkins ordered a follow-up appointment with the clinic and again ordered an HIV genotype, and another viral load and an immune panel.  *[Watkins depo. p. 30, lines 20 to p. 31, line 22].*

91.  Watkins could have called VTC to get clarification from VTC as to what was meant by starting therapy "now," but she chose not to do so.  *[Watkins depo. p. 35, line 24 to p. 36, line 14].*

92.  Leavitt's CD4, viral load and genotype results were obtained by Watkins on April 26, 2008.  *[Watkins depo. p. 60, lines 6 - 23].*

93.  Watkins claims she did not start Leavitt's medications after she obtained the test results, because she expected Leavitt to revisit VTC in a short period of time.  *[Watkins depo. p. 60, line 24 to p. 61, line 10].*

94.  The April 26, 2008 lab reports on Leavitt indicated a viral load of 297,562 and a CD4 of 296.  *[Kesteloot depo. exhibit 8].*

95.  After receiving the viral load and genotype lab reports on April 26, 2008, Watkins did not take any steps to check to see if a follow-up visit at VTC had been arranged for Leavitt.  *[Watkins depo. p. 62, lines 10 - 21].*

96.  Watkins is unable to explain why Leavitt did not return to VTC for a follow-up until June 25, 2008.  *[Watkins depo. p. 61, line 26 to p. 62, line 5; p. 72, lines 6 - 9].*

97.  Although Watkins was not an HIV expert, she understood that an immunocompromised person with an abnormally low CD4 count would be at higher risk of opportunistic infections, malignancy and cardiovascular disease, a more rapid progression of Hepatitis "C", and liver function decline.  *[Watkins depo. p. 69, line 1 to p. 70, line 4; Watkins Answer to Interrogatory #21].*

98.   After Leavitt's visit to VTC on June 25, 2008, VTC sent a Consultation Provider Report, dated that date, to CMS in which it noted that "Pt close to AIDS dx + VL is very high," that the patient had thrush on his tongue and swollen nodes in his neck, and that he needed to "start HIV antiviral meds ASAP." *[Smith depo. exhibit 9].*

99.   After August 10, 2007, Dr. Tritch did not see Leavitt again until June 26, 2008, at which time he ordered prescriptions for Kaletra and Truvada for Leavitt. *[Tritch depo. p. 54, lines 9 - 24].*

100.   When Dr. Tritch reviewed Leavitt's chart on June 26, 2008, he concluded that his HIV medications should have been started sooner. *[Tritch depo. p. 82, line 25 to p. 83, line 24].*

101.   Leavitt finally began receiving his HIV medications, Truvada and Kaletra, on July 7, 2008. *[Plaintiff's First Amended Verified Complaint, ¶ 26 (Document 33); Tritch depo. p. 54, lines 9 -24 ].*

102.   Dr. Tritch now denies knowing why the initiation of antiretroviral therapy for Raymond Leavitt was delayed so long. *[Tritch depo. p. 56, lines 1-5].*

103.   In responding to a complaint brought against him by Leavitt to the Maine Board of Licensure of Medicine on September 25, 2008, however, Dr. Tritch blamed the delays in Leavitt's care and treatment primarily on a "chronic shortage of providers" and a "substantial ongoing turnover in the correctional medical system" at the Maine State Prison. *[Tritch depo. p. 107, line 22 to p. 108, line 2; exhibit 2].*

20

104.    In his letter to the Board of Licensure in Medicine, Dr. Tritch also stated
        that Leavitt's "HIV viral load was undetectable" as of August 2007 and that
        his viral load did not become detectable until January 2008.  *[Tritch depo.
        p. 42, lines 3 – 16].*

105.    Dr. Tritch now claims he does not recall why he thought Leavitt's viral load
        was undetectable at that time of his September 25, 2008 letter to the Board
        and that he believed it to be true when he wrote it, but he is unable to point
        to any test in 2007 in which Leavitt had an undetectable viral load.
        *[Tritch depo. p. 42, line 17 to p. 43, line 8].*

106.    In fact, Leavitt's viral load, which was reported to CMS on August 22,
        2007, was over 100,000, representing a substantial increase from Leavitt's
        previous viral load.  *[Tritch depo. p. 43, lines 9 -15].*

107.    Dr. Tritch has never corrected this inaccurate assertion to the Board and
        does not intend to do so.  *[Tritch depo. p. 94, lines 21-25].*

108.    Leavitt first began suffering from thrush in July 2007, and it continued until
        after he started on his HIV medications in July 2008.  *[Leavitt depo. p. 52,
        lines 7 -13; p. 90, lines 20 -23; p. 105, line 25 to p. 106, line 2].*

109.    Leavitt's night sweats and chills continued on and off until after he started
        taking his HIV medications again.  *[Leavitt depo. p. 90, line 25 to p. 92,
        line 3].*

110.    Leavitt still has warts on his fingers and rashes on his stomach and arms,
        continues to suffer from worsening fatigue and malaise and has great fear

and uncertainty regarding his future as a result of his HIV drug interruption. *[Leavitt depo. p. 92, line 4 to p. 93, line 6; p. 106, line 24 to p. 108, line 3; Plaintiff's Amended Complaint, ¶ 37 (Document 33)].*

111.    It is not the standard of care to withdraw HIV medication from a patient who is doing well, whose CD4 counts have responded to treatment and who have no complications from their therapy. *[Pinsky depo. p. 37, lines 13 - 19].*

112.    Leavitt should have been kept on his HIV medications from the day he entered York County Jail, if he had been taking them previously. *[Pinsky depo. p. 40, line 24 to p. 41, line 11].*

113.    Since Leavitt had been off his medications for about a month by the time he was medically examined at the York County Jail, the appropriate medical approach was to obtain information regarding his treatment history, evaluate his status and reinitiate his treatment as quickly as possible, and no more than one month, after the information was available. *[Valenti depo. p. 99, line 20 to p. 102, line 24; Pinksy depo. p. 41, line 13 to p. 42, line 16].*

114.    Leavitt was denied appropriate treatment when he was not promptly evaluated or put back on retroviral therapy within a month after his labs were reported on October 23, 2006 at the York County Jail and when he was not promptly evaluated or given retroviral therapy at Maine State Prison after his transfer there. *[Valenti depo. p. 29, lines 7 -21; p. 121 line*

*5 to p. 122, line 22; p. 125, line 6 to p. 126, line 12; p. 176, lines 11 – 21;*

*Pinksy depo. p. 46, line 22 to p. 47, line 9; p. 48, line 16 to p. 49, line 8].*

115.   The delays in arranging Leavitt's visits to the VTC from Maine State Prison
did not constitute appropriate medical care and were the prime reason why
his medications were delayed from February of 2007 until July 2008.
*[Pinsky depo. p. 60, lines 8 - 25; Tritch depo. p. 88, line 23 to p. 89, line 4].*

116.   Though DHHS "Guidelines for the Use of Antiretroviral Agents in HIV-1-
Infected Adults and Adolescents," published on May 4, 2006,
recommended offering antiretroviral therapy to HIV patients with CD4
counts between 201 and 350, and though Leavitt's CD4 count in October
2006 was 415, Leavitt should have been immediately restated on anti-
retroviral therapy as soon as possible, because this guideline only applied to
new patients not patients who had already undergone therapy, because
Leavitt had a history of low CD4 counts, and because he had the related
health problem of Hepatitis C.   *[Valenti depo. p. 32, line 22 to p. 33, line 9;*
*p. 98, line 15 to p. 101, line 24; p, 125, line 8 to p. 126, line 23; exhibit*
*2, p. 8].*

117.   The DHHS Guidelines of May 4, 2006 also recommended treating patients
with a history of an AIDS-defining illness or severe symptoms of HIV
infection regardless of their CD4 count.   *[Valenti depo. exhibit 2, p. 8;*
*exhibit 7].*

118. For a patient with both HIV and Hepatitis C, the HIV disease must be controlled so that the Hepatitis C can be treated.  *[Valenti depo. p. 31, lines 9 – 21; p. 160, line 15 to p. 161, line 10; Pinsky depo. p. 69, lines 3-15].*

119. Thrush (candidiasis), which Leavitt suffered while at the Maine State Prison, is an AIDS-defining illness, generally associated with a CD4 level below 200.  *[Valenti depo. p. 44, lines 4 -11; exhibit 7].*

120. The DHHS Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents," published on December 1, 2007, slightly changed the guideline of May 4, 2006, by recommending that antiretroviral therapy be initiated, rather than just offered, to a patient with a CD4 count less than 350.  *[Valenti depo. p. 52, line 15 to p. 53, line 4, exhibit 3, p. 12].*

121. The December 1, 2007 guideline relating to re-initiation of antiretroviral therapy for CD4 counts below 350 applied to new patients rather than patients who had previously been on therapy.  *[Valenti depo. p. 52, line 15 to p. 54, line 8].*

122. As a result of not receiving HIV medication during his incarceration at the Maine State Prison between February 17, 2007 and July 7, 2008, Leavitt suffered immunological decline and damage to his CD4 cells and CD 4 subsets, became ill, and suffered a number of symptoms, including thrush, fatigue, malaise and night sweats, which were probably the result of that decline.  *[Valenti depo. p. 44, lines 3 -11; p. 91, line 10 to p. 95, line 4; p. 98, lines 3 – 14; p. 140, lines 13 – 23; p. 164, line 5 to p. 166, line 5; p.167,*

*line 4 to p. 169, line 11; p. 171, line 20 to p. 172, line 17; Pinsky depo. p.*
*33, lines 3 – 20; p. 49, lines 5 – 8; Smith depo. p. 39, line 24 to p. 41, line*
*19; exhibit 6; p. 48, line 8 to p. 49, line 24; exhibit 9].*

123.   An article published in the New England Journal of Medicine on November
       30, 2006, "CD4 Count Guided Interruption of Antiretroviral Treatment"
       (known as the SMART trial) disclosed the results of a 16-month
       randomized, controlled study, showing that interruption of antiretroviral
       therapy for patients with CD4 counts above 350 and resumption of that
       treatment when the CD4 count reached 250 significantly increased the risk
       of opportunistic disease or death from any cause over the course of the trial,
       as compared with continuous antiretroviral therapy, largely as a
       consequence of lowering CD4 cell count and increasing viral load.
       *[Pinsky depo. p. 74, line 5 to p. 76, line 24].*

124.   The rate of death from any cause in the test group of the SMART trial,
       whose antiretroviral therapy was interrupted for an average of 16 months,
       was 1.8 times that of the control group receiving continuous therapy, and
       the rate of opportunistic disease or death from any cause was 2.6 times
       greater in the test group than that of the control group.  *[Valenti depo. p. 41,*
       *line 18 to p. 42, line 5; Pinksy depo. p. 89, line 18 to p. 91, line 5].*

125.   There's a great body of medical literature suggesting that the lower
       someone's CD4 count when they initiate or reinitiate HIV treatment, the
       lesser the expectation of long-term immunologic recovery and the greater

the risk of both HIV and non-HIV related complications over the short

term.  *[Pinsky depo. p. 34, lines 8 - 21; p. 112, line 15 to p. 116, line 12; p.*

*128, line 4 to p. 131, line 8].*

126.　The interruption of Leavitt's antiretroviral therapy from September 6, 2006

to July 7, 2008 likely damaged subsets of his CD4 cells, making him

statistically more likely to be susceptible to opportunistic infections and/or

cancer in the future.  *[Valenti depo. p. 17, line 23 to p. 19, line 11; p. 46,*

*line 8 to p. 48, line 17; p. 140, lines 2 - 23; p. 171, line 20 to p. 172, line*

*17].*

127.　Most medical studies have shown that if patients begin treatment at lower

CD4 counts, their risk of not fully reconstituting the normal numbers of

CD4 subsets is greater.  *[Pinsky depo. p. 109, line 1 to p. 110, line 5].*

128.　There is medical evidence that controlling HIV disease slows the

progression of Hepatitis C.  *[Pinsky depo. p. 68, lines 2 - 15].*

129.　Maine Department of Corrections Policy 18.5(IV)(G)(3) states: When there

is an order for a specialty consultation, the required consultation shall be

performed at the next possible opportunity if being done on-site or an

appointment in the community shall be arranged in a timely manner."

*[Magnusson depo. p. 15, line 16 to p. 16 line 5; p. 17, lines 13 -25; exhibit*

*4].*

130.　Once an outside consultation referral is arranged by CMS for a Maine State

Prison inmate, corrections officers typically provide transportation

promptly for that appointment unless there is an unusual security situation at the prison, such as a riot, fire, hostage situation.  *[Kesteloot depo. p. 37, line 7 to p. 38, line 17].*

131.    Maine Department of Corrections Policy 18.5(IV)(I)(1) states: "Facility health care staff shall assure continuity of health care from the time of admission to the facility, through the incarceration, until release or transfer from the facility, for all emergency and routine health care services provided in the facility and through referral, consultation, or transfer to another departmental facility." *[Magnusson depo.  p. 16, lines 6 - 17; exhibit 4].*

132.    Maine Department of Corrections Policy 18.5(IV)(J)(2) states: Clinical treatment for … HIV… shall be provided according to nationally accepted clinical practice guidelines. These national clinical practice guidelines shall be specifically identified by the organization that established them, and there shall be documentation of compliance with the guidelines."
*[Magnusson depo. exhibit 4].*

133.    CMS had no clinical pathway or treatment protocol for treating HIV at Maine State Prison during the time period of Leavitt's incarceration there, although it did have a clinical pathway for Hepatitis C and many other infectious diseases.  *[CMS Answers to Interrogatories #27 & #28; Tritch depo. p. 99, line 3 to p. 100, line 12; Amberger depo. p. 17, line 14 to p. 18, line 5; p. 19, line 23 to p. 20, line 23].*

134.   On April 1, 2007 Leavitt wrote a letter to Janna Dinkel, then CMS Health

Services Administrator assigned to the Maine State Prison, in which he

complained about being deprived of his HIV medications from the time of

his arrest and incarceration at York County Jail on September 6, 2006 and

stressed his fear that he would develop resistance to these drugs, which are

"what keeps me alive." *[Leavitt depo. p. 24, line 16 to p. 25, line 14;*

*exhibit 5].*

135.   Dr. Tritch does not recall ever having seen or heard about Leavitt's letter to

Dinkel.  *[Tritch depo. p. 101, line 2 to p. 102, line 10].*

136.   Teresa Kesteloot [hereafter "Kesteloot"], who succeeded Dinkel in

September, 2007, as CMS Health Services Administrator for the Maine

State Prison, became aware of Leavitt's letter at some point after she

assumed her position but does not know if Dinkel ever acted on Leavitt's

complaint.  *[Kesteloot depo. p. 59, line 10 to p. 60, line 1].*

137.   On April 24, 2008, Leavitt filed a grievance with the Maine State Prison

complaining about his having been deprived of his HIV medications, to

which grievance he attached a copy of the April 1, 2007 letter to Dinkel.

*[Kesteloot depo. p. 39, lines 12 -25; exhibit 1].*

138.   At the time Leavitt filed his grievance, Kesteloot was responsible for

reviewing complaints and grievances relating to health care which were

brought by prisoners.  *[Kesteloot depo. p. 6, line 10 to p. 10, line 6].*

139.   If a prisoner complained about a delay in getting medical treatment, Kesteloot claims it was her practice to review the patient's chart and speak to the provider who directed the care of the patient. *[Kesteloot depo. p. 11, lines 4 - 21].*

140.   By May 1, 2008 Kesteloot had received Raymond Leavitt's April 24, 2008 grievance and completed her investigation of it. *[Kesteloot depo. p. 39, line 16 to p. 41, line 23].*

141.   In a May 1, 2008 memorandum, Kesteloot reported to Robert Costigan [hereafter "Costigan"], the Maine State Prison grievance review officer, that Leavitt had been "followed appropriately," a judgment she based on the fact that he had been seen in the chronic care clinic at the prison, that he had been seen in the past by outside infectious disease specialists, and that his labs recently been drawn and an appointment had been made for him at the HIV clinic. *[Kesteloot depo. p. 41, line 5 to p. 44, line 4; exhibit 1].*

142.   Although Kesteloot did not consider herself an HIV expert, she does not recall having sought the opinion of an HIV expert as to whether Leavitt's HIV care prior to the date of her memorandum had been appropriate. *[Kesteloot depo. p. 44, lines 14 -20; p. 64, line 23; Kesteloot Answer to Interrogatory #21].*

143.   Kesteloot's investigation was limited to speaking with Leavitt, examining part of his medical chart, and learning from Violet Hanson, a CMS nursing supervisor, that Leavitt's labs had recently been drawn and that he had

scheduled for an HIV clinic visit, but Kesteloot did not concern herself at all as to why Leavitt's antiretroviral therapy had been delayed to that point. *[Kesteloot depo. p. 44, line 1 to p. 46, line 13; p. 59, line 10 to p. 60, line 1; p. 60, line 4 to p. 69, line 11].*

144.   Kesteloot understood that HIV was a very serious health care condition which could develop into a fatal disease. *[Kesteloot depo. p. 42, line 20 to p. 43, line 5].*

145.   In preparing her memorandum, Kesteloot did not review Leavitt's admission health screening, dated February 12, 2007 or his physical assessment, dated February 20, 2007, indicating that he was HIV Positive, that he had Hepatitis B and C, and that he reported having been on HIV medications at the time of his incarceration. *[Kesteloot depo. p. 60, line 2 to p. 62, line 22; p. 64, lines 1 - 4; exhibit 2].*

146.   Although Kesteloot would have been concerned by Leavitt's CD4 count of 262 and viral load of 60,440, lab results which were noted in Watkins' progress note of April 14, 2008, she did not look at those lab results in the course of preparing her memorandum. *[Kesteloot depo. p. 63, line 6 to p. 65, line 17].*

147.   After writing her memorandum, Kesteloot did not investigate whether the delay in Leavitt's treatment was part of a broader problem in the treatment of HIV patients at the Maine State Prison, nor did she follow up on Leavitt

to insure that there would be no further delays in his treatment. *[Kesteloot depo. p. 45, line 6 to p. 46, line 13; p. 70, line 25 to p. 71, line 19].*

148.   Dr. Tritch, was not involved in Leavitt's April 24, 2008 grievance, and does not agree with Kesteloot's May 1, 2008 assessment Leavitt had been followed appropriately. *[Tritch depo. p. 71, line 25 to p. 72, line 10; p. 82, lines 3 - 18].*

149.   CMS maintained a computerized offsite referral log which, showed unusual delays in Leavitt's referral to an HIV specialist between March 2007 and June 2008. *[Amberger depo. p. 7, lines 19 - 23; p. 42, line 15 to p. 45, line 13].*

150.   Larry D. Amberger, regional manager for CMS for the State of Maine, the liaison between CMS and the Maine Department of Corrections, and the person responsible for overseeing site administrators, including Kesteloot, is unaware of any corporate investigation or audit which was conducted in response to Leavitt's April 24, 2008 grievance to determine if CMS personnel were adhering to protocols, policies and standards of compliance. *[Amberger depo. p. 10, lines 12–17; p. 11, line 23 to p. 12, line 8; Kesteloot depo. p. 45, lines 6 - 20].*

151.   Costigan did not issue a written ruling on Leavitt's grievance until May 23, 2008, 23 days after Kesteloot's memorandum to him, at which time he denied it. *[Magnusson depo. exhibit 6].*

152.   Leavitt filed an appeal of Costigan's ruling to Jeffrey Merrill [hereafter "Merrill"], the chief administrative officer of the Maine State Prison, on May 28, 2008.  *[Magnusson depo. exhibit 6].*

153.   Merrill issued a denial of the appeal on July 1, 2008.  *[Magnusson depo. exhibit 6].*

154.   Maine Department of Corrections Commissioner Martin Magnusson, whose duties include oversight of the prison system, including prison health care, does not know why it took approximately one month for Costigan to respond to Leavitt's level-one grievance and more than a month for Merrill to respond to his level-two grievance.  *[Magnusson depo. p. 6, lines 6 -18].*

155.   During the time that Leavitt was incarcerated at the Maine State Prison, both state employees and CMS contract employees worked in the medical department of the prison.  *[Magnusson depo. p. 6, line 11 to p. 7, line 8].*

156.   On August 10, 2007, January 6, 2008 and July 4, 2008, Leavitt submitted sick-call slips to the Department of Corrections  expressly for HIV, and on July 26, 2007, August 5, 2007, August 10, 2007, October 9, 2007, October 15, 2007, October 25, 2007, November 6, 2007, January 6, 2008, March 3, 2008, May 29, 2008, May 29, 2008, and July 2, 2008 and July 4, 2008, Leavitt submitted sick-call slips to the Department of Corrections for HIV for thrush, rashes or diarrhea, conditions which could have been symptomatic of HIV.  *[Affidavit of Jeanmarie Koenig, dated September 30, 2009 (Document 118)].*

157.   The Department of Corrections investigates critical incidents relating to the health and safety of inmates, which can include improper denial of medications, and, where warranted, the investigation can lead to disciplinary actions against state employees and penalties against a contractor like CMS.  *[Magnusson depo. p. 7, line 13 to p. 9, line 2].*

158.   Magnusson does not recall if any investigation was done by the Department of Corrections with respect to Leavitt's grievance to determine why his medication had been withheld. *[Magnusson depo. p. 30, line 5 to p. 31, line 3].*

159.   In his labs of February 27, 2009, Leavitt had a CD4 count of 252.  *[Smith depo. p. 54, lines 5 -9; exhibit 11].*

160.   CMS uses a "clinic system" for the Maine State Prison in which different practitioners may see a patient on any given day, and it maintains paper patient charts, incorporating all the patient's medical records, which are available to any provider who sees the patient.  *[Amberger depo. p. 27, line 15 to p. 30, line 9].*

Dated at Portland, Maine this 23rd day of October, 2009.


                                     /s/ Elliott Epstein
                                    ELLIOTT L. EPSTEIN, ESQ.
                                    Attorney for Plaintiff


PICKUS & EPSTEIN, LLC
980 Forest Avenue, suite 207
Portland, ME 04103
(207) 347-3186

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**CERTIFICATE OF SERVICE**

I hereby certify that on **October 23, 2009**, I electronically filed **Plaintiff's**

**Statement of Material Facts** with the Clerk of Court using CM/ECF system which will

send notification of such filing(s) to all counsel of record.

Dated:  October 23, 2009              */s/ Elliott Epstein*
                                      ELLIOTT L. EPSTEIN, ESQ.
                                      Attorney for the Plaintiff

                                      PICKUS & EPSTEIN, LLC
                                      980 Forest Avenue, Suite 207
                                      Portland, ME 04103
                                      207-347-3186
                                      elliottepstein@pickusandepstein.com