UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **RAYMOND D. LEAVITT**                         )<br>         Plaintiff,                                        )<br>                                                              )<br>                                                              )<br>v.                                                            )         **Civil Action**<br>                                                              )         **Docket No. 1:08-CV-132**<br>                                                              )<br>**CORRECTIONAL MEDICAL**              )<br>**SERVICES, INC., et. als**                         )<br>         Defendants,                                    )<br>                                                              ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT ALFRED CICHON'S**
**SUPPORTING STATEMENT OF MATERIAL FACTS**

Now comes the Plaintiff Raymond Leavitt, by and through undersigned counsel, responds to Defendant Alfred Cichon's Supporting Statement of Material Facts as follows:

1.    Raymond Leavitt was incarcerated at the York County Jail from September 6, 2006 through February 17, 2007, for a period of 167 days. (Attachment -Affidavit of Alfred Cichon at Paragraph 79)(hereinafter referred to as "Cichon at ¶___"); (Exhibit A Deposition of Raymond D. Leavitt at Page 21 lines 22-25 through Page 22, line 1; Page 45, lines 21-22, Page 82 line 25 through Page 83 line 1)(hereinafter referred to as "Leavitt at Page___, line__")

**RESPONSE:  Admitted.**

1

2. At the time of his incarceration at the York County Jail, Raymond Leavitt Leavitt was suffering from HIV, Hepatits C, a bipolar disorder, anxiety and a hypothyroid condition.  (Leavitt at Page 23, Lines 16-25)

**RESPONSE: Admitted.**

3. Alfred Cichon is a Physician Assistant employed by Allied Resources for Correctional Health, Inc. ("ARCH"), a corporation which supplied healthcare professionals to county correctional facilities in Maine including the York County Jail.  (Cichon at ¶¶1, 3)

**RESPONSE: Qualified. Cichon was also President and a major shareholder in ARCH during the period Leavitt was at the York County Jail.** *Plaintiff's Statement of Material Facts, 17 and citations contained therein.*

4. Raymond Leavitt saw Physician Assistant Alfred Cichon on one occasion, on October 5, 2006, during his incarceration at the York County Jail.  (Leavitt at Page 37, lines 15-18); (Cichon at ¶12)

**RESPONSE: Admitted.**

5. At the time of that visit, which occurred in the medical office at the jail, Alfred Cichon performed an examination of Mr. Leavitt.  P.A. Cichon did not have available for him a completed Health History form for Mr. Leavitt.  (Cichon at ¶¶12, 16)

**RESPONSE: Admitted.**

6. In conjunction with P.A. Cichon's physical examination of Mr. Leavitt, a nurse took Mr. Leavitt's pulse and temperature, which fell within the normal parameters.  (Cichon at ¶13)

**RESPONSE:  Admitted.**

7.     P.A. Cichon noted as the result of his examination, that Mr. Leavitt's health in general appeared to be normal including an examination of his eyes, ears, nose, mouth, throat, neck, chest, heart and lungs, as well as his abdomen.  P.A. Cichon performed a brief examination of Mr. Leavitt's neurological functioning and Mr. Leavitt's ability to use extremities including his ability to walk, hear and see, and again these all appeared to be normal. (Cichon at ¶14)

**RESPONSE:  Admitted.**

8.     At the conclusion of his examination, Mr. Leavitt informed P.A. Cichonthat Leavitt was HIV positive.  (Cichon at ¶16)

**RESPONSE:   Admitted.**

9.     Based on his examination of Mr. Leavitt, P.A. Cichon concluded that Mr. Leavitt did not have symptoms consistent with a positive HIV status in that he had no fever, his pulse was normal, and it was Cichon's opinion that based on Leavitt's objective symptoms that Mr. Leavitt's condition was stable.  (Cichon at ¶15)

**RESPONSE:  Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve Cichon's report of his**

**findings regarding Leavitt's symptoms or his opinion regarding Leavitt's condition.** *Plaintiff's Statement of Material Facts, 1 – 35 and citations contained therein.*

10. P.A. Cichon knew at the time of his examination of Mr. Leavitt, that Mr. Leavitt had been without his medications for HIV treatment for at least one month, as he had first been incarcerated at the York County Jail on September 6, 2006. (Cichon at ¶18)

   **RESPONSE: Admitted.**

11. Because there is a risk when re-initiating medications after a break in treatment that a patient has built a resistance to those medications, and because P.A. Cichon wanted to obtain information regarding Mr. Leavitt's medical history, his HIV medications, his compliance with taking those medications and information regarding his current blood levels, P.A. Cichon did not immediately reinstate the medications that Mr. Leavitt reported taking for his HIV. (Cichon at ¶26, 27)

   **RESPONSE: Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve that this was Cichon's motivation for not immediately re-instating Leavitt's HIV medications.** *Plaintiff's Statement of Material Facts, 1 – 35 and citations contained therein.*

12. P.A. Cichon discussed Mr. Leavitt's medical condition with him at the conclusion of the October 5th examination. He asked Mr. Leavitt for the name of the pharmacy where Leavitt had received his HIV medications when not incarcerated. He also asked Mr. Leavitt where Leavitt had previously received treatment, including any jails in which he had been incarcerated. (Cichon at ¶¶19, 21)

**RESPONSE: Admitted.**

13. P.A. Cichon entered an order for Mr. Leavitt to return to the medical clinic to have blood drawn so as to evaluate Leavitt's CBC differential, CD4 count and to check his viral load. (Cichon at ¶¶21, 25)

**RESPONSE: Admitted.**

14. P.A. Cichon ordered that the medical staff obtain medical records from each of the different facilities which Mr. Leavitt had reported had treated him and/or provided him with HIV medications. (Cichon at ¶20, 24)

**RESPONSE: Admitted.**

15. P.A. Cichon could not immediately reinstate Mr. Leavitt's HIV medications without information regarding the nature of Leavitt's medications, his compliance with taking those medications, and information concerning his blood counts. (Cichon at ¶26)

**RESPONSE: Admitted.**

16. It was the intent of P.A. Cichon to obtain additional information, both in the form of medical and pharmacy records, and clinical tests, to provide appropriate medical care to Raymond Leavitt. (Cichon at ¶29)

**RESPONSE: Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve Cichon's claim that he intended to provide appropriate medical care to Leavitt after he received medical and pharmacy records and test results.** *Plaintiff's Statement of Material Facts, 1 – 35 and citations contained therein.*

17. It was P.A. Cichon's intent to decide whether to initiate treatment or refer Mr. Leavitt to an infectious disease specialist once he had obtained the test results and the medical records as it was his experience that the specialists will not initiate treatment until these tests are performed. (Cichon at ¶¶28, 56)

**RESPONSE: Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve that Cichon ever intended to initiate HIV treatment or refer Leavitt to an HIV specialist, regardless of Leavitt's test results and medical history.** *Plaintiff's Statement of Material Facts, 1 – 35 and citations contained therein.*

18.     Given the fact that Mr. Leavitt had been off his medications for at least one month, it was the proper course of treatment for Alfred Cichon to test Mr. Leavitt's blood for the current CD4 count and viral load and to review Mr. Leavitt's prior medical records before initiating treatment. (Exhibit B - Deposition of August J. Valenti at Page 73, line 21 through Page 74, line 22)(hereinafter referred to as "Valenti at page___, line___")

**RESPONSE:  Admitted.**

19.     It was the proper course of action to defer the start of treatment until all of this information had been gathered.  (Valenti at page 126, lines 1-9)

**RESPONSE:  Admitted.**

20.     Pursuant to P.A. Cichon's order, Mr. Leavitt's blood was drawn on October 12, 2006.  (Cichon at ¶33)(Leavitt at Page 37, lines 22-25; Page 38, lines 1-3).

**RESPONSE:  Admitted.**

21.     Pursuant to P.A. Cichon's order, the medical staff obtained records from the Androscoggin County Jail, which included records from Positive Health Care of Portland, and from the Cumberland County Jail(Cichon at ¶¶36, 37, 41).

**RESPONSE:  Admitted.**

22.     When medical records or lab test results become available at the York County Jail, they are attached to a clip board for P.A. Cichon's review.  (Cichon at ¶45)

**RESPONSE:  Admitted.**

23.     P.A. Cichon reviewed the records provided by the Androscoggin County Jail.  These records reflected that at the time of Mr. Leavitt's incarceration on July 11,

7

2006, his medical condition was normal and that he did not complain of fatigue, night sweats, vomiting or other objective symptoms of HIV. (Cichon at ¶47)

**RESPONSE: Admitted.**

24. The records from the Androscoggin County Jail indicated that Mr. Leavitt had been restarted on his HIV medications, but that he had been released as of August 11, 2006. (Cichon at ¶¶48, 54, 56)

**RESPONSE: Admitted.**

25. The records provided by Androscoggin County Jail indicated to P.A. Cichon that Mr. Leavitt had a history of alcohol abuse and that he had been non-compliant with taking his HIV medications, and that Mr. Leavitt had not received his HIV medications on a continuous basis from January 4, 2006 through September 6, 2006 as reported. (Cichon at ¶¶49-52, 55)

**RESPONSE: Admitted.**

26. Although he has no recollection of having seen this document, P.A. Cichon reviewed the results of the CD4 test for Raymond Leavitt. (Cichon at ¶58)

**RESPONSE: Denied. Cichon has testified at deposition that he never reviewed Leavitt's blood test results.** *Plaintiff's Statement of Material Facts, 24 – 27 and citations contained therein*. **Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to**

8

**other patients, the fact finder would also be entitled to believe that he never bothered to look at the lab report or that he saw and disregarded it.** *Plaintiff's Statement of Material Facts, 1 – 35 and citations contained therein.*

27.    The October test results revealed a CD4 count of 415. (Cichon at ¶58; Exhibit A to Affidavit at page YCJ-17-18).

**RESPONSE:  Admitted.**

28.    P.A. Cichon did not review the results of Mr. Leavitt's viral load test. (Cichon at ¶59)

**RESPONSE:  Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve that Cichon never reviewed Leavitt's viral load test and choose to believe, instead, that he reviewed it but chose to disregard it.** *Plaintiff's Statement of Material Facts, 1 – 35 and citations contained therein.*

29.    Information regarding Mr. Leavitt's viral load was important to P.A. Cichon for evaluating the proper treatment to render to Raymond Leavitt.  In addition, he knew he would need to provide this test result to any specialist to whom he might refer Mr. Leavitt. (Cichon at ¶59)

**RESPONSE: Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve that obtaining Leavitt's viral load was important to Cichon in evaluating the proper treatment for Leavitt or in choosing to refer Leavitt to a specialist.** *Plaintiff's Statement of Material Facts, 1 - 35 and citations contained therein.*

30. Had he reviewed the viral load test results, it would have been P.A.Cichon's normal routine and practice to request that Raymond Leavitt be brought to the medical office so that he could discuss the findings and arrange for Leavitt's referral to an appropriate specialist. (Cichon at ¶60)

**RESPONSE: Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to disbelieve that this was Cichon's normal routine and practice.** *Plaintiff's Statement of Material Facts, 1 - 35 and citations contained therein.*

31. P.A. Cichon had no further clinical interaction with Mr. Leavitt following the jail's receipt of the viral load test results either directly through a clinic visit or through a request for treatment.  (Cichon at ¶62)

**RESPONSE:  Admitted.**

32. Raymond Leavitt understood during his period of incarceration at the York County Jail that the method for requesting medical treatment or medications at the jail was to file an Inmate Medical Request Form.  (Leavitt at Page 30, lines 2-5 and lines 21-25); (Cichon at ¶63)

**RESPONSE:  Admitted.**

33. While incarcerated at the York County Jail, Raymond Leavitt filed three medical requests forms, which were evaluated and acted on within days of each request by P.A. Cichon.  (Cichon at ¶¶64, 65)

**RESPONSE:  Admitted.**

34. These Inmate Medical Request Forms included a request for Fixadent to treat Mr. Leavitt's dentures, dated September 12, 2006, and two requests for antibiotic ointment to treat Mr. Leavitt's psoriasis.  (Cichon at ¶¶66, 67, 68)

**RESPONSE:  Admitted.**

35. While at the York County Jail from September 6, 2006 through February 17, 2007, Raymond Leavitt never submitted an Inmate Medical Request form for treatment related to his HIV disease or seeking treatment or medications for HIV. (Leavitt at Page 36, lines 4-8)(Cichon at ¶ 72)

**RESPONSE:  Qualied. Leavitt did not submit an official Inmate Medical Request form but sent letters requesting HIV treatment to Cichon and the medical department at the York County Jail.** *Plaintiff's Statement of Material Facts, 5 and citations contained therein*.

36. Alfred Cichon never intentionally denied Raymond Leavitt appropriate care or treatment or medications during the course of Raymond Leavitt's incarceration at the York County Jail. (Cichon at ¶76)

**RESPONSE:  Denied. Based upon Leavitt's testimony about his HIV symptoms at that time of the examination, the description he gave Cichon of those symptoms, and what Cichon told him about the county's unwillingness to pay for HIV treatment, as well as Cichon's refusal to provide Leavitt medication for his psoriasis and Cichon's admitted record of professional violations with respect to other patients, the fact finder could choose to believe that Cichon intentionally denied Leavitt appropriate care, treatment or medications while at the York County Jail.** *Plaintiff's Statement of Material Facts, 1 - 35 and citations contained therein.*

37. It has always been Alfred Cichon's practice to treat patients with HIV with an understanding that the condition warrants medical treatment and it was with that understanding that he attempted to treat Raymond Leavitt, as evidenced by the fact that he requested blood tests and ordered Mr. Leavitt's past medical records. (Cichon at ¶¶74, 75)

**RESPONSE:  Denied.**

12

38.   Raymond Leavitt did not lose weight while at the York County Jail. (Valenti at page 111, lines 10-12; page 113, lines 16-17)

**RESPONSE:  Admitted.**

39.   Raymond Leavitt did not have any fatigue or GI problems related to HIV disease while at the York County Jail.  (Valenti at page 112, lines 5-14)

**RESPONSE:  Denied. Plaintiff has testified that he did have fatigue and GI problems at the York County Jail.  *Plaintiff's Statement of Material Facts, 4, 6 - 7 and citations contained therein*.**

40.   Raymond Leavitt's CD4 counts rose during the course of his incarceration at the York County Jail.  (Valenti at page 92, lines 15-21)

**RESPONSE:  Qualified.  The most recent CD4 count before Leavitt's incarceration at York County Jail was in April 2006, six months earlier, and the next one afterwards was in February 2007. There can be a lag in CD4 count decline after antiretroviral therapy is discontinued. [*Valenti depo. p. 92, line 7 to p. 93, line 11; p. 157, lines 15 - 20*].**

41.   Raymond Leavitt did not have thrush while at the York County Jail. (Valenti at page 104, lines 1-4; page 113, line 20)

**RESPONSE:  Admitted.**

42.   Raymond Leavitt did not sustain any harm as the result of the fact that he did not receive antiretroviral medications during the period of his incarceration at the York County Jail.  (Exhibit C - Deposition of Robert Pinsky at Page 31, lines 13-21)(hereinafter referred to as "Pinsky at page ___, line ___")

**RESPONSE: Denied. Leavitt did sustain harm as a result of his incarceration at the York County Jail.** *Plaintiff's Statement of Material Facts, 4, 6 - 7, 16, 125 - 128 and citations contained therein*.

43. The standard for determining a patient's risk for developing clinical symptoms of HIV disease and for determining when to initiate antiretroviral therapy is the CD4 blood count. (Pinsky at page 21, lines 4-8 )

**RESPONSE: Qualified. The viral load is also helpful in making this determination. [*Pinsky depo. p. 22, lines 6 - 15*].**

44. Guidelines promulgated by the Department of Health and Human Services pertinent to this time period indicate that treatment should be instituted in patients who have not previously treated for HIV when their counts fall below 350. While this standard was promulgated to deal with the novel patient, one who had never received therapy, it does provide guidance to practitioners when initiating therapy to experienced patients. (Pinsky at page 24, lines 6-22)

**RESPONSE: Denied.** *Plaintiff's Statement of Material Facts, 116 and citations contained therein.*

45. Raymond Leavitt was first seen at the Virology Treatment Center on May 9, 2007. (Exhibit D -Deposition of Robert P. Smith, M.D. at page 7, lines 20- 21)(hereinafter referred to as "Smith at page ___, line___")

**RESPONSE: Admitted.**

46. At the time of the examination at the Virology Treatment Center, Raymond Leavitt had no physical outward signs of HIV disease. (Smith at page 11, lines 7-20)

14

**RESPONSE:  Admitted.**

47.     At the time of the May 9, 2007 examination, Dr. Smith of the Virology Treatment Center had for his review a blood test result taken in February of 2007 which indicated a CD4 count of 460.  (Smith at page 11, lines 20-21, page 13, lines 11-14)

**RESPONSE:  Admitted.**

48.     On May 9, 2007, the Virology Treatment Center recommended rescheduling Mr. Leavitt for an office visit and repeating the blood test before making recommendations for treatment.    (Smith at page 13, lines 11-14)

**RESPONSE:  Admitted.**

49.     Raymond Leavitt's condition is stable, and his CD4 count is within an acceptable range above 500.  (Valente at page 20, line 19 through page 21, line 7)  (Smith at page 17, line 7)

**RESPONSE:  Denied.  This statement is, in part, based upon an expert opinion by Dr. Smith, who has not been designated as an expert. In addition, Dr. Valenti, in the testimony cited above, described Leavitt's CD4 count of 550 in December 2008 as a "little low," [*Valenti depo., p. 20, line 19 to p. 21, line 5*], and Plaintiff suffered a subsequent drop in his CD4 count to 252 as of February 7, 2009.** *Plaintiff's Statement of Material Facts, 154. and citations contained therein*

50.     There are no peer reviewed medical studies that indicate that once a patient has achieved significant immunologic recovery with CD4 counts over 500 that those patients experience long term risks based on a prior history of CD4 counts.  (Pinsky at page 34, line 21 through page 35, line 2; page 62, lines 2-4)

15

**RESPONSE: Qualified. There is medical evidence, based upon cohort studies, that the lower someone's CD4 count when they initiate or re-initiate HIV treatment, the lesser the expectation of long-term immunologic recovery and the greater the risk of both HIV and non-HIV related complications over the short term, and this if patients begin treament at lower CD4 counts, their risk of not fully reconstituting the normal numbers of CD4 subsets is greater, thereby exposing them to opportunistic infections and cancers.** *Plaintiff's Statement of Material Facts, 125 – 127 and citations contained therein.*

51. Since beginning antiretroviral therapy in July of 2008, Mr. Leavitt's CD4 count has recovered into the normal range. (Pinsky at page 34, lines 11-14)

**RESPONSE: Denied. Plaintiff suffered a drop in his CD4 count to 252 as of February 7, 2009.** *Plaintiff's Statement of Material Facts, 154 and citations contained therein.*