## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **RAYMOND D. LEAVITT**, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | **Civil Action** |
| v. | ) | **Docket No. 1:08-cv-00132-JAW** |
| | ) | |
| **CORRECTIONAL MEDICAL** | ) | |
| **SERVICES, INC., et al.**, | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO SUMMARY JUDGMENT

This case involves the failure by various medical providers under contract with the York County Jail and the Maine State Prison, as well as three Maine Department of Corrections officials, to re-initiate HIV medications for the Plaintiff, Raymond Leavitt, over an aggregate period of approximately 21 months from October 5, 2006 through July 6, 2008. The transfer from the jail to the prison occurred on February 12, 2007. Leavitt has sued under 42 U.S.C. §1983 for violation of his rights under the Eighth and Fourteenth Amendment of the United States Constitution, and under Title II of the Americans with Disabilities Act.

Three groups of Defendants have each filed Summary Judgment Motions. Because of the overlapping nature of the issues covered by the motions, the Plaintiff is filing one opposition with respect to all three. In addition, the Plaintiff will not address summary judgment as it relates to Matthew Turner, as the parties have reached an agreement to dismiss Turner from this lawsuit pending court approval.

There is little disagreement between the parties as to the principles of law which govern resolution of these motions.  The Plaintiff's opposition is based primarily upon the existence of genuine issues of material fact which preclude summary judgment.

**1. Section 1983 Claims.**

It is well established that prison officers, corrections officials, and private health care providers who treat prisoners under contract with the state can be held liable under Section 1983, if they violate the constitutional rights of detainees or convicted prisoners to receive adequate medical care, either intentionally or through deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Denial of necessary medical care is considered a violation of the Eighth Amendment's prohibition against cruel and unusual punishment if it is inflicted upon a convicted prisoner, and a violation of the Fourteenth Amendment if upon a pre-trial detainee.  The Fourteenth Amendment provides at least as much protection for pretrial detainees as the Eighth Amendment provides for convicted inmates. *Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007).

In order to establish liability under Section 1983 for denial of adequate medical care, the plaintiff must first show that he has suffered serious deprivation; that is, that he has been forced to go without treatment for a condition that "may produce death, degeneration, or extreme pain."  *Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994).  When a serious condition is left untreated or a degenerative condition is neglected over a long period of time, the delay in treatment may be viewed as a serious deprivation.  *Compare Smith v. Carpenter*,

316 F.3d 178, 186 (2d Cir. 2003) (seven-day interruption in HIV medication with respect to an inmate who otherwise received consistent and appropriate treatment not serious enough to meet Section 1983 standard) *with Montgomery v. Pinchak*, 294 F.3d 492, 500 (alleged nine-month delay in providing HIV and heart medications to an inmate stated *prima facie* claim under Section 1983).

The United States District Court for the District of Maine and the First Circuit have held that unconstitutional deprivations of medical care can include: withholding prescribed HIV medication from a detainee for three days after his incarceration, *McNally v. Prison Health Services,* 46 F. Supp. 2d 49 (U.S.D.C. D.Me. 1999); failure to determine the cause of, or to attempt to prevent, an inmate's seizures, *Miranda v. Munoz*, 770 F.2d 255  (1st Cir. 1985); failure to segregate a severely mentally ill prisoner from the general prison population, *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556 (1st Cir. 1988); and failure to treat or furnish pain medication for a growth on a bone, *Dellairo v. Garland*, 222 F.Supp.2d 86, 90-91 (D. ME. 2002).

In addition to proving a serious deprivation, a Section 1983 plaintiff must prove that the defendant acted with culpability, *i.e.,* with "deliberate indifference," a state of mind which may, but need not, arise to the level of intent to deny medical care as punishment.  It is sufficient if the defendant "knows of and disregards an excessive risk to inmate's health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The plaintiff does not have to show that the defendant "acted or failed to act

believing that harm actually would befall an inmate; it is enough that the [defendant] acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* 828. *See also Ruiz-Rosa v. Rullan,* 485 F.3d 150, 156 (1st Cir. 2007); *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 161-2 (1st Cir. 2006).

Deliberate indifference can include situations in which there is "actual knowledge of impending harm, easily preventable," *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir. 1991), in which the plaintiff  has a medical condition that is sufficiently serious for a lay person to realize a doctor's intervention is required, *Dellairo v. Garland, supra.*, 222 F.Supp.2d  at 90-91, *Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir.); and in which the defendant ignores a medical condition that is "sure or very likely to cause serious illness and needless suffering the next week or month or year," even though the plaintiff has no serious current symptoms.  *Helling v. McKinney*, 509 U.S. 25, 33; 113 S.Ct. 2475; 125 L.Ed.2d 22 (1993).

Deliberate indifference to an inmate's serious needs can be found even when some affirmative action has been taken, but where the defendant's omissions rendered the treatment so inadequate as to shock the conscience, or where the omission was so dangerous to the plaintiff's health or safety that the defendant's knowledge of a large risk can be inferred. *Toracco v. Maloney* 923 F.2d 231, 235 (1st Cir. 1991).

Under Section 1983, a supervisor may be held liable for the constitutional violations of his subordinates, "if the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate

indifference." *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008).  Failure to act on information indicating that unconstitutional acts are occurring can implicate the supervisor as well.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.); *Wright v. Smith*, 21 F.3d 496, 501-02 (2d Cir.1994).  Moreover, supervisors need not have actual knowledge of the specific incident at issue, if they had the power and duty to alleviate the conditions which led to the violation.  *Pinto v. Nettleship*, 737 F.2d 130,132-22 (1st Cir. 1984); *Fernandez v. Chardon*, 681 F.2d 42, 55 (1st Cir. 1982); *Miranda v. Munoz, supra.* 770 F.2d at 260.

This is not a case in which prison health care providers or officials failed to provide medical assistance on a single occasion to a patient who could not assist himself. *Sires v. Berman*, 834 F.2d 9 (1st Cir. 1987).  It is a case in which a prisoner was deprived of his antiretroviral therapy, a treatment recognized as effective in controlling the progress of the deadly HIV virus, for almost two years, nearly 17 months of them at the Maine State Prison.

The Defendants have created a virtual dust storm of defenses and justifications for this extraordinary lapse in the provision of adequate medical care by selectively culling facts from the record which purport, as a matter of undisputed fact, to show that:

- Leavitt's HIV did not represent a serious condition or cause him significant harm.  As proof of this, the Defendants point to evidence that his symptoms during the 22-month period were mild, that his CD4 count actually showed improvement during his stay at York County Jail, that his CD4 count did not drop to a critical level until April 2008, that he was able to work in

prison, and that he has achieved a substantial degree of recovery and stabilization since the re-initiation of retroviral therapy in July 2008;

• The Defendants did not act with intention to harm Leavitt or with deliberate indifference towards his medical condition.  As proof of this, the Defendants point to evidence that they did provide various forms of medical care to Leavitt, periodically drawing labs, examining him every three months at the prison's chronic care clinic, prescribing medications to alleviate, among other things, his symptoms of skin rash and thrush, and referring him on four occasions to an outside infectious disease clinic. Moreover, they argue, they were not HIV specialists and had to rely upon recommendations of the infectious disease clinic, which advised there was no "urgency" in re-initiating medication. They claim that any delays in obtaining infectious disease consults or providing lab reports to the infectious disease clinic were the result of isolated, innocent mistakes by various individual Defendants, all of whom were well meaning.  In any event, they argue, there was no consensus among HIV specialists as to when or under what circumstances it was appropriate to re-initiate antiretroviral therapy. Thus, the delay in restarting HIV medications was, at best, within the scope of reasonable medical judgment and, at worst, the result of a series of negligent missteps.

• The Maine Department of Corrections ["DOC"] Defendants, as well as Correctional Medical Services, Inc. ["CMS"], which contracted with DOC

6

to provide medical care to the inmates at Maine State Prison,  played no
direct role in Leavitt's care and cannot, as a matter of law, be held
responsible for a constitutional violation under the doctrine of *respondeat
superior.*  In any event, DOC did not become involved until Leavitt filed a
grievance over the withholding of HIV medications on April 24, 2008, and,
by then, the damage to his health, if any, was already done.

Nearly every critical fact raised by the Defendants in support of their motions can
be  rebutted, either by disputed material facts or by other undisputed material facts which
they have neglected to reference.

**a.  Serious Deprivation**.

Perhaps the most ludicrous of the Defendants' arguments is that Leavitt, as a
matter of undisputed fact, did not suffer serious harm.  The Defendants reach this
conclusion by attempting to exclude, as speculative, the opinion of the Plaintiff's expert,
Dr. Valenti.  Dr. Valenti has testified, *inter alia*, that Leavitt's unchecked viremia while
incarcerated, as reflected in lab results, likely caused permanent damage to CD4 subsets
in his blood, groups of cells that fight specific viral and fungal infections. [Pl. SMF 126].
The Defendant's expert, Dr. Pinsky, has agreed at least in part with Dr. Valenti by
conceding that most medical studies have shown that patients who begin treatment at
lower CD4 counts are at greater risk of not fully reconstituting the normal numbers of
CD4 subsets. [Pl. SMF 127].

However, even if the Court were to exclude Dr. Valenti's opinion as to risk of
future harm (which, for reasons set forth in Plaintiff's Objection to Defendant Cichon's

*Daubert* motion it should decline to do), there exist genuine issues of material fact as to whether the Plaintiff has already suffered serious harm during his medication hiatus.

It is undisputed that HIV is a serious condition which, if untreated with antiretroviral therapy when a patient is symptomatic or at low CD4 levels, can cause serious degenerative harm and death. [Pl. SMF 30-31, 61-64, 69, 97, 116-117, 120, 123-4, 128, 144].  Symptoms of HIV include fatigue, malaise, fevers, night sweats, thrush, wasting syndrome, leukoplakia, psoriasis and seborrheic dermatitis. [Pl. SMF 16, 19].

It is undisputed that Leavitt had no detectible HIV viral load in April 2006, six months before his confinement at the jail , but that he repeatedly tested as viremic from October, 2006, one month after his incarceration at the jail, through October 2008, three months after his medications were restarted at the prison. [Pl. SMF 23-24, 38, 44, 58, 94, 146; Magnusson, Merrill and Costigan's SMF 34, 35, 70 (Document 114)].  By August 2007, Leavitt's viral load had increased to almost 300,000 from 100,000 in August 2007. [Pl. SMF 58, 94].  By June 2005, his CD4 count had fallen so low that a nurse practitioner at the Virology Treatment Center (hereafter "VTC") described him as being "close to AIDS diagnosis." [Pl. SMF 98].

There is a genuine issue of material fact as to whether Leavitt was regularly on medication when he first entered the York County Jail in September 2006. [Pl. SMF 1-3].

There are also genuine issues of material fact as to whether Leavitt first became symptomatic following incarceration, the severity of those symptoms, and whether his symptoms have abated. The Plaintiff testified that, following his incarceration at the York County jail, he suffered  sweats, chills, fevers, nausea, vomiting, general malaise, and

psoriasis, that he was so fatigued he was sleeping 16 hours a day, that these symptoms worsened after his incarceration at Maine State Prison, and that the night sweats and chills continued until after the re-initiation of drug therapy.  [Pl. SMF 4, 6, 7].

He also testified that he had outbreaks of thrush, warts and rashes after his transfer to the prison, and that he continued to experience worsening fatigue and malaise, as well as rashes and warts, even after the restarting his medications in July 2008. [Pl. SMF 37, 108-110].  Finally, he has averred that he has suffered fear anxiety for the future from the impact of his drug interruption.  [Pl. SMF 110].

There is undisputed evidence as to the progress of Leavitt's symptoms from at least July 16, 2007 through June 25, 2008.  During that period, Leavitt submitted 13 sick call slips at the Maine State Prison complaining of HIV-like symptoms of thrush, rashes, fatigue and diarrhea. [Pl. SMF 155].  Complaints and symptoms of HIV (thrush, rashes or fatigue) were noted by CMS providers Dr. Todd Tritch, MD ["Tritch"] on August 10, 2007 [Pl. SMF 57], by PA Edith Woodward, PA ["Woodward"] on September 1, 2007 [Pl. SMF 67], and by Charlene Watkins, F.N.P. ["Watkins"] on February 26, 2008 [Pl. SMF 85-86].  Obvious symptoms of immunological decline from HIV were noted at VTC on December 19, 2007 and June 25, 2008, including recurrent thrush, leukoplakia,, seborrheic dermatitis and swollen neck nodes. [Pl. SMF 74, 98].

In addition, the treatment of Mr. Leavitt's Hepatitis "C," which itself poses a severe risk to his health, had to be delayed until his HIV virus was brought under control. [Pl. SMF 118, 128].

These facts, some disputed and some undisputed, are sufficient to satisfy Section 1983's requirement of serious deprivation, even assuming, *arguendo*, that there is no genuine issue of material fact that Leavitt has fully recovered and will suffer no future harm as a result of his HIV drug interruption.

### b.  Intentional Deprivation or Reckless Indifference.

The contention that the Defendants indisputably acted in good faith and without deliberate indifference requires a tunnel-vision approach to the evidence developed in discovery.  To reach such a conclusion, this Court would have to uncritically accept the Defendants' "my dog ate the homework" explanations about well-meaning intentions, ignore Leavitt's testimony entirely, and disregard undisputed, objective evidence of prolonged, repeated, inappropriate and largely unexplained lapses in medical care and treatment in the face of the Defendants' admitted awareness of Leavitt's disease, his medical history, and the life-threatening hazards posed by untreated HIV.

The experts for both sides, and Tritch himself, have agreed that a 22-month delay in re-initiating Leavitt's antiretroviral therapy was inappropriate in light of his history, labs and symptoms.  [Pl. SMF 52, 100, 111-114].  They have likewise agreed that the major culprit in that delay was a repeated pattern of delays in referrals to infectious disease specialists to determine the appropriate HIV medications for Leavitt.  [Pl. SMF 52, 115].

All Defendants directly involved in Leavitt's care have conceded that they understood HIV was a serious disease, which, if left untreated, could be fatal. [Pl. [SMF 61-64, 69, 97].  Likewise, the CMS site administrator for the Maine State Prison has

acknowledged she was generally aware of the risks associated with HIV. [Pl. SMF 144].
Given this Court's *McNally* decision in 1999, this hazard should have been clear to them
in anyway.

Cichon had possession of Leavitt's labs and prior treatment records. [Pl. SMF 19-
23]. All CMS treating providers had access to Leavitt's chart. [Pl. SMF 160]. These
records, as will be discussed in detail below, showed that Leavitt had a long history of
HIV, that he had been prescribed HIV medications prior to his incarceration, and that he
been diagnosed with Hepatitis B and C. They showed that he was viremic and that,
during his incarceration at Maine State Prison, his CD4 count was declining and he was
increasingly complaining of, or exhibiting, symptoms often associated with HIV. [Pl.
SMF 38-100].

In addition, on April 1, 2007, Leavitt sent a letter to the then CMS site
administrator, in which he complained of being deprived of his HIV medications, and on
April 24, 2008, filed a formal grievance on the same issue, which was investigated by the
CMS site administrator, reviewed first by the prison's grievance officer and then by the
warden, all prior to the re-initiation of his medications. [Pl. SMF 136-147, 151-153].

Armed with this knowledge, the various treating providers, their supervisors, and
DOC officials acted in ways which a fact finder could reasonably infer manifested
deliberate indifference toward Leavitt in light of the fact that he had been, and continued
to be, deprived of HIV medications for a protracted period of time.

**(1) Alfred Cichon.**

11

Cichon, who was the primary physician assistant at the York County Jail, was informed by Leavitt on October 5, 2006 that he had HIV and that he had been off his HIV medications since his incarceration on September 6, 2006. [Pl. SMF 27].  Cichon requested and, by October 11, 2007, received records of Leavitt's HIV treatment history. [Pl. SMF 19-23]. He also ordered and, by October 23, 2007, had available to him blood test results, which showed that the Plaintiff had a viral load of 143,000 and a low CD4 count of 415. [Pl. SMF 24-26].  However, after October 5 Cichon never again saw or treated Leavitt, or referred him to an infectious disease specialist, even though he conceded, at deposition, that the lab results alone were "just cause to have moved precipitously" to refer Leavitt to a specialist. [Pl. SMF 28-29].

Cichon claims that he never saw Leavitt's labs.  However, it is undisputed that they were addressed to him, that inmates' labs were, in the ordinary course, promptly brought to his attention, and that this was the first time in 17 years as a physician assistant at the jail, he had not received a lab report. [Pl. SMF 27].  He could offer no explanation as to why he did not see or review the labs. [Pl. SMF 27].

More importantly, Leavitt testified that, when he complained to Cichon on October 5 about not getting HIV medications, Cichon told him that the jail was small and not financially able to pay for expensive medications for inmates, that Leavitt would have to wait for HIV treatment until he was transferred to Maine State Prison, and that Leavitt had enough HIV medication in his system to last until he got to the prison. [Pl. SMF 9-11].

While Cichon has denied making these statements regarding HIV, he did admit making similar statements to Leavitt about Hepatitis C.  [Pl. SMF 13].  Cichon, a significant shareholder in ARCH, the company which then held the contract to provide medical services to inmates at the jail, also admitted he was concerned about the cost of medications provided to prisoners. [Pl. SMF 15, 17].  Moreover, he admitted he denied Leavitt's two requests for antibiotic ointment for psoriasis, the second time without examining Leavitt. [Pl. SMF 14].

On January 15, 2008, Cichon entered into a consent agreement with the Board of Osteopathic Medicine acknowledging that, on one occasion (prior to the date of Leavitt's incarceration), he had withheld medication from a patient with potentially serious medical problems and that on another (also prior to Leavitt's incarceration) he had changed a patient's mediation dosage without informing the patient.  In the consent agreement, he also admitted to having acted fraudulently and deceitfully by having practiced as a physician assistant for a period of time after November 2, 2007 without a supervising physician or board-approved plan of supervision.  [Pl. SMF 32-35].

"[I]ssues concerning state of mind (such as deliberate indifference) are often unsuited to resolution on summary judgment." *Stepanischen v. Merchants Despatch Transp. Co.*, 722 F.2d 922 (1st Cir. 1983).  This is all the more apt, where, as here, there is disputed evidence as to Cichon's reasons for failing to refer Leavitt to an HIV specialist, and evidence independent of Cichon's interactions with Leavitt which cast doubt upon Cichon's credibility.  This evidence generates genuine issues of material fact

not only as to deliberate indifference but as to whether Cichon acted intentionally to deprive Leavitt of adequate medical care.

**(2)   Todd Tritch, Edie Woodward, Charlene Watkins, Teresa Kesteloot and CMS.**

The primary providers for Leavitt at the Maine State Prison were Tritch, Woodward and Watkins. Tritch was also the CMS director of medical services.  All were either employed by, or under contract to, CMS, which had a contract with the Maine Department of Corrections to provide medical services to inmates at the Maine State Prison and other state penal institutions.

Under the CMS "clinic" system, in order to insure continuity of treatment, patient records, including progress notes, lab results, provider orders, and outside consultant reports, were kept in one chart and were available to any CMS medical provider who might be assigned on a given day to see the patient.  [Pl. SMF 160]. Thus, Tritch, Woodward and Watkins all had access to Leavitt's full chart.

In addition, Tritch, as medical director, had to approve all referrals from the Maine State Prison to outside consultants, such as the Virology Treatment Center.  [Pl. SMF 42]. Dr. Smith of VTC wrote a letter to him on March 9, 2007. [Pl. SMF 49].   He also examined Leavitt both at the prison chronic care clinic on August 10, 2007 for HIV-related complaints. [Pl. SMF 57].  Therefore, he had reason to be familiar with all Leavitt's records and referrals relating to HIV.

CMS, at the state corporate level, maintained a computer data base showing when each prisoner, including Leavitt, had been referred to an outside consultant, the date the referral was ordered, the reason for the referral, and the date the referral took place. The

CMS database showed the delays in the execution of orders referring Leavitt to outside infectious disease consultants. [Pl. SMF 45].

Although it was required that prison guards transport an inmate to an outside referral appointment, MDOC policy required that such referrals take place as soon as possible and transportation could generally be arranged promptly, unless an urgent security situation, such as a riot or fire at the prison, caused a delay. [Pl. SMF 130].

Matthew Turner, a CMS physician's assistant at the Maine State Prison, did an initial assessment of Raymond Leavitt on February 20, 2007, shortly after Leavitt entered the prison, and recommended a follow-up "ASAP" with Dr. Gonella, an infectious disease consultant then under contract with CMS to visit patients in the prison. [Pl. SMF 38]. Generally when a CMS provider uses the term "ASAP," it is because they have some degree of concern about a patient's health. The follow-up with Dr. Gonella never took place. [Pl. SMF 39].

On March 25, 2007, a chronic care clinic note by another CMS physician, Dr. Christopher Short, stated that Leavitt "needs referral for infectious disease physician for recommendations on HIV meds." [Pl. SMF 40].

CMS finally sent Leavitt to the Virology Treatment Center ("VTC") on May 9, 2007, where he was seen by Dr. Robert P. Smith, Jr., Dr. York, and others. [Pl. SMF 43]. His February 2007 lab results, which had been forwarded to VTC, showed a CD 4 count of 460 and a viral load of 97,000, indicating to Dr. Smith that Leavitt's HIV disease was active. [Pl. SMF 44]. VTC recommended to CMS that Leavitt's CD4 count and viral

load blood tests from February 2007 be repeated and indicated that VTC would obtain records of his prior treatment. [Pl. SMF 45].

The handwritten consultation report sent to CMS by VTC also recommended a follow-up appointment in one month to review records and make treatment recommendations. [Pl. SMF 46].  Turner noted VTC's recommendation for a follow-up appointment on the patient's chart on May 24, 2007.  [Pl. SMF 48].  VTC had the ability to schedule follow-up appointments within one or, at most, two months of a request by CMS. [Pl. SMF 47].

Dr. Smith also wrote a letter to Tritch on May 9, indicating his plan to obtain Leavitt's records and advice on antiretroviral therapy, "which he will likely need in the near future," and reiterating the need for a follow-up in approximately six weeks.  [Pl. SMF 49].

Although the VTC handwritten report to CMS stated that there was "[n]o urgent indication for RX with CD4 at 460," this was not intended to mean that it was acceptable to wait six months to re-examine the patient and determine whether to start his antiretroviral therapy; at the outside limit, it meant a follow-up based on lab results and prior history within three months to determine whether therapy should be re-initiated. [Pl. SMF 50-52].

Yet, Leavitt was not seen at VTC until December 19, 2007, more than seven months later, despite intervening examinations of Leavitt by Tritch on August 10, 2007 and by Woodward on September 1, 2007, in which both noted HIV-like symptoms. [Pl. SMF 57, 67].  Tritch, who was supposed to see Leavitt himself in September, neither met

16

with him nor reviewed his labs at that time, and did not initiate a referral to VTC until November 6, 2007. [Pl. SMF 59-60].  Woodward, who knew on September 1 that Leavitt's follow-up with VTC had not yet occurred, took no steps herself to make sure the referral took place and is unable to explain why the follow-up visit did not take place until December 19, 2007. [Pl. SMF 67-68, 70-71].

On December 19, 2007, following examination of Leavitt, VTC sent a report to CMS, noting that Leavitt complained of chronic fatigue and thrush, and exhibited conditions which were interpreted as symptomatic of immunological decline from HIV, namely recurrent thrush (a yeast infection in his mouth), leukoplakia (a pre-cancerous condition manifested by white protrusions on the lateral side of the tongue) and seborrheic dermatitis.  [Pl. SMF 74-75].

In its report, VTC stated that Leavitt met the criteria for starting antiretroviral therapy for HIV, requested a repeat viral load as a baseline for treatment, a repeat CD4, and a genotype, to determine Leavitt's resistance to medications, and asked for a follow-up appointment in one month so it could recommend antiretroviral therapy; it also recommended to CMS a genotype test on Leavitt to determine the extent, if any, of his resistance to certain HIV medications. [Pl. SMF 73]. Had Leavitt been seen within four to six weeks of his May 9, 2007 appointment, as originally requested by VTC, a genotype would probably have been recommended as of that time and anti-retroviral therapy would have begun much earlier.  [Pl. SMF 77].

On January 23, 2008, Woodward wrote in her progress notes that the one-month VTC follow-up appointment had not yet occurred. [Pl. SMF 77]. Leavitt's visit to VTC

did not take place until March 12, 2008. [Pl. SMF 78]. A genotype lab ordered by

Woodward was not obtained by CMS until April 26, 2006, too late for his March 12

appointment. [Pl. SMF 79, 92]. Woodward is unable to explain why the genotype report

was delayed or why it took so long to re-initiate antiretroviral therapy for Leavitt. [Pl.

SMF 80-81]. Lacking a genotype, VTC recommended on March 12, "Will need to start

him back on Truvada/Kaletra now. Will recommend they obtain a CD4, VL and a

genotype. F/U in 1 month." [Pl. SMF 89].

Watkins was the a nurse practitioner who replaced Woodward when the latter left

her position as primary CMS physician assistant at Maine State Prison. [Pl. SMF 82].

Watkins first saw Leavitt on February 26, 2008, at which time she became aware that

Leavitt had a diagnosis of HIV. Leavitt complained to Watkins about a rash, and

Watkins realized that the rash could be a fungal infection, which could be symptomatic of

HIV. [Pl. SMF 83-86].

On April 14, 2008, Watkins saw Leavitt in the chronic care clinic, where she

requested and received from VTC a faxed copy of its March 12, 2008 dictated progress

note for Leavitt's visit to the clinic of that date, not previously in Leavitt's CMS file,

which contained the recommendation "to start him back on "Truvada/Kaletra "now."

[Pl. SMF 87-89].

Although Dr. Smith of VTC was available by phone and pager service around the

clock, Watkins did not phone VTC for clarification of whether "now" meant that the

medications should be restarted immediately without awaiting the lab results or right after

the lab results were obtained and recommendations made by VTC. [Pl. SMF 53-54, 91].

18

Instead, she re-ordered labs and scheduled yet another appointment with VTC.  [Pl. SMF 90, 93].  The labs, reported to CMS on April 26, 2008, indicated a viral load increase to 297,562 and a CD4 of 296.  [Pl. SMF 92, 94].

Although aware that Leavitt was progressively immunocompromised, Watkins did not check to make sure that his follow-up appointment with VTC took place and is unable to explain why it did not take place for two months.  [Pl. SMF 95-96].

The VTC appointment finally occurred until June 25, 2008.  By that point, a VTC nurse practitioner noted that Leavitt was close to AIDS, and urged CMS to "start HIV antiviral meds ASAP."  [Pl. SMF 98].

On June 26, 2008, Tritch prescribed Leavitt's HIV medications, Truvada and Kaletra (the same he had been on before the interruption), and Leavitt began receiving his medications on July 6, 2008.   [Pl. SMF 99-100].

Tritch, who was given a letter of guidance by the Maine Board of Licensure of Medicine as a result of Leavitt's complaint to the Board, offered, as an excuse for the delay in re-initiating Leavitt's antiretroviral therapy, that "at MSP there has been a chronic shortage of providers, particularly physicians ….  There is also substantial, ongoing turnover in the correctional medical system" at the Maine State Prison.  [Pl. SMF 103].

In his letter to the Board, Tritch misrepresented that "tests ordered on 8/10/07 showed a CD4 count of 424 and a negative HIV viral load."  In fact, Leavitt's viral load at the time was over 100,000.  In deposition testimony, Tritch was unable to point to any blood test in 2007 showing a negative viral load, and, though he claimed to have believed

his statement to the Board to be true when he wrote it, he also said he did not intend to inform the Board of his error.  [Pl. SMF 104-107].

On April 1, 2007, Leavitt wrote a letter to Janna Dinkel ["Dinkel"], then the CMS site administrator, in which he complained about being deprived of his HIV medications from the time of his arrest and incarceration at York County Jail on September 6, 2006 and stressed his fear that he would develop resistance to these drugs, which are "what keeps me alive." [Pl. SMF 134].  There is no evidence that Dinkel acted on this letter. [Pl. SMF 135-136].  This was not the first time Leavitt had complained about the lack of HIV medications in strong terms.  He submitted a Department of Corrections sick-call slip on August 10, 2007 in which he stated: "As a result of being denied meds for HIV+ my immune system is low resulting in thrush and it seems as though I'm being denied meds for that also."  [Pl. SMF 56].

On April 24, 2008, Leavitt filed a grievance with DOC in which he complained about being deprived of his HIV mediations; he appended his April 1, 2007 letter to the petition.  [Pl. SMF 137].

Teresa Kestaloot ["Kesteloot"], who replaced Dinkel as site administrator in October, 2007, investigated Leavitt's grievance. [Pl. SMF 138-140].  In a memorandum, dated May 1, 2008, she reported to a DOC grievance officer that she had spoken with Leavitt and reviewed his chart.  On the basis of information that Leavitt had already been to the VTC on several occasions, his labs had recently been drawn and he was scheduled to return to VTC to start his medications, she reported that Leavitt appeared to have been "followed appropriately." [Pl. SMF 141].  In fact, Kesteloot, who was admittedly not an

expert on HIV, did not fully review Leavitt's chart, never investigated why the re-initiation of anti-retroviral therapy had taken so long, never spoke with Dr. Tritch or any other physician assistant or nurse practitioner, and did not consult any HIV specialists on the appropriateness of Leavitt's care. [Pl. SMF 142-143, 145-147]. Nor did she follow up to see that Leavitt actually was back on his medications, which was not to occur for another 10 weeks. [Pl. SMF 147].

CMS, at the state corporate level, maintained a computer data base showing when each prisoner, including Leavitt, had been referred to an outside consultant, the date the referral was ordered, the reason for the referral, and the date the referral took place. The CMS database showed unusual delays in the execution of orders referring Leavitt to VTC. [Pl. SMF 149]. There is no evidence that Leavitt's grievance triggered a corporate investigation or audit to determine if CMS personnel had adhered to protocols, policies and standards in treating Leavitt, or if HIV care at the prison was adequate. [Pl. SMF 150].

In sum, there are genuine issues of material facts, as to whether CMS as a corporation, its site administrator and its site providers, all of whom were aware of Leavitt's HIV diagnosis, his long medication interruption, his medical condition, and the serious risks posed by untreated HIV, acted with deliberate indifference by failing to make timely referrals to VTC, provide timely labs to VTC, clarify VTC's instructions regarding the re-initiation of HIV medications, and failing to determine whether, as a result of his lengthy medication interruption, Leavitt was receiving adequate care. While these Defendants were not qualified to determine whether to re-start Leavitt's

medications on their own, they controlled the Plaintiff's access to the HIV specialists who could recommend the correct timing and dosages of medication and controlled the flow of lab data required by those specialists in making drug therapy recommendations.

  **(3)  Costigan and Merrill.**

  Robert Costigan ["Costigan"], the grievance review officer, and Jeffrey Merrill ["Merrill"], the prison's chief administrative officer, may have been unaware that Leavitt's HIV medications were being withheld before April 24, 2008, but they cannot have remained unaware after Leavitt's grievance petition of April 24, 2008 and Kesteloot's May 1, 2008 memorandum to Costigan.

  The response of these officials at each stage of the grievance process was inexplicably slow in light of the urgency of the grievance.  The first level grievance was filed by Leavitt on April 24, 2008 and the investigation was apparently completed by May 1, 2008; yet no decision was issued until May 23, 2008.  [Pl. SMF 151].  The second level grievance was filed on May 25, 2008, and a decision was not issued until July 1, 2008.  [Pl. SMF 152-153].

  In ruling on the grievance, Costigan and Merrill each relied upon information from Kesteloot as to the appropriateness of Leavitt's care. [Affidavits of Merrill and Costigan]. Neither independently investigated the reasons for the delays in re-initiating Levitt's anti-retroviral therapy, attempted to accelerate treatment, or expedited the processing of the grievance.  That raises a genuine issue of material fact as to whether they condoned the deprivation of adequate medical care by CMS.  Indeed, in this respect, their Summary

Judgment Motion is a reiteration of the same motion previously filed by them and denied by this Court in its Recommended Decision on January 13, 2009.

The only new issue raised by Costigan and Merrill is the argument that, if Leavitt did suffer harm, it was harm which had already occurred by the time he filed his grievance on April 24, 2008.  To support this argument, they cite a snippet of testimony from Dr. Valenti, taken out of context, in which Dr. Valenti testified that the sharp drop in Leavitt's CD4 count in April 2008 indicated that the damage from HIV had already taken place.  Elsewhere in his testimony, however, Dr. Valenti has described the harm to Leavitt from treatment interruption as a "continuum," a long-term viral degradation of Leavitt's blood count, extending from September 6, 2006, when Leavitt was confined to the York County Jail and continuing through his resumption of HIV medications on July 6, 2008 at Maine State Prison.  [Pl. SMF 36].

Therefore, there is a genuine issue of material fact as to whether Levitt suffered harm during the roughly two-month period in which Costigan and Merrill sat on his grievance petition.

## 2. ADA Claims.

The U.S. Supreme Court has ruled that a state can be sued for damages in federal court for violation of Title II of the Americans With Disabilities Act for maintaining courtroom facilities that are not handicapped accessible. *Tennessee v. Lane*, 541 U.S. 509 (2004); 124 S.Ct. 1978; 158 L.Ed.2d 820. The U.S. Supreme Court has also ruled that a denial of services to a disabled inmate in a state prison can be a violation of the ADA.

*Pennsylvania Department of Corrections v. Yesky*, 524 U.S. 206, 118 S.Ct. 1951, 141 L.Ed.215 (1998).

 As this Court has already held in its Recommended Decision on Merrill and Costigan's Motion for Summary Judgment (document #45), dated January 13, 2009, that denial of medication to a prisoner can constitute a violation of Title II of the ADA; *Kinman v. N.H. Dep't of Corr*, 451 F.3d 274 (1st Cir. 2006), a corrections official can be held responsible in his official capacity for violating Title II. *Carten v. Kent State Univ.*, 282 F.3d 396 (6th cir. 2002); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003); *Bruggeman v. Blagojevich,* 324 F.3d 906, 912-13 (7th Cir. 2003); and discriminatory intent can be proven by showing the defendant acted with at least deliberate indifference. *Bartlett v. New York State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998).

 Under ADA regulations, 28 CFR 35.130, liability can also lie against a state or local governmental entity, even when the Title II violation is committed as the result of a contractual arrangement with a private contractor:

> (a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.
>
> (b) (1) A public entity, in providing any aid, benefit, or service, may not, **directly or through contractual, licensing, or other arrangements**, on the basis of disability --
>
> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
>
> (ii) Afford a qualified individual with a disability an opportunity to

participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(emphasis added).

There exists a genuine issue of material fact as to whether Costigan and Merrill acted with discriminatory intent by failing to expedite action on Leavitt's April 24, 2008 petition (described in the Magistrate's Recommended Decision, p.11, as a "plodding administrative approach" to the grievance process), and whether Commissioner Magnusson condoned their conduct by failing to question their handling of the grievance.

There is also a genuine issue of material fact as to whether Magnusson, in his official capacity as the commissioner of DOC, acquiesced in a system in which, through a contractual arrangement with CMS, the Department failed to afford HIV-infected inmates like Leavitt, the same service, *i.e.,* medical care, afforded to other prisoners with disabling chronic conditions

Unlike other infectious diseases, such as Hepatitis C, and notwithstanding DOC policy requiring HIV treatment in accordance with specified nationally-accepted clinical guidelines [Pl. SMF 132], CMS had no pathway, protocol or guideline for HIV treatment at the Maine State Prison. [Pl. SMF 133].  All of the CMS practitioners treating Leavitt professed to lack expertise in HIV and relied, instead, upon recommendations of outside infectious disease specialists, who were, in turn, dependent upon CMS for timely referrals and timely lab reports. As a result, Leavitt was examined by providers without

the ability to independently initiate or re-initiate HIV medication and without pathways, protocols or guidelines to inform their care.  Moreover, repeated discontinuities in referrals and labs made it difficult for the referral specialists to provide timely recommendations regarding therapy, also in violation of DOC polices requiring prompt referrals and continuity of care.  [Pl. SMF 129, 131].

When Leavitt finally filed a grievance petition in April 2008, it was superficially reviewed by a CMS site administrator lacking HIV expertise, then by DOC officials who relied upon information from the CMS administrator (which turned out to be incomplete and inaccurate) and treated the petition in a desultory fashion that ignored the underlying reasons for the delays in re-initiating antiretroviral therapy or the existence of any systemic underlying reasons for the delay.

While Title II ADA claims may be brought against state officials acting in their official capacity, the weight of precedent holds that such claims will not lie against private contractors working for the state.  Therefore, the Plaintiff concedes that summary judgment on the ADA claims may be granted with respect to the private Defendants, but he maintains that summary judgment should be denied as to Costigan, Merrill and Magnusson.

## 3.  Conclusion.

For the foregoing reasons, the Plaintiff requests that Defendants' Motions for Summary Judgment, except for those relating to private parties under Title II of the ADA, be dismissed.

Dated at Portland, Maine this 23rd day of October, 2009.


                                    */s/ Elliott Epstein*_____
                                    ELLIOTT L. EPSTEIN, ESQ.
                                    Attorney for Plaintiff


PICKUS & EPSTEIN, LLC
980 Forest Avenue, Suite 207
Portland, ME 04103
207-347-3186
elliottepstein@pickusandepstein.com

# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

## **CERTIFICATE OF SERVICE**

I hereby certify that on **October 23, 2009**, I electronically filed **Plaintiff's**

**Memorandum of Law in Opposition to Summary Judgment** with the Clerk of Court

using CM/ECF system which will send notification of such filing(s) to all counsel of

record.


Dated: October 23, 2009                    */s/ Elliott Epstein*_____
                                           ELLIOTT L. EPSTEIN, ESQ.
                                           Attorney for the Plaintiff

                                           PICKUS & EPSTEIN, LLC
                                           980 Forest Avenue, Suite 207
                                           Portland, ME 04103
                                           207-347-3186
                                           elliottepstein@pickusandepstein.com