UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RAYMOND LEAVITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 8-132-B-W |
| | ) | |
| CORRECTIONAL MEDICAL SERVICES, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**RECOMMENDED DECISION ON MOTION
FOR SUMMARY JUDGMENT (Doc. No. 108)**

Raymond Leavitt has filed a civil rights action seeking remedy for alleged denial of

adequate medical care during the time he was a detainee at the York County Jail and an inmate at

the Maine State Prison.  Leavitt's complaint has a count under the Eighth Amendment of the

United States Constitution and a count under Title II of the Americans with Disability Act

(ADA).  In this recommended decision I address the motion for summary judgment filed by

Albert Cichon, a physician assistant employed by Allied Resources for Correctional Health, Inc.,

a corporation which supplied healthcare professionals to county correctional facilities in Maine

including the York County Jail.  Leavitt was detained at the York jail and in defending this

motion for summary judgment he asserts that his medical care was inadequate during that

detention from September 6, 2006, through February 17, 2007.  I recommend that the court grant

Cichon's motion.

*Discussion*

## I.  ADA CLAIM

Leavitt concedes that Cichon, a defendant sued in his individual capacity, is entitled to summary judgment on his Americans with Disabilities Claim.  (Pl's Opp'n Mem. at 26.) Accordingly, I recommend that the Court enter judgment in favor of Cichon on this count.

## II.  EIGHTH AMENDEMNT CLAIM

### A.  Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil Procedure 56(c)).  Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.

### Eighth Amendment Denial of Adequate Medical Care Standard

As a detainee at the York County Jail Leavitt was entitled to "'the minimal civilized measure of life necessities,'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), and the denial of necessary medical care can arise to the level of an Eighth Amendment violation, see generally Farmer v. Brennan, 511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (citation omitted). However, negligence and medical malpractice are not actionable. Daniels v. Williams, 474 U.S. 327 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence); accord Estelle, 429 U.S. at 105-06.

### Facts[1]

The parties think that the following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

---

[1] The following facts are a combination of the statement of facts and responses thereto unique to the Cichon motion and the relevant additional statements of facts propounded by Leavitt and responded to by the defendants in a united response. Therefore, when I discuss disagreements as to the additional facts I describe the response as that of the defendants as opposed to only Cichon.

3

There is no dispute that Raymond Leavitt was incarcerated at the York County Jail from September 6, 2006, through February 17, 2007, for a period of 167 days.  (SMF ¶ 1; Resp. SMF ¶1.) [2]  At the time of his incarceration at the York County Jail, Leavitt was suffering from HIV, Hepatitis C, a bipolar disorder, anxiety, and a hypothyroid condition.  (SMF ¶ 2; Resp. SMF ¶2.)

Alfred Cichon is a Physician Assistant employed by Allied Resources for Correctional Health, Inc. ("ARCH"), a corporation which supplied healthcare professionals to county correctional facilities in Maine including the York County Jail. (Cichon SMF ¶ 3; Cichon Aff. ¶¶ 1, 3.) During Leavitt's incarceration at the York County Jail, Cichon was president and a major shareholder in ARCH, a private company which provided contract health-care services to inmates at the York County Jail, and he was the physician assistant who worked at the jail most frequently, about 16 hours per week. (Resp. SMF ¶ 3; SAMF ¶ 17; Resp. SAMF ¶ 17.)   While Leavitt maintains that there was no physician providing direct patient care at the jail during Leavitt's incarceration (SAMF ¶ 18; Cichon Dep. at  17-18), Cichon represents that, at all times relevant to Leavitt's incarceration at the York County Jail, there was a supervising physician who was available for consultation, reviewed dictations regarding acute office visits, and provided general guidance as to patient care (Resp. SAMF ¶ 18; Cichon Dep. at 17-18.)

According to Leavitt, before he entered the York County Jail on September 6, 2006, he had been taking his HIV medications, Kaletra and Truvada, on a regular basis. (SAMF ¶ 1; Leavitt Dep. at 19-23.)  The defendants respond that the medical records provided by the Androscoggin Jail indicated that Leavitt had been non-compliant taking his HIV medications and that he had not received his HIV medications on a continuous basis from January 4, 2006,

---

[2]     I use the date of September 6 as opposed to September 9 as indicated in Paragraph 1 of Leavitt's Statement of Additional Facts.  It is not a material distinction.

4

through September 6, 2006.  (Resp. SAMF ¶ 1; SMF ¶ 25; Resp. SMF ¶ 25.)  The medical

records reviewed by Cichon indicated that Leavitt had a history of alcohol abuse which may

have impeded his compliance with taking his HIV medications.  (Resp. SAMF ¶ 1; Cichon Aff.

¶49.)  The medical records from the Androscoggin Jail indicate that Leavitt reported in July 2006

that he had left his backpack containing his medications in a friend's van which went out of state

for two weeks. That entry indicated to Cichon that Leavitt had been non-compliant with taking

his HIV medications during that two-week period.  (Resp. SAMF ¶ 1; Cichon Aff. ¶ 50.) A

"medications verification note" received from the Androscoggin Jail indicated that Leavitt had

been prescribed a one-month refill of Kaletra on April 15, 2006, and that nearly two and a half

months had passed without a refill. (Resp. SAMF ¶ 1; Cichon Aff. ¶ 51.) This note also indicated

that Leavitt's prescription for Truvada was last refilled on April 7, 2006, but was never picked

up. (Resp. SAMF ¶ 1; Cichon Aff. ¶ 52.)

At the time of his booking at the York County Jail, Leavitt insists, he told the booking

officer he was taking his HIV medications. (SAMF ¶ 2; Leavitt Dep. at 22-23.)  The defendants

respond that the intake form completed by intake personnel at the time of Leavitt's admission to

the York County Jail indicates that Leavitt did not report to the intake officer that he had any

medical problems or that he was taking any regular medications.   Handwritten notes on the first

page of the intake form reflect that someone from the medical staff reviewed that information

and noted that Leavitt had no known allergies and was not taking any medications.  (Resp.

SAMF ¶ 2; Cichon Aff. ¶¶ 10,11.)

Per Leavitt, at his request, Charles Kelley, a friend of his, brought Leavitt's HIV

medications to the York County Jail, but a jail officer refused to accept them.  (SAMF ¶ 3;

Charles Kelley Dep. at 8- 9, 37.) The defendants note that Kelley did not talk to any medical provider during this visit.  (Resp. SAMF ¶ 3; Kelley Dep. at 27.)

About four days after his incarceration at the York County Jail, Leavitt reports that he began experiencing sweats, chills, fevers, nausea, vomiting and general malaise, symptoms he believed to be related to his HIV.  (SAMF ¶ 4; Leavitt Dep. at 26, 49.) The defendants respond that Leavitt did not tell Cichon that he was experiencing any of these symptoms. (Resp. SAMF ¶¶ 4, 6; Cichon Aff. ¶ 15.)

Leavitt saw Cichon on one occasion, on October 5, 2006. (SMF ¶ 4; Resp. SMF ¶ 4.)  At the time of that visit, which occurred in the medical office at the jail, Cichon performed an examination of Leavitt. Cichon did not have available for him a completed health history form for Leavitt. (SMF ¶ 5; Resp. SMF ¶5.)   In conjunction with Cichon's physical examination of Leavitt, a nurse took Leavitt's pulse and temperature, which fell within the normal parameters. (SMF ¶ 6; Resp. SMF ¶6.)   Cichon noted as the result of his examination, that Leavitt's health in general appeared to be normal including an examination of his eyes, ears, nose, mouth, throat, neck, chest, heart and lungs, as well as his abdomen.   Cichon performed a brief examination of Leavitt's neurological functioning and Leavitt's ability to use extremities including his ability to walk, hear, and see.  These all appeared to be normal.  (SMF ¶ 7; Resp. SMF ¶7.)

 At the conclusion of his examination, Leavitt informed Cichon that Leavitt was HIV positive and gave a history of having gone without HIV medication from the time of his incarceration at the jail. (SMF ¶ 8; Resp. SMF ¶8; SAMF ¶ 8; Resp. SAMF ¶ 8.)  Leavitt maintains that he told Cichon that it was not right he was being kept off his HIV meds since they had been keeping him alive for the past ten years and keeping his symptoms and a low blood count from claiming him as a victim of AIDS.  (SAMF ¶ 9; Leavitt Dep. at 40 -41.)

6

Either Leavitt or Cichon mentioned the fact that Leavitt was not on medications and Cichon referred to the intake booking sheet which reflected that Leavitt had told the officers he was not on medications. Cichon and Leavitt then discussed what pharmacies Leavitt had used and where Leavitt had been treated so that Cichon could obtain those medical records. (Resp. SAMF ¶ 9; Cichon Dep. at 30; SMF ¶ 12; Resp. SMF ¶ 12.) Cichon told Leavitt that he would order a blood test to see where Leavitt was and get his medications verified and to determine how compliant Leavitt had been with the medications and that he would take the next steps that were appropriate based on what the findings were from the test results and medical records. (Resp. SAMF ¶ 9; Cichon Depo. at 31:1-5.)

Based on his examination of Leavitt, Cichon concluded that Leavitt did not have symptoms consistent with a positive HIV status in that he had no fever, his pulse was normal, and it was Cichon's opinion that based on Leavitt's objective symptoms that Leavitt's condition was stable. (SMF ¶ 9; Cichon Aff. ¶15.)[3] Leavitt did not report or exhibit any symptoms that would indicate that he was HIV positive (Resp. SAMF ¶ 4; Cichon Dep. at 30:7-10, 54:3-9.); his health appeared to be normal (Resp. SAMF ¶ 4; SMF ¶ 7; Resp. SMF ¶ 7). Leavitt states that he was vomiting three times a day as of October 2006. (Resp. SAMF ¶ 4; Leavitt Dep. at 40:4-6.) Cichon replies that if Leavitt had been experiencing severe night sweats and vomiting while at the York County Jail, it would have been the normal practice for the jail staff to bring those symptoms to the attention of the medical staff, which it did not do. (Resp. SAMF ¶ 4; Cichon Aff. ¶ 8.) Vomiting would not be a symptom that one would attribute to HIV disease, although loss of appetite may be a symptom. (Resp. SAMF ¶ 4; Pinsky Dep. at 21:15-19.)

---

[3]    Leavitt responds to this statement of fact by citing to his statements of additional fact 1 through 35, and maintaining that based on his description of interactions with Cichon a fact-finder could choose to disbelieve Cichon's version of the story.

Cichon knew at the time of his examination of Leavitt, that Leavitt had been without his medications for HIV treatment for at least one month, as he had first been incarcerated at the York County Jail on September 6, 2006. (SMF ¶ 10; Resp. SMF ¶ 10.) Because there is a risk when re-initiating medications after a break in treatment that a patient has built a resistance to those medications, and because Cichon wanted to obtain information regarding Leavitt's medical history, his HIV medications, his compliance with taking those medications and information regarding his current blood levels, Cichon did not immediately reinstate the medications that Leavitt reported taking for his HIV.  (SMF ¶ 11; Cichon Aff. ¶¶ 26, 27.) [4]

There is no dispute that Cichon discussed Leavitt's medical condition with him at the conclusion of the October 5 examination. He asked Leavitt where Leavitt had previously received treatment, including any jails in which he had been incarcerated. (SMF ¶ 12; Resp. SMF ¶ 12.)  Cichon entered an order for Leavitt to return to the medical clinic to have blood drawn so as to evaluate Leavitt's CBC differential, CD4 count, and to check his viral load. (SMF ¶ 13; Resp. SMF ¶ 13.)  Cichon ordered that the medical staff obtain medical records from each of the different facilities that Leavitt had reported had treated him and/or provided him with HIV medications. (SMF ¶ 14; Resp. SMF ¶ 14.)  Cichon could not immediately reinstate Leavitt's HIV medications without information regarding the nature of Leavitt's medications, his compliance with taking those medications, and information concerning his blood counts.  (SMF ¶ 15; Resp. SMF ¶ 15.)  There is no dispute that, given the fact that Leavitt had been off his medications for at least one month, it was the proper course of treatment for Cichon to test Leavitt's blood for the current CD4 count and viral load and to review Leavitt's prior medical

---

[4]      Leavitt responds to this statement of fact by citing to his statements of additional fact 1 through 35, maintaining that based on his description of interactions with Cichon a fact-finder could choose to disbelieve Cichon.

8

records before initiating treatment. (SMF ¶ 18; Resp. SMF ¶ 18.)    It was the proper course of action to defer the start of treatment until all of this information had been gathered. (SMF ¶ 19; Resp. SMF ¶ 19.)

According to Cichon, it was his intent to obtain additional information – medical records, pharmacy records, and clinical tests --  to provide appropriate medical care to Leavitt. (SMF ¶ 16; Cichon Aff. ¶29.) [5]  It was his intent to decide whether to initiate treatment or refer Leavitt to an infectious disease specialist once he had obtained the test results and the medical records as it was his experience that the specialists will not initiate treatment until these tests are performed. (SMF ¶ 17; Cichon Aff.  ¶¶28, 56.) [6]  There is no dispute that on October 5, 2006, after examining Leavitt, Cichon instructed the ARCH nursing staff to do a medication verification at the pharmacies Leavitt had utilized and to get his prior treatment records from Androscoggin, Kennebec, Cumberland, Knox, and Cumberland County jails and Portland Positive Health Care. Cichon also ordered a complete blood count with a differential, CD4 count and viral load for HIV.  (SAMF ¶; 19; Resp. SAMF ¶ 19.) Requests for Leavitt's medical records went out in accordance with Cichon's instructions on October 10, 2006. (SAMF ¶ 20; Resp. SAMF ¶ 20.)

Then there is the following key factual dispute -- material to Leavitt's Eighth Amendment claim against Cichon -- that is generated by Leavitt's additional facts. According to Leavitt, Cichon told Leavitt, "We don't give away [HIV] medications here at this jail because the jail is so small and we are not equipped financially to hold the burden of providing expensive medication, and … [you will] have to wait until you [get] to the Maine State Prison where they

---

[5]     Leavitt responds to this statement of fact by citing to his statements of additional fact 1 through 35, maintaining that based on his description of interactions with Cichon a fact-finder could choose to disbelieve Cichon's version of the story.

[6]     Once again, Leavitt responds to this statement of fact by citing to his statements of additional fact 1 through 35, and maintaining that based on his description of interactions with Cichon a fact-finder could choose to disbelieve Cichon's version of the story.

are able to pay for these medications." (SAMF ¶ 10; Leavitt Dep. at 42, Verified Sec. Am.

Compl. ¶ 6, Doc, No. 44-4.)  Cichon also purportedly told Leavitt, "You don't need to stay on

the [HIV] medications to be healthy, and just as soon as you get to the Maine State Prison they'll

fix you right up." (SAMF ¶ 11; Leavitt Dep. at 43; Verified Sec. Am. Compl. ¶ 8.)

     Cichon outright denies that he made these statements. (Resp. SAMF ¶¶ 10, 11; Cichon

Dep. at 81-82; Cichon Aff. ¶ 31.)  During the relevant period of time, Cichon was not under any

budgetary restrictions imposed by the jail as to the cost or amount of medication he could

prescribe. The jail paid for all medications, lab analysis, and for outside consultation.  (Resp.

SAMF ¶ 10;  Cichon Dep. at 24-25; SAMF ¶ 12; Resp. SAMF ¶12.) Cichon insists that financial

considerations did not play a role in his decision making with regard to his treatment of HIV and

Leavitt.  (Resp. SAMF ¶ 15;  Cichon Dep. at 83-84.)  He was never questioned by anyone in the

County government or Sheriff's department about the amount of money being spent on outside

consultants, referrals, lab tests, or medications. (Resp. SAMF ¶¶ 10, 15; Cichon Dep. at 28, 109-

10.)  When he treats a patient in the jail, Cichon does not typically know when that patient will

be released or transferred to another facility.  (Resp. SAMF ¶ 11; Cichon Aff. ¶33.)  At the time

of the October 5 examination, neither Leavitt nor Cichon knew how long Leavitt would be held

at the York County Jail. (Resp. SAMF ¶ 11; Leavitt Dep. at 33.) The drawing of Leavitt's blood

and Cichon's review of the medical records occurred after October 5, 2006, the date that Leavitt

states Cichon told him he would not be treating him for HIV.  (Resp. SAMF ¶11; Cichon Aff. ¶

77.)  According to Leavitt, Cichon was mindful of the cost of testing and treating inmates for

chronic conditions. (SAMF ¶ 15; Cichon Dep. at 110 -12.)

     Per Leavitt, in addition to discussing HIV with Leavitt on October 5, 2006, Cichon told

Leavitt he would not be tested or treated for Hepatitis C, because testing for Hepatitis C was

quite expensive and because treatment for Hepatitis C was not something that occurred in the jail setting, but that his Hepatitis C might possibly be treated at the Maine State Prison.  (SAMF ¶ 13; Cichon Dep at 107 -108.)[7]  Cichon admits that Leavitt told him that he was positive for Hepatitis C and asked for treatment of this condition.  Cichon told Leavitt that Hepatitis C was not something that would be treated at the jail because a patient must be sober for at least six months to institute treatment. He explained that Leavitt would need to have a physical evaluation to determine if he could tolerate the treatment as well as an evaluation for mental stability and that that was not something generally done in the jail because people did not stay in the jail long enough for that to be possible. Cichon did advise Leavitt that testing for Hepatitis C was quite expensive and that it was not done at the jail because treatment would not be rendered in the jail. Cichon did advise Leavitt that this treatment might be rendered in the prison.   (Resp. SAMF ¶¶ 13, 15; Cichon Dep. at 107-108.)  Cichon would not initiate an evaluation at the jail because it had been his experience that the prison did not necessarily accept tests and examinations performed at the jail. (Resp. SAMF ¶¶ 13, 15; Cichon Dep. at 110-12.)  Given Leavitt's history of alcohol abuse, it was appropriate to delay treatment for Hepatitis C as patients need to have stopped abusing alcohol for a number of months before treatment is instituted.  (Resp. SAMF ¶ 13; Valenti Dep. at 87:10-25.)

Pursuant to Cichon's order, Leavitt's blood was drawn on October 12, 2006 (SMF ¶ 20; Resp. SMF ¶ 20) and the medical staff obtained records from the Androscoggin County Jail, which included records from Positive Health Care of Portland, and from the Cumberland County Jail (SMF ¶ 21; Resp. SMF ¶ 21; SAMF ¶ 21; Resp. SAMF ¶ 21.).   When medical records or lab

---

[7]    Leavitt does not recall ever discussing his Hepatitis C condition with Cichon.  (Resp. SAMF ¶ 13; Leavitt Dep. at 44.)

test results become available at the York County Jail, they are attached to a clip board for

Cichon's review (SMF ¶ 22; Resp. SMF ¶ 22) and would have been reviewed by Cichon in the

ordinary course within a half week to a week after their receipt (SAMF ¶ 22; Resp. SAMF ¶ 22).

Cichon reviewed the records provided by the Androscoggin County Jail. These records reflected

that at the time of Leavitt's incarceration on July 11, 2006, his medical condition was normal and

that he did not complain of fatigue, night sweats, vomiting or other objective symptoms of HIV.

(SMF ¶ 23; Resp. SMF ¶ 23.)    These records indicated that Leavitt had been "restated" on his

HIV medications, but that he had been released as of August 11, 2006. (SMF ¶ 24; Resp. SMF ¶

24.)  The records indicated to Cichon that Leavitt had a history of alcohol abuse and that he had

been non-compliant with taking his HIV medications, and that Leavitt had not received his HIV

medications on a continuous basis from January 4, 2006, through September 6, 2006, as

reported.  (SMF ¶ 25; Resp. SMF ¶ 25; Resp. SAMF ¶ 1; Cichon Aff. ¶ 49; Resp. SAMF ¶ 23;

SMF ¶ 25; Resp. SMF ¶ 25.)   Leavitt's labs on April 6, 2006, had shown an undetectable viral

load of less than 75 and an abnormal CD4 count of 355.  (SAMF ¶ 23; Cichon Dep. at 63-64, 67-

68; Cichon Ex. 15, #77, 79; Ex. 16, #86, 87; Ex. 17, #90.)  According to Cichon the records he

reviewed from the Androscoggin Jail, which included records from Positive Health Care,

indicated a subjective report by Leavitt that he had a history of HIV for 15 years but did not

contain documentary evidence on that point.  (Resp. SAMF ¶ 23; Cichon Dep. at 65:9-14.)

The resulting lab report indicated a CD4 count of 415 on October 16, 2006, noting it was

below normal range, "indicative of immunodeficiency state and/or recent viral infection," and

which reported a viral load of 143,000 on October 23, 2006.  (SMF ¶ 27; Resp. SMF ¶ 27;

SAMF ¶ 24; Cichon Dep. at 58-59; Cichon Exs. 13 &14.)  Cichon adds that the final diagnosis

on the Flow Cytometry Report states: "Mild decrease in CD4 level and increase in CD8 subset,

12

indicative of immunodeficiency state and/or recent viral infection." (Resp. SAMF ¶ 24; Cichon Ex. 13.)   Both lab reports were sent to Cichon, the CD4 report being addressed to him at the ARCH office in Augusta and the viral load report to him at the York County Jail.  (SAMF ¶ 25; Resp. SMF ¶ 25.)  In the ordinary course of business, Leavitt's laboratory reports would have been delivered to the York County Jail medical office, where they would have been placed on a clip board and reviewed by Cichon each time he went to the jail. (SAMF ¶ 26; Resp. SAMF ¶26.)

Cichon maintains that, although he has no recollection of having seen this document, Cichon reviewed the results of the CD4 test for Leavitt. (SMF ¶ 26.)  Leavitt responds that, although Cichon claims not to have seen the lab reports, he is unable to explain why this happened and asserts that it was the only time in 17 years such an omission had occurred. (SAMF ¶ 27, Cichon Dep. at 61,74.)  This is an accurate summary of Cichon's testimony.   For his part, Cichon relies on his affidavit paragraph which represents that on September 8, 2009, the York County Jail provided its subpoenaed documents to him. These included a faxed document**,** with Cichon's initials on it, which suggests that he did review the CD-4 test results, although he has no recollection of ever having seen that document. However, these new documents from the York County Jail did not reflect that he had seen test results as to Leavitt's viral load as that test result was not initialed by Cichon.   (Resp. SAMF ¶ 27; Cichon Aff. ¶ 58.)  Cichon insists he did not review the results of Leavitt's viral load test and that this information regarding Leavitt's viral load was important to Cichon for evaluating the proper treatment to render to Leavitt. In addition, he knew he would need to provide this test result to any specialist to whom he might refer Leavitt. Had he reviewed the viral load test results, it would have been Cichon's normal routine and practice to request that Leavitt be brought to the medical office so that he could

13

discuss the findings and arrange for Leavitt's referral to an appropriate specialist. (SMF ¶¶ 28,29, 30; Resp. SAMF ¶ 28; Cichon Aff.  ¶¶ 59, 60.)[8] Since a copy of the viral load report appears in the York County Jail's file it is likely that this record was filed by other medical staff personnel without ever being shown to Cichon.  (Resp. SAMF ¶ 27; Cichon Aff. ¶ 61.)  Cichon would have considered a viral load of 143,000 to be higher "than [he] would like to see it" and would have considered such a lab result to "have been just cause to move precipitously" to refer Leavitt to an infectious disease specialist.  (SAMF ¶ 28; Cichon Dep. at 84-85.)

Cichon had no further clinical interaction with Leavitt following the jail's receipt of the viral load test results either directly through a clinic visit or through a request for treatment. (SMF ¶ 31; Resp. SMF ¶ 31.) In other words, during the approximate five-month period that elapsed between Cichon receiving Leavitt's blood test results and prior treatment records, and Leavitt's transfer to the Maine State Prison, Cichon never saw Leavitt again, did not order a referral to an infectious disease specialist, or take any other steps to follow up on Leavitt's HIV condition.  (SAMF ¶ 29; Cichon Dep. at 73.)

Leavitt understood during his period of incarceration at the York County Jail that the method for requesting medical treatment or medications at the jail was to file an inmate medical request form. (SMF ¶ 32; Resp. SMF ¶ 32.)  While incarcerated at the York County Jail, Leavitt filed three medical requests forms, which were evaluated and acted on within days of each request by Cichon. (SMF ¶ 33; Resp. SMF ¶ 33; Resp. SAMF ¶ 14.)   These inmate medical request forms included a request for Fixadent to treat Leavitt's dentures, dated September 12, 2006, and two requests for antibiotic ointment to treat Leavitt's psoriasis. (SMF ¶ 34; Resp. SMF

---

[8]        Leavitt responds to these statements of fact by citing to his statements of additional fact 1 through 35, by maintaining that based on his description of interactions with Cichon a fact-finder could choose to disbelieve Cichon's version of the story.

¶ 34.)  Cichon denied written requests by Leavitt, dated October 4, and October 8, 2006, for triple antibiotic ointment for psoriasis of Leavitt's hand and face, on each occasion without seeing Leavitt for his complaints. (SAMF ¶ 14;Cichon Dep. at  46 - 47, 55-56; Exs. 7 & 8.)  With regards to the September 12, 2006, request for Fixodent for his dentures, it was an appeal for hygiene supplies as opposed to a complaint about a health issue, so on September 14, 2006, Cichon referred that request back to the Corrections Department to address.  (Resp. SAMF ¶ 14; Cichon Aff. ¶ 66.)   He denied the first request for triple antibiotic ointment as it was not an appropriate treatment for psoriasis and because he had not noted the existence of psoriasis on Leavitt's hands during his physical examination which he had performed one day earlier.  (Resp. SAMF ¶ 14; Cichon Aff. ¶ 67; Cichon Dep. at  54:18). On October 10, 2006, Cichon reviewed Leavitt's inmate medical request form dated October 8, 2006, which was another submission for triple antibiotic ointment. At that time, he again denied the request because triple antibiotic ointment is not an appropriate treatment for psoriasis and because he had not noted the existence of psoriasis on Leavitt's hands during the physical examination he had performed five days earlier. (Resp. SAMF ¶ 14; Cichon Aff. ¶¶ 68-69.)

While at the York County Jail from September 6, 2006, through February 17, 2007, Leavitt never submitted an inmate medical request form for treatment related to his HIV disease or seeking treatment or medications for HIV.  (SMF ¶ 35; Leavitt Dep. at 36:4-8; Cichon Aff. ¶ 72; Resp. SAMF ¶ 5; Cichon Aff. ¶¶ 70, 73.) Cichon notes that Leavitt never requested any further treatment or follow-up after the filing of his October 8, 2006, inmate request form relating to his psoriasis. (Resp. SAMF ¶ 29; Cichon Aff.  ¶¶ 62, 72.)   Leavitt adds the while he did not submit an official inmate medical request he did send one or more letters – prior to being examined by Cichon -- to Cichon and the jail medical department requesting HIV treatment  and

15

medication.  (Resp. SMF ¶ 35; Leavitt Dep. at 27-28, 32-33, 50; SAMF ¶ 5.)  Cichon points out that Leavitt does not know for sure whether he wrote the letter prior to or after his examination by Cichon.  (Resp. SAMF ¶ 5; Leavitt Dep. at 32-33.) He submitted the letter to the jail officers and he never gave any letter to any member of the medical staff. (Resp. SAMF ¶ 5; Leavitt Dep. at 34.) In sum, Cichon received three inmate medical request forms from Leavitt, to which he timely responded, and not one of which requested treatment for HIV or requested HIV medications.  (Resp. SAMF ¶ 5; SMF ¶ 33; Resp. SMF ¶ 33; Cichon Aff. ¶ 72; Leavitt Dep. at 36.)

Cichon professes that he never intentionally denied Leavitt appropriate care or treatment or medications during the course of Leavitt's incarceration at the York County Jail. (SMF ¶ 36; Cichon Aff.  ¶76.) [9]   According to Cichon it has always been his practice to treat patients with HIV with an understanding that the condition warrants medical treatment and it was with that understanding that he attempted to treat Leavitt, as evidenced by the fact that he requested blood tests and ordered Leavitt's past medical records. (SMF ¶ 37; Cichon Aff.  ¶¶ 74, 75.)[10]  Cichon understood that HIV was a serious and potentially life threatening medical condition.  (SAMF ¶ 30; Resp. SAMF ¶30.)  According to Leavitt, Cichon's understanding was that an HIV positive patient should be kept consistently on HIV medications because of the potential to develop resistance to the medications. (SAMF ¶ 31; Cichon Dep. at  76: 3-11.)  Cichon adds that  he also understood that when an interruption in treatment occurred that there was a risk in simply reinstituting medications without information regarding the nature of the patient's  medications, his compliance with taking the medications, and information regarding blood counts. (Resp.

---

[9]    Again, Leavitt responds to this statement of fact by citing to his statements of additional fact 1 through 35, maintaining that, based on his description of interactions with Cichon, a fact-finder could choose to disbelieve Cichon's version of the story.
[10]    Leavitt denies this fact without providing any record citation.  (Resp. SMF ¶ 37.)

SAMF ¶ 31; Cichon Aff. ¶26.)  At the time Cichon first saw Leavitt, Leavitt had been off medications for at least one month.  (Resp. SAMF ¶ 31; SMF ¶ 10; Resp. SMF ¶ 10.)  Because Leavitt had been off medications, Cichon could not immediately reinstate Leavitt's HIV medications without information regarding the nature of Leavitt's medications, his compliance with taking those medications and information concerning his blood counts. (Resp. SAMF ¶ 31; SMF ¶ 15; Resp. SMF ¶ 15.)  Therefore, he requested medical records and blood tests to evaluate whether Leavitt's medications could simply be restarted or wither he needed another course of treatment.  Cichon expected that he would need to refer Leavitt to an infectious disease specialist once he had the test results.  (Resp. SAMF ¶ 31; Cichon Aff. ¶¶27, 28.)  In following this course, Cichon maintains that he followed the appropriate standard of treatment. (Resp. SAMF ¶ 31; SMF ¶¶ 18,19; Resp. SMF ¶¶ 18, 19; Valenti Dep. 73:21-74:12.)

Leavitt did not lose weight while at the York County Jail.  (SMF ¶ 38; Resp. SMF ¶ 38; Resp. SAMF ¶¶ 4, 36.) Leavitt's normal weight is about 145 pounds. (Resp. SAMF ¶ 4; Leavitt Dep. at 96:24-97:1.) Leavitt gained approximately 16 pounds during his incarceration at the jail. Leavitt weighed 158 pounds in July 2006 before his admission.  (Resp. SAMF ¶ 4; Valenti Dep. at 109:24-110:1.) His initial screening at the Maine State Prison reflects that in February of 2007, Leavitt weighed 174 pounds. (Resp. SAMF ¶ 4; Valenti Dep. at 111:6-7.) Weight loss is one facet in deciding the seriousness of the disease as it can be indicative of problems such as diarrhea and wasting syndrome.  (Resp. SAMF ¶ 36; Valenti Dep. at 106:7-15.) According to Cichon, Leavitt did not have any fatigue or GI problems related to HIV disease while at the York County Jail. (SMF ¶ 39; Valenti Dep. at 112:5-14.)  Leavitt indicated that his night sweats began

in July of 2007.  (Resp. SAMF ¶ 4;  Leavitt Dep. at 90:20-91:3.)[11]  Leavitt did not have thrush

while at the York County Jail. (SMF ¶ 41; Resp. SMF ¶ 41; Resp. SAMF ¶ 36; Valenti Dep. at

104:1-4.)

Leavitt responds that about four days after his incarceration at the York County Jail, he

began experiencing sweats, chills, fevers, nausea, vomiting and general malaise, symptoms he

believed to be related to his HIV.  (Resp. SMF ¶ 39; Leavitt Dep. at  26: 6 – 17, 49; 13 – 17.)

When Leavitt was finally examined by Cichon at the York County Jail on October 5, 2006,

Leavitt told Cichon that he was experiencing night sweats, chills, fever nausea and vomiting.

(Resp. SMF ¶ 39; Leavitt Dep. at 39: 5 – 15; SAMF ¶ 6.) By this date, Leavitt reports that he was

so fatigued, he felt like he couldn't do anything and was sleeping about 16 hours a day. (Resp.

SMF ¶ 39; Leavitt Dep. at 48-49; SAMF ¶ 7.)   The defendants also add that Leavitt has been

diagnosed with bipolar disorder and when he is experiencing a period of depression he sleeps a

great deal, up to 18 to 20 hours a day.  (Resp. SAMF ¶ 7;  Leavitt Dep. at 66—68.)  Bipolar

disorder would cause one to experience fatigue, as would Hepatitis C.  (Resp. SAMF ¶ 7; Valenti

Dep. at 107.) Leavitt reports that he is tired all the time even during those periods of time that he

is receiving HIV medications.  (Resp. SAMF ¶ 7; Leavitt Dep. at 79.)

According to Cichon, Leavitt's CD4 counts rose during the course of his incarceration at

the York County Jail. (SMF ¶ 40; Resp. SAMF ¶ 36; Valenti Dep. at 92: 15-21) and  Leavitt did

not sustain any harm as the result of the delay in the reinitiation of antiretroviral therapy during

the course of his incarceration at the York County Jail while under the care of Cichon (Resp.

SAMF ¶¶ 36,42 ; Pinsky Dep. at 31:13-21).   Leavitt observes that the most recent CD4 count

prior to Leavitt's incarceration was April 2006, six months earlier, and the next was in February

---

[11]        Cichon maintains that Leavitt is a "poor historian." (Resp. SAMF ¶ 4; Valenti Dep. at 97:20-21.)

2007.  There can be a delay in CD4 count decline after antiretroviral therapy is discontinued. (Resp. SMF ¶ 40; Valenti Dep. at 92-93, 157.)   It is Leavitt's contention that the long delay in the re-initiation of Leavitt's antiretroviral therapy for HIV, starting with his incarceration at York County Jail on September 6, 2007, and continuing through his incarceration at Maine State Prison, constituted a continuum of harm, which led to Leavitt's becoming immune compromised and suffering a dramatic drop in his CD4 count by April of 2008.  (SAMF ¶ 36; Valenti Dep. at 91 - 95, 98.)[12]

According to the defendants, today Leavitt's HIV disease is stable, and his CD4 count is within an acceptable range above 500. (SMF ¶ 49; Resp. SAMF ¶ 36; Valenti Dep. at 20-21; Smith Dep. at 17:1-14)  His immune system is adequate to deal with any of the opportunistic infections that tend to infect persons who are HIV positive, (Resp. SAMF ¶ 36; Valenti Dep.  at 40:12-41:7); it is impossible to know what subpopulations of Leavitt's CD4 cells, if any, have been destroyed, (Resp. SAMF ¶ 36; Valenti Dep. at 17-20, 165-166); and it is impossible to quantify Leavitt's increased risk of disease (Resp. SAMF ¶ 36;  Valenti Dep. at 41:8-42:5). According to Cichon, there are no peer-reviewed medical studies that indicate that once a patient has achieved significant immunologic recovery with CD4 counts over 500 that those patients experience long-term risks based on a prior history of CD4 counts. (SMF ¶ 50; Pinsky Dep.  at 34- 35, 62.)

Leavitt was first seen at the Virology Treatment Center on May 9, 2007. (SMF ¶ 45; Resp. SMF ¶ 45.) At the time of the examination at the Virology Treatment Center, Leavitt had no physical outward signs of HIV disease. (SMF ¶ 46; Resp. SMF ¶ 46.)  At the time of the May

---

[12]      The defendants respond that this statement should be stricken. They insist that whether an insult to the immune system, including symptoms of the kind reported by Leavitt, constitutes "harm" actionable under the Eighth and Fourteenth Amendments and Section 1983 is an issue of law.  (Resp. SAMF ¶ 36.)

19

9, 2007, examination, Dr. Smith of the Virology Treatment Center had for his review a blood test

result taken in February 2007 which indicated a CD4 count of 460. (SMF ¶ 47; Resp. SMF ¶ 47.)

On May 9, 2007, the Virology Treatment Center recommended rescheduling Leavitt for an office

visit and repeating the blood test before making recommendations for treatment. (SMF ¶ 48;

Resp. SMF ¶ 48.)  Since beginning antiretroviral therapy in July of 2008, Leavitt's CD4 count

has recovered into the normal range. (SMF ¶ 51; Pinsky Dep. at  34:11-14.) Leavitt points out

that Doctor Valenti described Leavitt's December 2008 CD4 count of 550 as a little low.  (Resp.

SMF ¶ 49; Valenti Dep. at 20-21) and noted that Leavitt's CD4 count has dropped to 252 as of

February 27, 2009 (Resp. SMF ¶¶ 49, 51; SAMF ¶ 159; Smith Dep. at 54).[13]

     Leavitt insists that there is a great body of medical literature suggesting that the lower

someone's CD4 count when they initiate or reinitiate HIV treatment, the lesser the expectation of

long-term immunologic recovery and the greater the risk of both HIV and non-HIV related

complications over the short-term.  (Resp. SMF ¶¶ 42, 50; Pinsky Dep. at 34: 8 – 21, 112 -116,

128 – 131.)  The interruption of Leavitt's antiretroviral therapy from September 6, 2006, to July

7, 2008, likely damaged subsets of his CD4 cells, making him statistically more likely to be

susceptible to opportunistic infections and/or cancer in the future.  (Resp. SMF ¶¶ 42, 50; Valenti

Dep. at 17 -19, 46-  48, 140,  171 - 72.)  Most medical studies have shown that if patients begin

treatment at lower CD4 counts, their risk of not fully reconstituting the normal numbers of CD4

subsets is greater. (Resp. SMF ¶¶ 42, 50; Pinsky Dep. at  109 -110.) There is medical evidence

that controlling HIV disease slows the progression of Hepatitis C.  (Resp. SMF ¶ 42; Pinsky

Dep. at  68: 2 - 15.)[14]

---

[13]    Leavitt seems to have mis-cited to his Statement of Additional Fact Paragraph 154.

[14]    Leavitt also reiterates that about four days after his incarceration at the York County Jail he began
experiencing sweats, chills, fevers, nausea, vomiting and general malaise, symptoms he believed to be related to his

According to Cichon, the standard for determining a patient's risk for developing clinical symptoms of HIV disease and for determining when to initiate antiretroviral therapy is the CD4 blood count. (SMF ¶ 43; Pinsky Dep. at 21.)  Leavitt adds that the viral load is also helpful in making this determination.  (Resp. SMF ¶ 43; Pinsky Dep. at 22:6-15.)  Guidelines promulgated by the Department of Health and Human Services (DHHS) pertinent to this time period indicate treatment should be instituted in patients who have not previously treated for HIV when their counts fall below 350.  While this standard was promulgated to deal with the novel patient -- one who had never received therapy -- it does provide guidance to practitioners when initiating therapy to experienced patients. (SMF ¶ 44; Pinsky Dep at 24: 6-22.)  Leavitt retorts that, although DHHS "Guidelines for the Use of Antiretroviral Agents in HIV-1- Infected Adults and Adolescents," published on May 4, 2006, recommended offering antiretroviral therapy to HIV patients with CD4 counts between 201 and 350, and though Leavitt's CD4 count in October 2006 was 415, Leavitt should have been immediately restarted on antiretroviral therapy as soon as possible, because this guideline only applied to new patients not patients who had already undergone therapy, because Leavitt had a history of low CD4 counts, and because he had the related health problem of Hepatitis C.  (Resp. SMF ¶ 44; SAMF ¶ 116; Valenti Dep. at  32 -- 33, 98 - 101, 125 -26,  Ex. 2 at  8.)

According to Leavitt, Cichon was given a letter of guidance by the Maine State Board of Licensure in Medicine on October 11, 2005, for withholding medications from another patient

---

HIV.  (Resp. SMF ¶ 42; Leavitt Dep. at  26: 6 – 17, 49; 13 - 17.)  When he was finally examined by Cichon on October 5, 2006, Leavitt told Cichon that he was experiencing night sweats, chills, fever, nausea and vomiting.  (Resp. SMF ¶ 42; Leavitt Dep. at 39: 5 – 15.)  At that point, Leavitt was so fatigued, he felt like he couldn't do anything and was sleeping about 16 hours a day. (Resp. SMF ¶ 42; Leavitt Dep. at 48-49.)  Symptoms of HIV include fevers, night sweats, loss of appetite, loss of weight, wasting syndrome, chronic diarrhea, thrush, leukoplakia, and psoriasis and seborrheic dermatitis.  (Resp. SMF ¶ 42;  Pinsky Dep. at 21- 22; Valenti Dep. at 106 - 107; SAMF ¶ 16; Resp. SAMF ¶ 16.)

who had potentially serious medical problems, "without appropriate evaluation" and "with no clear reason that the patient could not receive them." (SAMF ¶ 32; Cichon Dep. at 90: 17 – 22; Ex. 14.) Cichon was also given a letter of guidance by the Maine State Board of Licensure of Medicine on April 11, 2007, for changing the frequency of dosage of medication of another patient without informing the patient, where the patient's physician had prescribed the medication four times a day, the jail had not wanted medications passed out more than twice a day, and Cichon had changed the prescription frequency to twice a day without informing the patient. (SAMF ¶ 33; Cichon Dep. at 86-87; Ex. 22.) Cichon was also reprimanded and his physician assistant license suspended by the Maine State Board of Licensure of Medicine for 90 days, from May 8 to August 8, 2007, for fraud and deceit and unprofessional conduct as a result of "providing medical services as a physician assistant without having a supervisory physician and/or by failing to notify the medical Board that he no longer had a supervisory physician licensed by the Board and/or by misrepresenting to the Medical Board staff the status of his license and supervisory relationship through the Board of Osteopathic Licensure." (SAMF ¶ 34; Cichon Dep. at 87 – 88; Ex. 23.) Cichon entered into a consent agreement with the Board of Osteopathic Licensure on January 15, 2008, in which he admitted to underlying violations of his physician assistant's license, set forth in paragraphs 32 through 34 above, as well as two other violations. (SAMF ¶ 35; Cichon Dep. at 93-94; Ex. 27.)

Cichon asserts that these statements of fact should be stricken. (Resp. SAMF ¶¶ 32-35.) He contends, pursuant to Local Rule 56(e), that this statement should not be considered by the Court as this is not a statement of fact. Rather they are attacks on Cichon's credibility that would be for the jury to resolve. (Credibility is an issue in this case: In his response to Cichon's Statement of Material Facts ¶¶ 9, 11, 16, 17, 26, 28, 29, 30, 36, Leavitt has asserted that the

22

Court can disregard Cichon's statements because of his lack of credibility.)   Additionally, Cichon insists, these Letters of Guidance should not be admitted because Cichon cannot discuss the substance of the letters without risking revealing patient confidentiality. Finally, Letters of Guidance are issued by the Maine Board of Licensure solely as guidance to medical providers, they are not findings of a violation of any rules or standards.

With respect to the substance of the board's findings, Cichon responds that in order to administer the medications four times a day, the jail would have had to finance extra staffing which it declined to do.   Cichon contacted the provider who assured Cichon that it would be acceptable to administer the medication twice a day versus four times a day.   Cichon objects to the Board's finding in that he told the patient that the medicine would be changed to twice daily. (Resp. SAMF ¶ 33; Cichon Dep. at 86:24-87:13.)  At all times relevant to Leavitt's incarceration at the York County Jail, Cichon had a plan of supervision with Dr. Brazalovich who saw and reviewed dictations, discussed patients with him and contributed to patient care. Before that, Dr. Abrahamson provided supervision for Cichon. At all times, Cichon was being supervised by a physician. (Resp. SAMF ¶ 34; Cichon Dep. at 89:10-25.)

B. **_Recommended Resolution of Leavitt's Eighth Amendment Claim against Cichon_**

There are factual disputes in the summary judgment record applicable to Cichon's motion but none of these disputes are sufficient, separately or together, to justify sending Leavitt's case against Cichon to trial.  There is a dispute as to whether or not Leavitt told intake staff that he was taking medications; Leavitt says he did and the intake form says he did not.  It may be that Leavitt's friend attempted to bring Leavitt his HIV medications, but there is no evidence that any medical staff learned of this stymied transaction.   There is no dispute that, given the fact that Leavitt had been off his medications for at least one month, it was the proper course of treatment

23

for Cichon to test Leavitt's blood for the current CD4 count and viral load and to review

Leavitt's prior medical records before initiating treatment and that it was the proper course of

action to defer the start of treatment until all of this information had been gathered.   Cichon

maintains that, although he has no recollection of having seen this document, Cichon reviewed

the results of the CD4 test for Leavitt which revealed a CD4 count of 415. Cichon claims not to

have seen the lab reports, but he is unable to explain why this happened and asserts that it was

the only time in 17 years such an omission had occurred.  Leavitt's attempts to raise a factual

dispute about Cichon making decisions on his testing based on cost constraints falls flat as there

is no dispute that Cichon actually ordered the tests following his October 5, 2006, examination of

Leavitt.   He also ordered and reviewed Leavitt's previous medical records.

    Cichon had no further clinical interaction with Leavitt following the jail's receipt of the

viral load test results either directly through a clinic visit or through a request for treatment.  It

may well have been negligent for Cichon not to follow-up on Leavitt's HIV condition after his

October examination and the ordering of tests; Cichon acknowledges "that the care given Mr.

Leavitt was not optimal" and that a referral ought to have been made (Reply Mem. at 5-6). See

Daniels v. Williams, 474 U.S. at 666; accord Estelle, 429 U.S. at 105-06.  But it is also

undisputed that Leavitt, who submitted three inmate medical request forms after this visit, did

not attempt to seek further action apropos his HIV treatment and he did not report sweats, chills,

fevers, nausea, vomiting and general malaise to the medical department after his October 5,

2006, examination.  Leavitt does claim that Cichon told him that the jail did not give away HIV

medications because the jail is so small and they are not equipped financially to bear the burden

of providing expensive medication and that Leavitt would have to wait until he got to the Maine

State Prison where they are able to pay for these medications.  He also reports that Cichon told

him he did not need to stay on the HIV medications to be healthy, and just as soon as he got to the Maine State Prison they would fix him up.  Cichon flatly denies making these statements but, even if he did, they are insufficient in the context of the rest of the summary judgment record to create a triable cruel and unusual punishment case against Cichon.  Although I do not agree with Cichon that the facts pertaining to the Board of Licensure should be stricken, and I do view the evidence as troubling, I do not think that this evidence is sufficiently linked to the facts of Leavitt's case to warrant sending this case to trial based on the entire summary judgment record. Cichon may be incompetent in his job but incompetency or negligence is not the equivalent of the "'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (citation omitted).

My recommendation is to grant summary judgment because Leavitt has failed to create a genuine dispute of fact that Cichon's medical care of Leavitt rises to the level of cruel and unusual punishment.  However, I add that there is also a possible alternative ground for granting judgment in favor of Cichon; Leavitt has insubstantial proof of injury caused by Cichon. With respect to Leavitt's health during his time at the jail, he did not lose weight during this stay. Regarding the longer-term ramification of the absence of treatment of Leavitt's HIV condition during his time at the York County Jail, Leavitt was first seen at the Virology Treatment Center on May 9, 2007, and at the time, Leavitt had no physical outward signs of HIV disease.  A blood test result taken in February 2007 indicated a CD4 count of 460.   In May 2007, approximately three months after Leavitt's transfer from the York County Jail, the Virology Treatment Center recommended rescheduling Leavitt for an office visit and repeating the blood test before making recommendations for treatment. Since beginning antiretroviral therapy in July of 2008, Leavitt's CD4 count has recovered into the normal range.  Leavitt attempts to make much of the fact that

25

his CD4 count has dropped to 252 as of February 27, 2009, (a drop in CD4 levels the defendants link to Leavitt's treatment for Hepatitis C).[15] However, this event was a full two years after Leavitt's transfer to the Maine State Prison, and it is far too tenuous a bit of evidence on which to pin liability on Cichon, especially in view of the allowed evidence that as of September 2009, his counts have rebounded to an acceptable range above 500.

## CONCLUSION

For these reasons I recommend that the Court grant the motion for summary judgment (Doc. No. 108).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 31, 2009

---

[15]     In fact, in responding to the State Defendant's motion for summary judgment, Leavitt concedes that his CD4 count dropped to 252 because he began receiving Hepatitis C treatment which lowered his total white blood cell count and subsequently his absolute CD4 count. (State SMF ¶ 77; Resp. SMF ¶ 77.)   The percent CD4 count of 36 percent actually was an increase from Leavitt's previous CD4 percent. (State SMF ¶ 78; Resp. SMF ¶ 78.)  Dr. Smith interpreted the results to mean that Leavitt's immune system was "better than it looks based on the absolute count." (State SMF ¶ 79; Resp. SMF ¶ 79.)