UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RAYMOND LEAVITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 8-132-B-W |
| | ) | |
| CORRECTIONAL MEDICAL SERVICES, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**RECOMMENDED DECISION ON MOTION
FOR SUMMARY JUDGMENT (Doc. No. 111)**

Raymond Leavitt has filed a civil rights action seeking remedy for alleged denial of adequate medical care during the time he was an inmate at the Maine State Prison (MSP). Leavitt's complaint has a count under the Eighth Amendment of the United States Constitution and a count under Title II of the Americans with Disability Act (ADA). This recommendation addresses a motion for summary judgment pressed by Correctional Medical Services (CMS), the private contractor for medical care at the Maine State Prison during the times relevant to this suit, and its employees Todd Tritch, M.D., Matthew Turner, PA, Edie Woodward, P.A., Charlene Watkins, FNP, and Teresa Kesteloot. For the reasons that follow, I recommend that the Court grant judgment in the CMS Defendants' favor on the ADA claim as Leavitt has conceded that they are entitled to judgment on that count. With regards to the Eighth Amendment claim, I recommend that the Court grant the defendants judgment on the grounds that there is not sufficient evidence that the individual defendants were <u>deliberately</u> indifferent to Leavitt's medical needs.

*Discussion*

## I.  ADA CLAIM

In his consolidated response memorandum, Leavitt concedes that CMS is entitled to judgment on his ADA claim on this count as it pertains to CMS and its employees. (Consolidated Resp. Mem. at 26.)

## II.  EIGHTH AMENDEMNT CLAIM

### A.  Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in <u>Scott v. Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil Procedure 56(c)).  <u>Scott</u> reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Id.</u>

### B.  Eighth Amendment Denial of Adequate Medical Care Standard

As an inmate at the Maine State Prison, Leavitt was entitled to "'the minimal civilized measure of life necessities,'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), and the denial of necessary medical care can arise to the level of an Eighth Amendment violation, see generally Farmer v. Brennan, 511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97 (1976).  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Estelle, 429 U.S. at 104 (citation omitted).   However, negligence and medical malpractice are not actionable. Daniels v. Williams, 474 U.S. 327 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence); accord Estelle, 429 U.S. at 105-06.

## FACTS RELEVANT TO THE CMS DEFENDANT'S LIABILITY

The parties think that the following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Scientific Data Relevant To HIV Treatment

The human immunodeficiency virus (HIV) compromises the immune system, making a person with the virus more likely to develop a variety of infectious diseases and certain cancers. (CMS SMF ¶ 1; Resp. SMF ¶ 1.)  Highly active antiretroviral therapy (HAART), currently the standard treatment for HIV, significantly enhances survival rates for those afflicted with the

virus. (CMS SMF ¶ 2; Resp. SMF ¶ 2.)   An individual's CD4 cell count is the best estimate of his risk of short-term progression to develop clinical symptoms of HIV, such as fevers, night sweats, loss of appetite, loss of weight, wasting syndrome, and chronic diarrhea, and the risks of complications of HIV, which include opportunistic infections and some opportunistic malignancy. (CMS SMF ¶ 3; Resp. SMF ¶ 3; SAMF ¶ 16; Resp. SAMF ¶ 16.) When there is a significant interruption in anti-retroviral therapy, there is a detriment to subpopulations of CD4 cells. (CMS SMF ¶ 4; Resp. SMF ¶ 4.)  This detriment to subpopulations of CD4 cells occurs while treatment is interrupted. (CMS SMF ¶ 5; Resp. SMF ¶ 5.) Some subpopulations of CD4 cells can be lost forever as a result of the interruption of antiretroviral treatment. (CMS SMF ¶ 6; Resp. SMF ¶ 6.)  However, it is impossible to say which subpopulations of CD4 cells are lost forever, except perhaps in a research setting. (CMS SMF ¶ 7; Resp. SMF ¶ 7.)

An individual's HIV viral load is helpful in assessing his short term risk of progression, but it is not as meaningful a predictor as the CD4 count. (CMS SMF ¶ 8; Resp. SMF ¶ 8.) Viral load is most helpful in assessing a patient's response to treatment. (CMS SMF ¶ 9;  Pinsky Dep. at 21:6-20.) Leavitt responds that the viral load is helpful in assessing a patient's response to treatment but is also generally helpful in assessing the risk of short-term progression of HIV. (Resp. SMF ¶ 9; Pinsky Dep. at 22.)  HIV genotype testing tells a physician whether a patient with HIV has acquired resistance to particular antiretroviral medications. (CMS SMF ¶ 10; Resp. SMF ¶ 10.)

### *Relevant Studies*

The parties discuss a number of studies related to antiretroviral treatment.   In May 2006 guidelines published by the United States Department of Health and Human Services stated that for HIV positive patients who had never been on anti-retroviral therapy (sometimes referred to as

4

"drug-naïve" or "treatment-naïve" patients), treatment could be deferred while the patients CD4 count was above 350, as long as the patient did not have an "AIDS defining illness" or severe symptoms of HIV infection. (CMS SMF ¶ 11; Resp. SMF ¶ 11.)

According to the CMS Defendants, at the same time as this study, there was a debate in the medical community as to whether treatment should likewise be deferred for patients with CD4 counts greater than 200 and less than 350. (CMS SMF ¶ 12; Valenti Dep. at 36:5-23.) The "deferred treatment approach" – that is, deferring antiretroviral therapy until a patient's CD4 count reaches a certain level – is based on the recognition that robust immune reconstitution occurs in the majority of patients whose CD4 counts have fallen to the 200-350 cell range. (CMS SMF ¶ 13; Valenti Dep. at 36:5-23.) The same premise, that robust immune reconstitution will occur in a patient with a CD4 count between 200-350, likewise applies to patients who are "experienced" – that is, who have previously been treated. (CMS SMF ¶ 14; Valenti Dep. at 37-39, 52-55; Pinsky Dep. at 24- 25.)   Although the DHHS HIV treatment guidelines are explicitly directed to the treatment of "treatment- naïve" patients they are still extremely useful in treating experienced patients because the risk that CD4 counts are associated with, both long-term and short-term, are very much the same for experienced and naïve patients. (CMS SMF ¶ 15; Pinsky Dep. at 24:16-22.)

While the DHHS Guidelines pertain to new patients, the question of restarting treatment on a patient has been less clearly studied with regard to the threshold of treatment, therefore most clinics use the information and guidelines for initiating antiretroviral therapy for the first time. (Resp. SAMF ¶ 116; Smith Dep. at 50:13-20.) The guidelines are useful because the risks that CD4 counts as associated with both short-term and long-term risks are very much the same for both experienced and new patients. (Resp. SAMF ¶ 116; Pinsky Dep. at 24:17-22.)

Leavitt responds that this debate was primarily about treating naïve patients, and it was conclusively resolved when the SMART trial results (discussed below) began to be published in late 2006. The portion of the Valenti deposition cited by the defendants was simply his acknowledgement that that statement appeared in the document he was shown, "Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents" (May 4, 2006). It was not an acknowledgment that the deferred treatment approach was valid, broadly accepted by HIV practitioners, or relevant to treatment experienced patients. (Resp. SMF ¶¶ 12, 13, 14; Valenti Aff. ¶¶ 4 – 8; Valenti Dep. at 100 – 101.) The May 4, 2006, report recommended offering antiretroviral therapy to HIV patients with CD4 counts between 201 and 350, and though Leavitt's CD4 count in October 2006 was 415, Leavitt should have been immediately restated on antiretroviral therapy as soon as possible, because this guideline only applied to new patients not patients who had already undergone therapy, because Leavitt had a history of low CD4 counts, and because he had the related health problem of Hepatitis C. (SAMF ¶ 116; Valenti Dep. at 32- 33, 98 -101, 125- 26; Ex. 2 at 8.) This guideline also recommended treating patients with a history of an AIDS-defining illness or severe symptoms of HIV infection regardless of their CD4 count. (SAMF ¶ 117; Valenti Dep. Ex. 2 at 8; Ex. 7.)

For a patient with both HIV and Hepatitis C, the HIV disease must be controlled so that the Hepatitis C can be treated. (SAMF ¶ 118; Valenti Dep. at 31, 160 - 61; Pinsky Dep. at 69.)[1] Thrush (candidiasis), which Leavitt suffered while at the Maine State Prison, is an AIDS-defining illness, generally associated with a CD4 level below 200. (SAMF ¶ 119; Valenti Dep. at 44; Ex. 7.) Whether HIV should be controlled before initiating Hepatitis C treatment depends

---

[1]  I provisionally deny the request to strike this statement that argues that Valenti was not designated to offer expertise on this topic.

on the individual patient. (Resp. SAMF ¶ 118; Pinksy Dep. at 69:3-15.) The Valenti Deposition
Exhibit 7 expressly incorporates by reference the list of "AIDS-defining illnesses" established by
the Centers for Disease Control in 1993. The CDC includes candidiasis of the bronchi, trachea,
lungs, and esophagus, but not candidiasis of the mouth.  (Resp. SAMF ¶ 119;  Centers for
Disease Control, 1993 Revised Classification System for HIV Infection and Expanded
Surveillance Case Definition for AIDS Among Adolescents and Adults, *Appendix B;* United
States Dept. of Veterans Affairs, AIDS-Defining Illnesses. See Fed. R. Evid. 803(8).)

The DHHS Guidelines for the Use of Antiretroviral Agents in HIV-1- Infected Adults
and Adolescents," published on December 1, 2007, slightly changed the guideline of May 4,
2006, by recommending that antiretroviral therapy be initiated, rather than just offered, to a
patient with a CD4 count less than 350. (SAMF ¶ 120; Resp. SAMF ¶ 120.)  The December 1,
2007, guideline relating to re-initiation of antiretroviral therapy for CD4 counts below 350
applied to new patients rather than patients who had previously been on therapy.  (SAMF ¶ 121;
Valenti depo. p. 52- 54.) The defendants stress that, although, the guidelines explicitly address
only treatment-naïve patients, the rationale for their recommendation applies equally to
experienced patients. (Resp. SAMF ¶ 121; Valenti Dep. at 38 -39, 52 -55; Pinksy Dep. at 24-25.)

Per CMS, there is a great body of literature suggesting that the lower a patient's CD4
count is when treatment is either initiated or reinitiated, the less his expectation of long-term
immunologic recovery and the greater his risk of complications, both HIV and non-HIV related,
over the short-term. However, there is nothing in the literature that would suggest that a patient is
at long-term risk based on his nadir CD4 count or his prior history of CD4 counts, once he has
achieved significant immunologic recovery to CD4 counts over 500.  (CMS SMF ¶ 16;  Pinsky

Dep. at 34:8-35:2.)[2]  A large cohort study published in 2007 suggests that HIV patients whose

immunologic recovery is sufficient that their CD4 counts remain over 500 for several years have

a mortality that is essentially equal to the non-HIV infected population, and there are a number

of other studies that have very similar results.  (CMS SMF ¶ 17; Pinsky Dep. at 35:16-23.)

Based on studies that have been done to date, it is unclear whether patients whose CD4 counts

recover to a level above 200 but below 500 are at any increased long-term risk.  (CMS SMF ¶

18;  Pinsky Dep. at 35:25-36:13.)   The risks of withholding HIV treatment in the short run are

negligible, and there is never an emergency need to initiate anti-retroviral therapy.  (CMS SMF ¶

19;  Pinsky Dep. at 44:1-21.)[3]  Two major studies (the SMART study and the TRIVACAN

study) showed that patients whose treatment was interrupted and not restarted until their CD4

counts fell to 250 had more HIV and particularly non-HIV related complications in the short

term, but did not assess whether there was any long-term risk of that treatment interruption.

(CMS SMF ¶ 20;  Pinsky Dep. at 61:5-62:4.)   Other studies which have looked at treatment

interruption at higher CD4 counts have not clearly shown any adverse effects.  (CMS SMF ¶ 21;

Pinsky Dep. at 62:5-7.)[4]  The only adverse outcomes identified in the SMART study occurred

within the time frame when the study was done, and the study does not address the question of

---

[2]     Leavitt points out that Pinsky testified that significant recovery means a patient whose CD4 counts have remained over 500 for several years.  (Resp. SMF ¶ 16; Pinsky Dep. at 34:8-35:2.) This is not an entirely accurate summary of Pinsky's testimony at the cited lines.

[3]     Leavitt qualifies this statement by stating that "short run" means, at most, a month. (Resp. SMF ¶ 19; SAMF ¶ 113.) Paragraph 113 of his additional facts asserts: "Because Leavitt had been off his medications for about a month by the time he was medically examined at the York County Jail, the appropriate medical approach was to obtain information regarding his treatment history, evaluate his status and reinitiate his treatment as quickly as possible, and no more than one month, after the information was available."   (SAMF ¶ 113; Valenti Dep. at  99 - 102; Pinksy Dep. at  41 -42.)

[4]     Leavitt denies this statement by citing to four pages of the Pinsky deposition with no explanation of the grounds for denial.  (Resp. SMF ¶ 21; Pinsky Dep. at 112: 15-115:11.)  The cited testimony relates to an April 30, 2009, article in the *New England Journal of Medicine* entitled *Effect of Early Versus Deferred Antiretroviral Therapy for HIV in Survival*.   Pinsky concedes that there is evidence that treatment regimes that are initiated earlier versus later seem to have better clinical outcomes.

subsequent risk after adequate CD4 recovery occurs.  (CMS SMF ¶ 22; Pinsky Dep. at 74:5-76:15.)  Most studies have shown that if patients begin treatment at lower CD4 counts, their risk of not fully reconstituting the normal number of CD4 subsets is greater, but even patients starting with very low CD4 counts may reconstitute all of their subsets to normal levels.  (CMS SMF 23; Pinsky Dep. at 109:8-110:11; Resp. SMF ¶ 23.)  None of the studies which have observed poor clinical outcomes in patients whose anti-retroviral therapy had been withdrawn have looked at patients who have had immune recovery.  (CMS SMF ¶ 24;  Pinsky Depo. at 119:8-20.)  Virtually all studies of the prognostic importance of CD4 counts have shown that the most recent CD4 count is a much more important prognostic indicator than the nadir CD4 counts, which in most studies are negated by response to treatment. In other words, patients who achieve an adequate  immunologic recovery seem to be at no greater risk based on their prior low CD4 count than those who had a prior higher CD4 count.  (CMS SMF ¶ 25;  Pinsky Dep. at 122:23-123:8.)

An article published in the New England Journal of Medicine on November 30, 2006, "CD4 Count Guided Interruption of Antiretroviral Treatment" (known as the SMART trial) disclosed the results of a 16-month randomized, controlled study, showing that interruption of antiretroviral therapy for patients with CD4 counts above 350 and resumption of that treatment when the CD4 count reached 250 significantly increased the risk of opportunistic disease or death from any cause over the course of the trial, as compared with continuous antiretroviral therapy, largely as a consequence of lowering CD4 cell count and increasing viral load. (SAMF ¶ 123; Pinsky Dep. at  74 -76.)

The SMART  study demonstrated elevated risks of opportunistic infection and death only during the time frame that the study was done; it does not demonstrate any continuing risk after

9

CD4 cell recovery occurs. (Resp. SAMF ¶ 123; Pinsky Dep. at 74 -76.) This study does not stand

for the proposition that because Leavitt had a CD4 count in the 200s that he will be at greater

long-term risk of opportunistic disease and infection. (Resp. SAMF ¶ 123; Pinsky Dep. at 34-

35.)  The study identified increased risk only during the period of treatment interruption, not

after CD4 cell recovery.  (Resp. SAMF ¶ 124;  Pinsky Dep.  at 74-76.)  There's a great body of

medical literature suggesting that the lower someone's CD4 count when they initiate or reinitiate

HIV treatment, the lesser the expectation of long-term immunologic recovery and the greater the

risk of both HIV and non-HIV related complications over the short term. (SAMF ¶ 125; Resp.

SAMF ¶ 125.)

     Leavitt asserts that Dr. Pinsky's remarks relied on by CMS were limited to the results of

a French cohort study, the conclusions of which related to patients whose CD4 counts remained

over 500 for several years after re-initiation of antiretroviral therapy. He went on to say that "It's

possible, and I think the literature would support a possibility that patients whose CD4 counts …

don't recover into that range, may be at some long-term risk, …"  (Resp. SMF ¶ 17;  Pinsky Dep.

at  25:25- 36: 13.)

      Leavitt also relies -- without explanation -- on fourteen paragraphs of a post-deposition

affidavit of Dr. Valenti concerning the SMART trial. (Resp. SMF ¶¶16, 18 20, 22, 24, 25.)

Therein Valenti indicates that he testified during his July 16, 2009, deposition that he accepted

the conclusions of the SMART trial.  (Valenti Aff. ¶ 3.) SMART was a randomized trial

involving 5,472 participants, divided into two groups of roughly equal size, who were followed

for an average of 16 months.  It compared the rates of death and disease in a "drug conservation"

group of 2720 patients with CD4+ counts above 350, whose highly active antiretroviral therapy

was interrupted until their CD4 counts reached 250, with a control or "viral suppression" group,

who were maintained on HAART during the same time period.  (Id. ¶ 4.) The SMART trial was terminated in January 2006 because of ethical concerns about the high rates of death and disease in the drug conservation group, and participants in the deferred group were put back on HAART. (Id. ¶ 5.) The results of the SMART trial were published in late 2006. (Id. ¶ 6.)  The SMART trial results showed, among other things, that the opportunistic disease or death from any cause was 2.6 times higher in the drug conservation group than in the suppression group.  Death from any cause and for major cardiovascular, renal, and hepatic disease was 1.8 times higher. (Id. ¶ 7) (see also SAMF ¶ 124; Valenti Dep. at 41-42; Pinsky Dep. at 89-91).   Although it is Valenti's belief that only a small minority of HIV practitioners, prior to the publication of SMART trial results, practiced interruption of HAART with their HIV patients outside a carefully controlled research setting, the results of SMART discredited drug holidays and, in Valenti's opinion, conclusively established a standard of care that required continuation of HAART therapy, absent the onset of toxic side effects.  (Id. ¶ 8.)

Follow-up studies of the SMART participants, which have been published from time to time since the trial's termination, have revealed additional data on the health of participants.  (Id. ¶ 9.)   The results of one follow-up study, which was published in the Annals of Internal Medicine on September 2, 2008, entitled  "Risk for Opportunistic Disease and Death after Reinitiating Continuous Antiretroviral Therapy in Patients with HIV Previously Receiving Episodic Therapy," (attached to this affidavit) was something Valenti was unaware of at the time of his deposition.  (Id. ¶ 10.)  This study tracked SMART participants for 18 months after the termination of SMART.  It concluded, among other things, that during the 18-month period, participants in the drug conservation group (the "conservation arm") improved but did not fully reconstitute their immune systems after re-initiation of HAART, leaving them at greater

statistical risk for opportunistic infections and death than the viral suppression group (the "suppression arm").  (Id. ¶ 11.)[5]  CD4 counts increased in the conservation arm after re-initiation of HAART, but the increase remained significantly lower than the CD4 levels in the viral suppression group throughout the 18-month period of the study.  The authors concluded that "more than 18 months … would have been required for the average CD4+ cell count to return to preinterruption levels." (Id. ¶13.)  The authors also concluded that the risk of death for participants in the conservation arm after resumption of HAART was "significantly greater" in the follow-up period among participants who had experienced cardiovascular, renal, or hepatic events during the 16 months of the SMART trial.  Leavitt, who has Hepatitis C would, therefore, be at a greater risk of hepatic disease for at least 18 months following his resumption of HAART in July 2008.  (Id. ¶ 14.) These findings indicate to Valenti that Leavitt is at greater risk for future opportunistic infection, hepatic disease and death as a result of his approximate 22-month HAART interruption than if he remained on HAART.  (Id. ¶ 15.)[6]

According to Leavitt, the interruption of Leavitt's antiretroviral therapy from September 6, 2006, to July 7, 2008, likely damaged subsets of his CD4 cells making him statistically more likely to be susceptible to opportunistic infections and/or cancer in the future.  (SAMF ¶ 126; Valenti Dep. at 17 -19, 46 - 48, 140, 171 -72; see SMF ¶ 10; Resp. SMF ¶ 10.)  Most medical studies have shown that if patients begin treatment at lower CD4 counts, their risk of not fully reconstituting the normal numbers of CD4 subsets is greater. (SAMF ¶ 127; Pinsky Dep. at 109

---

[5]     The difference between the two groups, in terms of the statistical risk for opportunistic infections and death, is illustrated by the lower of the two graphs on page 296 of the Annals article.  (Id. ¶ 12.)
[6]     Leavitt does not actually include Paragraph 15 of the affidavit in his response to these paragraphs but he does with regards to Statement of Material Fact 170 so I include it here for ease of cross-referencing this material later on.

-10.) The defendants respond that, although there was a risk, even patients starting with very low CD4 counts may reconstitute to normal levels.  (Resp. SAMF ¶ 127; Pinsky Dep. at 109-10.)[7]

The Organization and Operations of CMS

CMS provides medical care within the Maine State Prison, as well as other facilities operated by the Maine Department of Corrections (MDOC), under a contract with MDOC. (CMS SMF ¶ 26; Resp. SMF ¶ 26.)   In 2007-2008 Dr. Todd Tritch was the Regional Medical Director for CMS in the State of Maine. (CMF SMF ¶ 27; Resp. SMF ¶ 27.)

Beginning in September 2007, CMS employee Theresa Kesteloot was the Health Services Administrator at the Maine State Prison.  (CMS SMF ¶ 28; Resp. SMF ¶ 28.)   In her capacity as Health Services Administrator, Kesteloot was responsible for coordinating medical, mental health, and dental services for the prison.  (CMS SMF ¶ 29: Resp. SMF ¶ 29.) Kesteloot reported to Larry Amberger, Regional Manager for CMS in Maine, who was administratively responsible for the operations of CMS at various sites throughout Maine. (CMS SMF ¶ 30; Resp. SMF ¶ 30.) Physicians engaged by CMS as independent contractors to provide services within MDOC facilities are paid at an hourly rate that is well above the going rate for primary care physicians in the state.  (CMS SMF ¶ 31; Resp. SMF ¶ 31.) Nurses employed by CMS are paid at a level that is competitive with nursing salaries in the state. (CMS SMF ¶ 32; Resp. SMF ¶ 32.)   Staffing levels for CMS personnel within MDOC facilities are based on contract staffing levels that were developed in a contract between MDOC and a prior medical services vendor. (CMS ¶ 33: Resp. SMF ¶ 33.)

---

[7]        Leavitt asserts, almost as an aside, that here is medical evidence that controlling HIV disease slows the progression of Hepatitis C. (SAMF ¶ 128; Pinsky Dep. at  68.) The defendants add that this evidence is not compelling. (Resp. SAMF 128; Pinsky Dep. at 68.)  There is not enough evidence on this aspect of long-term impact to warrant any discussion.

For the period July 1, 2007, through July 30, 2008, CMS provided physician hours at 92% of the level required for the Maine State Prison in its contract with the Maine Department of Corrections, and the combined staffing of physicians and mid-level providers was at 83% of the level specified in the contract. (CMS ¶ 34: Resp. SMF ¶ 34.)   The shortfall in mid-level provider staffing was primarily the result of the fact that Matthew Turner, a physician assistant who had been working at the prison for about seven years, resigned to take another position, and it took several months, from July until early September, to fill that position. (CMS SMF ¶ 35; Amberger Dep. at 59:1-2, 73:11-12.)[8]  CMS did not accept or ignore the staffing shortfalls that occurred in the latter half of 2007.  (CMS ¶ 36: Resp. SMF ¶ 36.)    CMS responded to the staffing shortage by rearranging the schedule of the medical director, Dr. Todd Tritch, so that he was working at the prison more than he had been in the past. (CMS ¶ 37: Resp. SMF ¶ 37.)   As soon as the provider who resigned gave CMS notice of his intention to leave, CMS started recruiting efforts.  (CMS ¶ 38: Resp. SMF ¶ 38.)  CMS's recruiting efforts included networking, placing posting on various employment websites, and advertising in newspapers. (CMS ¶ 39: Resp. SMF ¶ 39.)

It has been the experience of CMS that it is difficult to recruit providers to work at the Maine State Prison. (CMS SMF ¶ 40: Resp. SMF ¶ 40.)  CMS gained nothing by leaving any positions vacant, but rather had to reimburse the state for the value of those vacant positions. (CMS SMF ¶ 41: Resp. SMF ¶ 41.) According to the defendants, Kesteloot never had reason to believe that medical care at the Maine State Prison was compromised by staffing shortfalls.

---

[8]      Leavitt denies this statement by asserting that Tritch blamed problems on a "chronic shortage of providers" and a "substantial turnover."  He cites to all his statements of additional fact and all his citations therein.  He also notes that delays in re-initiating Leavitt's antiretroviral therapy continued long after September 2007, citing his Statement of Additional Facts 65-101.  (The relevant Statement of Additional Fact seems to be 103, which is included in the recitation below.)

(CMS SMF ¶ 42; Kesteloot Dep. at 50:13-51:2.)  Leavitt counters that in responding to a complaint brought against him by Leavitt to the Maine Board of Licensure of Medicine on September 25, 2008, however, Dr. Tritch blamed the delays in Leavitt's care in part on a "chronic shortage of providers" and a "substantial ongoing turnover in the correctional medical system" at the Maine State Prison.  (SAMF ¶ 103; Resp. SAMF ¶ 103; Tritch Dep. at  107 -08, Tritch Dep. Ex. 2, Doc. No. 129-20 at 23-24.)

The Maine State Prison medical department operates on a "clinic model," so that in the usual course inmates are not assigned to be followed by particular providers. (CMS SMF ¶ 43: Resp. SMF ¶ 43.)  Different practitioners may see a patient on any given day, and it maintains paper patient charts, incorporating all the patient's medical records, which are available to any provider who sees the patient.  (SAMF ¶ 160; Resp. SAMF ¶ 160; Resp. SMF ¶ 146.)  The Maine State Prison operates a "chronic care clinic" in which inmates with chronic diseases are seen typically at three-month intervals. (CMS SMF ¶ 44: Resp. SMF ¶ 44.)

According to the defendants, in deciding whether to refer inmates to outside providers for specialty care, CMS practitioners are guided by standards of medical necessity and community standards of care.  (CMS SMF ¶ 45; Amberger Dep. at 17:14-17.)[9]  When a physician or a mid-level provider such as a physician assistant or nurse practitioner feels it is medically appropriate to refer a patient out for specialty care, they write a referral and then the Regional Medical Director either approves or denies the referral. (CMS SMF ¶ 46: Resp. SMF ¶ 46.)  A scheduling secretary was responsible for arranging an approved consult. (CMS SMF ¶ 47: Resp. SMF ¶ 47.) Kesteloot had no involvement in the referral approval process. (CMS SMF ¶ 48: Resp. SMF ¶

---

[9]      Leavitt denies these allegations, citing Paragraphs 37 through 109, and 114 through 115, of his Statement of Additional Facts.  (Resp. SMF ¶ 45.)  His point is that in view of the protracted, largely unexplained and inappropriate delays by a CMS practitioner in obtaining specialty care for Leavitt, a fact-finder could reject this statement.

48.)   When a patient returns to the prison after a consult, a handwritten note of the consult

ordinarily comes back to the prison with him and is reviewed by whichever provider happens to

be working that day, for appropriate action, then placed in the patient's chart. (CMS SMF ¶ 49:

Resp. SMF ¶ 49.)   The same process is generally followed when lab reports are received in the

prison. (CMS SMF ¶ 50: Resp. SMF ¶ 50.)

The following facts are in contention.  CMS asserts that it has never issued a directive or

applied any pressure to try to influence clinicians to minimize or limit lab work because of the

cost. (CMS SMF ¶ 51; Amberger Dep. at 72:6-10.) CMS has never issued a directive or applied

any pressure to clinicians to limit in any way referrals to outside specialists. (CMS SMF ¶ 52;

Amberger Dep. at 72:11-14; Tritch Dep. at 36:9-38:1.)   CMS has never exerted any pressure on

Kesteloot to keep down the number of referrals to outside providers. (CMS SMF ¶ 53;  Kesteloot

Dep. at 58:25-59:9.) According to CMS, the Maine Department of Corrections has made it very

clear to CMS that it wants care decisions directed by medical necessity and community standards

of care, and CMS continuously conveys that message to its providers. (CMS SMF ¶ 54;

Amberger Dep. at 72:14-22.)

Leavitt denies these three paragraphs by referencing a large number of his statements of

additional facts.  (Resp. SMF ¶¶ 51, 52, 53, 54; SAMF ¶¶ 38-107, 114-115, 131-133,  136-148,

150 -158.)  With respect to the lab slips he notes that CMS was responsible for paying for lab

studies requested by outside specialists.  (Resp. SMF ¶ 51; Amberger Dep. at 47:10-14.)

There is no dispute that the quality of medical care at the Maine State Prison is tracked by

quality assessment studies and regular peer review. (CMS SMF ¶ 55: Resp. SMF ¶ 55.)  In a

component of the quality assurance process that is carried out periodically on a local level within

the individual MDOC facilities, reviewers are instructed to randomly pull ten charts and audit

them by answering specified questions addressing fifteen "standards" covering a broad spectrum of issues in the health care environment. (CMS SMF ¶ 56: Resp. SMF ¶ 56.)  In a separate component of the quality assurance process, CMS biannually sends into each MDOC facility an employee who is not employed within that facility, whose task is to assess all fifteen standards over the course of two or three days.  (CMS SMF ¶ 57: Resp. SMF ¶ 57.) The biannual quality assurance surveys conducted by CMS between June 16 and June 19, 2008, disclosed that with respect to all the charts that had been reviewed for timeliness of referrals, the determination was made that referrals were made in a timely manner. (CMS SMF ¶ 58; Amberger Dep. at 51:2-54:4; id. at 51:3-4.)

The Maine State Prison, including its medical unit, is accredited by the American Corrections Association, most recently in 2006 (CMS SMF ¶ 59: Resp. SMF ¶ 59), which was prior to Leavitt's incarceration there (Resp. SMF ¶ 60). The medical services provided at the Maine State Prison have received very high scores in the ACA accreditation process. (CMS SMF ¶ 60: Resp. SMF ¶ 60.)

When inmate complaints about the medical care they were receiving reached Kesteloot, she reports that she would address them by speaking to the providers involved in rendering the care. (CMS SMF ¶ 61; Kesteloot Dep. at 14:4-15:12.) Leavitt responds that a fact-finder could question her credibility because of the limited investigation she did in responding to his April 24, 2008, grievance, highlighting her failure to talk with any of the physicians or physician assistants.  (Resp. SMF ¶ 61; SAMF ¶¶ 137-148.)

Maine Department of Corrections Policy 18.5(IV)(G)(3) states: "When there is an order for a specialty consultation, the required consultation shall be performed at the next possible opportunity if being done on-site or an appointment in the community shall be arranged in a

timely manner." (SAMF ¶ 129; Resp. SAMF ¶ 129.) Once an outside consultation referral is

arranged by CMS for a Maine State Prison inmate, corrections officers typically provide

transportation promptly for that appointment unless there is an unusual security situation at the

prison, such as a riot, fire, hostage situation. (SAMF ¶ 130; Resp. SAMF ¶ 130.)  Maine

Department of Corrections Policy 18.5(IV)(I)(1) states: "Facility health care staff shall assure

continuity of health care from the time of admission to the facility, through the incarceration,

until release or transfer from the facility, for all emergency and routine health care services

provided in the facility and through referral, consultation, or transfer to another departmental

facility."  (SAMF ¶ 131; Resp. SAMF ¶ 131.)  Maine Department of Corrections Policy

18.5(IV)(J)(2) states: "Clinical treatment for … HIV… shall be provided according to nationally

accepted clinical practice guidelines. These national clinical practice guidelines shall be

specifically identified by the organization that established them, and there shall be

documentation of compliance with the guidelines."  (SAMF ¶ 132; Resp. SAMF ¶ 132.)   CMS

had no clinical pathway or treatment protocol for treating HIV at Maine State Prison during the

time period of Leavitt's incarceration there, although it did have a clinical pathway for Hepatitis

C and many other infectious diseases. (SAMF ¶ 133; CMS A. Interrogs. Nos. 27, 28; Tritch Dep.

at  99 -100; Amberger Dep. at. 17- 20.)[10]

Raymond Leavitt's Medical History

Raymond Leavitt was diagnosed with HIV in 1991.  (CMS SMF ¶ 62: Resp. SMF ¶ 62.)

Before entering the Maine State Prison in February 2007, Leavitt was considered disabled, in

part due to his HIV. (CMS SMF ¶ 63; Leavitt Dep. at 78:10-22; Resp. SMF ¶ 63.)   Even when

---

[10]    The defendants argue that this statement should be stricken because there is no foundation for the implied
assertion that such a protocol existed and that CMS should have adopted it.  (Resp. SAMF ¶ 133.)

Leavitt is being fully and actively treated for his HIV, he is "tired all the time." (CMS SMF ¶ 64; Leavitt Dep. at 78:23-79:8.)   Leavitt has suffered from chronic fatigue ever since he was diagnosed with HIV.   (CMS SMF ¶ 65; Resp. SMF ¶ 65; Leavitt Dep. at 107:18-108:3.) Leavitt adds that he has testified that fatigue from his HIV has gotten worse and that, in the past, he had "some good days."  (Resp. SMF ¶¶ 63, 64, 65; Leavitt Dep. at 107: 18-108:3.)

Due to his bipolar disorder, Leavitt sometimes sleeps 16 to 20 hours per day. (CMS SMF ¶ 66: Resp. SMF ¶ 66.)  Leavitt's normal weight is 145 pounds. (CMS SMF ¶ 67: Resp. SMF ¶ 67.)  Leavitt has had consistent gastrointestinal complaints throughout the years (CMS SMF ¶ 68;  Leavitt Dep. at 94:9-17) that he thinks may be related to his drinking when not incarcerated (Resp. SMF ¶ 68; Leavitt Dep. at 94: 9-7).

Raymond Leavitt's Incarceration in The Maine State Prison

On February 12, 2007, Leavitt was incarcerated in the Maine State Prison.  (CMS SMF ¶ 69: Resp. SMF ¶ 69.)   For the preceding 167 days, while Leavitt was incarcerated in the York County Jail, he had received no antiretroviral medicine for his HIV.  (CMS SMF ¶ 70: Resp. SMF ¶ 70.)[11]  During Leavitt's initial assessment on February 20, 2007, he told Matthew Turner, a CMS-employed physician assistant, that he was HIV-positive and that he wanted to resume HIV treatment. (CMS SMF ¶ 71: Resp. SMF ¶ 71.)  Within the correctional system HIV-positive patients are routinely referred to outside specialists for management of their disease. (CMS SMF ¶ 72: Resp. SMF ¶ 72.)  Turner ordered a follow-up "ASAP" with Dr. Gonella, an infectious

---

[11]      According to Leavitt before he entered the York County Jail on September 9, 2006, he had been taking his HIV medications, Kaletra and Truvada, on a regular basis. (SAMF ¶ 1; Leavitt Dep. at 19-23.)  According to Leavitt, it is not the standard of care to withdraw HIV medication from a patient who is doing well, whose CD4 counts have responded to treatment, and who have no complications from their therapy.   (SAMF ¶ 111; Pinsky Dep. at 37.)  Leavitt should have been kept on his HIV medications from the day he entered York County Jail, if he had been taking them previously. (SAMF ¶ 112;  Pinsky Dep. at  40 - 41.)  I have addressed Leavitt's claim pertaining to his treatment at the York County Jail in the context of a recommended decision on Albert Cichon's motion for summary judgment; there is no dispute with respect to CMS's motion that Leavitt had been off his HIV medication since his detention at the jail.

disease consultant under contract with CMS to visit patients in the prison, and ordered an HIV viral load and CD4 labs.  (SAMF ¶ 38; Resp. SAMF ¶ 38.)   Generally when a CMS provider uses the term "ASAP," it is because the provider has some degree of concern about a patient's health. (SAMF ¶ 39; Resp. SAMF ¶ 39.)

At the conclusion of the intake physical, Turner entered in Leavitt's chart an order that his labs be drawn, that his prior HIV treatment records be requested, and that he be seen in consultation by an infectious disease specialist. (CMS SMF ¶ 73: Resp. SMF ¶ 73.) Leavitt's labs were drawn on February 26, 2007, and reported on March 1, 2007, showing CD4 count of 460 and a viral load over 97,000.  (SAMF ¶ 38; Resp. SAMF ¶ 38; CMS SMF ¶ 74: Resp. SMF ¶ 74.)

The follow-up with Dr. Gonella ordered by Turner never took place. (SAMF ¶ 40; Tritch Dep. at  73 - 74.)   The consult ordered by Turner was delayed because Gonella, who had previously contracted to come into the prison to see patients with infectious diseases, stopped doing so.  (CMS SMF ¶ 75; Tritch Dep. at 72:23-73:16.)[12]  On March 25, 2007, Dr. Christopher Short, a CMS physician, wrote an order that Leavitt be "referred to an infectious disease doctor for starting HIV medications." (SAMF ¶ 41; Resp. SAMF ¶ 41.)  Dr. Todd Tritch, the physician who was CMS's medical director for the Maine State Prison, had to approve all requests to refer patients to outside consultations. (SAMF ¶ 42; Resp. SAMF ¶ 42.)

Leavitt was not seen by an infectious disease specialist until he was examined on May 9, 2007, by a team at the Virology Treatment Center (VTC), headed by Dr. Robert P. Smith, Jr., the clinic's medical director. (SAMF ¶ 43; Resp. SAMF ¶ 43.)   At this time he denied any

---

[12]     Again, Leavitt denies this statement of fact on the grounds that the facts supporting his claims that they were unjustified, inappropriate delays as to assuring specialty care for Leavitt would allow the fact-finder to reject this statement.  (Resp. SMF ¶ 75; SAMF ¶ 37-109, 114-115.)

weight loss, fever, chills, or other HIV symptoms, and his only complaint was that he wanted his HIV medications. (CMS SMF ¶ 76; Smith Dep. at 7:18-21, 10:14-20; Leavitt Dep. at 85:9-16.)[13] In 2007-2008, the VTC used the same information and recommendations that had been developed in the study of "drug naïve" patients to guide their treatment decisions for patients who had been on medications for a time and then stopped. (CMS SMF ¶ 77: Resp. SMF ¶ 77.) When Leavitt was seen by VTC on May 9, 2007, his lab results from the prior February, showing a CD4 count of 460 and viral load of 97,000, were reviewed by Dr. Smith and interpreted as indicating that the HIV disease was active. (SAMF ¶ 44; Resp. SAMF ¶ 44.)   The VTC physicians who evaluated Leavitt on May 9, 2007, saw "no urgent indication for treatment" – meaning that Leavitt then had a pretty good buffer in terms of his immunologic reserve to protect him from getting opportunistic infections or some of the other consequences of HIV/AIDS – and recommended follow-up in one month.   (CMS SMF ¶ 78; Smith Dep. at 32:6-23 & 34:6-14.) Leavitt adds that, per this analysis, a delay in re-initiating treatment of as much as three months might be justified.  (Resp. SMF ¶ 78.)      Provider Consultation Report was sent by VTC to CMS, dated May 9, 2007, which stated, "HIV: No urgent indication for … rx with CD4 at 460. Will obtain records from Dr. Kuhn, Dr. Pickus + Dr. Lamire + review."  (SAMF ¶ 45; Resp. SAMF ¶ 45.)  This report recommended a "f/u in 1 month to review records and make recommendations," which would have included recommendations for restarting Leavitt on his HIV medications. (SAMF ¶ 46;  Smith Dep. at  33.)  The defendants offer the following qualification of this paragraph. Dr. Smith interpreted the Provider Consultation Report to mean that the VTC wanted to obtain preexisting medical records and see Leavitt back in a month or

---

[13]      Leavitt qualifies this statement by citing testimony by Smith that he was unsure if these representations extended back "for a year or not." (Resp. SMF ¶ 76; Smith Dep. at 10:4-14.)

two to review his situation with the additional benefit of those records. (Resp. SAMF ¶ 46; Smith Dep. at 33- 34.)   Furthermore, the letter Dr. Smith authored the same day said only that Leavitt would "likely" need to restart antiretroviral therapy "in the near future," and Dr. Smith thought Leavitt had good "immunologic reserve," such that he would be satisfied to see follow-up laboratory tests in about three months.  (Resp. SAMF ¶ 46; Smith Dep. at 8, 34-35; Ex. 3.)

Dr. Smith's recommendation to repeat the CD4 and viral load labs was in accordance with usual practice to do those tests every three to four months to monitor an HIV patient's condition whether on therapy or not.  (SAMF ¶ 50; Resp. SAMF ¶ 50.)  Dr. Smith's decision to delay treatment to obtain Leavitt's prior treatment record was made for the purpose of obtaining information about Leavitt's immune status, viral loads, antiretroviral drug history, and any previous drug resistance testing. (SAMF ¶ 51; Resp. SAMF ¶ 51.)   Though the VTC May 9, 2007, Provider Consultation Report on Leavitt, stated that there was "[n]o urgent indication for RX with CD4 at 460," the phrase was not intended to mean it was acceptable to wait six months to reexamine the patient and determine whether to start his antiretroviral therapy, but meant, at most, a follow-up based on lab results within about three months to determine whether therapy should be re-initiated. (SAMF ¶ 52; Resp. SAMF ¶ 52(qualification); Smith Dep. at  34 -35.) If CMS personnel treating Leavitt had any questions as to VTC's reports or recommendations, Dr. Smith maintained a beeper phone service available so he could be contacted 24/7.  (SAMF ¶ 53; Resp. SAMF ¶ 53.)  Dr. Tritch never had a problem reaching VTC to talk to a specialist about HIV. (SAMF ¶ 54; Resp. SAMF ¶ 54.)

In HIV care, particularly with a patient who has been infected for a period of time, before a new regimen is started it is important to know what medications a patient previously has been on and whether he has been resistant to them; which ones have been stopped, and why;

whether he has had resistance problems with prior medications; and what the course of his immunologic status has been over the years. Without that information, there is a risk that an inadequate regimen will be started. (CMS SMF ¶ 79: Resp. SMF ¶ 79.)   At Leavitt's May 9, 2007, visit the VTC made arrangements to obtain records pertaining to his prior HIV treatment. (CMS SMF ¶ 80: Resp. SMF ¶ 80.)

VTC had the capacity to reschedule patients in one or, at most, two months.  (SAMF ¶ 47; Resp. SAMF ¶ 47.) Dr. Smith also authored a letter to Dr. Tritch, dated May 9, 2007, in which he recommended repeating Leavitt's CD4 and HIV viral load and stated, "We are in the process of obtaining prior records to advice or [sic] specifically on antiretroviral therapy, which he will likely need in the near future. We plan to see him again in approximately 6 weeks. Please give me a call in the meantime if there are any questions."  (SAMF ¶ 49; Smith Dep. at  8: 1–7; Ex. 3.) The defendants note that there is no evidence that the letter was actually sent to or received by Tritch.  (Resp. SAMF ¶ 49; Tritch Dep. at 75-76; Smith Dep. at 21-23.)

On May 24, 2007, Matthew Turner noted the recommendation of the infectious disease specialist and ordered the follow up with Dr. York [of the VTC] that had been recommended. (CMS SMF ¶ 81: Resp. SMF ¶ 81.) The VTC Provider Consultation Report, under the subheading, "To be Completed by CMS Provider," bore the signature of Turner, dated May 24, 2007, and contained a note by Turner which stated: "f/u 1 month." (SAMF ¶ 48; Resp. SAMF ¶ 48.)    The CMS "Offsite Consultation Request Form," dated this date, requesting this follow-up notes that a copy was placed in the patient's chart, but it does not bear the signature of Dr. Tritch for approving the referral. (SAMF ¶ 55; Resp. SAMF ¶ 55; Kesteloot Dep.  Ex. 5.) [14]

---

[14]    The defendants do request that this statement of fact be stricken assuming that it is offered to show that Tritch denied the request for a follow-up referral.  (Resp. SAMF ¶ 55.)  The basis for this request is that the

Edith L. Woodward was a physician assistant who worked full-time at the Maine State Prison under the supervision of Dr. Tritch from October 2007 through February 2008. (SAMF ¶ 65; Resp. SAMF ¶ 65.)   On June 10, 2007, Woodward saw Leavitt in the Chronic Care Clinic, at which time Leavitt complained of a rash. (CMS SMF ¶ 82: Resp. SMF ¶ 82; SAMF ¶ 66; Resp. SAMF ¶ 66.)   She noted that Leavitt had HIV, that his labs showed a CD4 count of 460 and a viral load 95,000 and that he was to "follow up with Dr. York as scheduled," a reference to VTC's recommendation of May 9, 2007, that Leavitt be seen at the clinic again in one month. (SAMF ¶ 66; Resp. SAMF ¶ 66.)  Woodward assumed the follow-up ordered on May 24, 2007, had been or was being scheduled.  (CMS SMF ¶ 83: Resp. SMF ¶ 83.)

Leavitt submitted a prison sick call slip on August 10, 2007, in which he stated: "As a result of being denied meds for HIV+ my immune system is low resulting in thrush and it seems as though I'm being denied meds for that also." (SAMF ¶ 56; Resp. SAMF ¶ 56.)   On August 10, 2007, Dr. Todd Tritch saw Leavitt; took a history; physically examined Leavitt; concluded that  Leavitt was suffering from thrush; ordered updated blood work to evaluate his HIV disease; and ordered follow-up in one month.  (CMS SMF ¶ 84: Resp. SMF ¶ 84; SAMF ¶ 57; Resp. SAMF ¶ 57.)    The medication Leavitt was prescribed to treat his thrush worked well. (CMS SMF ¶ 85: Resp. SMF ¶ 85.)   Although the Maine State Prison operates on a "clinic model," so that in the usual course inmates are not assigned to be followed by particular providers, Dr. Tritch specifically ordered that Leavitt's follow-up be scheduled with him for September 2007, but he did not see either the patient or his blood tests at that time.  (SAMF 59; Tritch Dep at  40; Kesteloot Dep. Ex.  6; CMS SMF ¶ 86: Resp. SMF ¶ 86.)  The defendants note that Tritch was

___

statement is only relevant if the form was actually presented to Tritch for approval and Leavitt has not established that foundation.

not responsible for scheduling the follow-up visit and does not know why it was not scheduled with him as he had ordered.  (Resp. SAMF ¶ 59; Tritch Dep. at 90-93, 126-27; CMS SMF ¶ 87: Resp. SMF ¶ 87; SAMF ¶ 58; Resp. SAMF ¶ 58.)

Although Dr. Tritch was not a specialist in HIV treatment, he understood that untreated symptomatic HIV could lead to death.  (SAMF ¶ 61; Resp. SAMF ¶ 61.)  Dr. Tritch believed that symptomatic HIV patients, with symptoms such as thrush, probably had a severe problem with their immune systems and needed to be treated sooner rather than later. (SAMF ¶ 62; Resp. SAMF ¶ 62.)  Dr. Tritch understood that the introduction of antiretroviral therapy in the 1990s dramatically reduced the mortality rate from HIV. (SAMF ¶ 63; Resp. SAMF ¶ 63.)  Dr. Tritch understood that, when drugs were stopped for an HIV patient, whose disease had been under control with the drug therapy, the HIV could reassert itself. (SAMF ¶ 64; Resp. SAMF ¶ 64.)

The labs ordered by Dr. Tritch were drawn on August 15, 2007, and reported on August 22, 2007, showing a CD4 count of 424 and a viral load greater than 100,000. (CMS SMF ¶ 88: Resp. SMF ¶ 88.)    CMS providers had enough information about Leavitt's HIV, including the CD4 count and HIV viral load, to make a referral to VTC by September 1, 2007, but Tritch did not approve a referral until November 6, 2007, when, without having seen Leavitt again, he noted as the reason for the referral on Leavitt's chart that Leavitt "wants to go to Virology for discussion of HIV/HEP C treatment." (SAMF ¶ 60; Tritch Dep. at 49 -51; Kesteloot Dep. at 73:3 – 8, 75- 76; Exs. 5 & 7.)  The defendants add that there is no evidence that Tritch received information about Leavitt's August 2007 lab tests prior to November 6, 2007, at which point he immediately referred Leavitt for follow-up at VCT and this was motivated not only by Leavitt's request but also because Tritch was concerned that a lot of time had elapsed since the last VTC consult.  (Resp. SAMF ¶ 60; Tritch Dep. at 50 -51.)

Woodward saw Leavitt again on September 1, 2007, at which time he complained of a rash under his arms (which was not improved by using a different soap), white, cracked, painful toes, and fatigue, all of which she recognized could have been HIV symptoms. Woodward prescribed Miconazole cream for his skin and feet. (CMS SMF ¶ 89: Resp. SMF ¶ 89; SAMF ¶ 67; Resp. SAMF ¶ 67.)  When Woodward saw Leavitt on September 1, 2007, she knew that the one-month follow-up consultation recommended by VTC on May 9, 2007, had not yet occurred. (SAMF ¶ 68; Resp. SAMF ¶ 68.)  CMS states, although Woodward was aware on September 1, 2007, that the follow-up visit ordered by Matthew Turner had not yet occurred, she was also aware that Leavitt had been seen by Dr. Tritch, she assumed Leavitt would be seen again in follow-up by Dr. Tritch (as Dr. Tritch had ordered on August 10, 2007), and she believed Dr. Tritch would take appropriate steps to deal with Leavitt's complaints. (CMS SMF ¶ 90; Woodward Dep. at 41:1-42:22 & 46:19-48:12; Resp. SAMF ¶ 70.)  Because September 1, 2007, was a Saturday, the secretary who had the information concerning when patients were scheduled to go out for consults was not working; therefore, there was no one with whom Woodward could have checked to confirm that scheduling of the VTC follow-up was in process. (CMS SMF ¶ 91; Tritch Dep. at 61:22- 62:16 & 67:14-68:1; Woodward Dep. at 46:19-48:12. )

To this set of facts Leavitt responds: Woodward examined Leavitt at the prison's chronic care clinic on June 10, 2007, at which time she noted that Leavitt had HIV, that his labs showed a CD4 count of 460 and a viral load 95,000 and that he was to "follow up with Dr. York as scheduled," a reference to VTC's recommendation of May 9, 2007, that Leavitt be seen at the clinic again in one month. (SAMF ¶ 66; Resp. SAMF ¶ 66.)  During Leavitt's September 1, 2007, visit Woodward noted the above mentioned symptoms as potentially HIV symptoms. (SAMF ¶ 67; Resp. SAMF ¶ 67.)  She knew that the one-month follow-up consultation

26

recommended by VTC on May 9, 2007, had not yet occurred. (SAMF ¶ 68; Resp. SAMF ¶ 68.)

Although Woodward was not an HIV expert, she knew, when she saw Leavitt on September 1,

2007, that HIV was a serious condition which, if left untreated, could be fatal. (SAMF ¶ 69;

Resp. SAMF ¶ 69.)   After this visit Woodward did not investigate why the follow-up

consultation at VTC had not taken place and took no steps to make sure the visit would occur

quickly thereafter.  (SAMF ¶ 70; Woodward Dep. at  47: 17-25.)  Woodward has no explanation

as to why the follow-up visit at VTC did not occur until December 19, 2007. (SAMF ¶ 71; Resp.

SAMF ¶ 71.)  Leavitt also notes that Woodward worked for CMS at the MSP full-time from

October 2007 through February 2008, and could have checked at a later time on the scheduling

of Leavitt's VTC follow-up appointment.  (Resp. SMF ¶ 91; Woodward Dep. at 9: 6-9.)

On October 22, 2007, Woodward saw Leavitt in the Chronic Care Clinic. She noted that

his most recent CD4 count was 424; that he complained of intermittent thrush and a rash; and

that Leavitt was interested in HIV and Hepatitis C treatment. She ordered several medications,

laboratory testing (including a Hepatitis C genotype and viral load), and  follow-up with Dr.

Tritch per his order of August 10, 2007. (CMS SMF ¶ 92; Resp. SMF ¶ 92.)  On this date

Woodward did not order a referral to the Virology Treatment Center because she believed one

was in process. (CMS SMF ¶ 93; Woodward Dep. at 38:20-40:2.)

On November 6, 2007, Dr. Tritch reviewed Leavitt's chart, he reports that he became

concerned that a long time had elapsed since his last specialist visit, and referred him to VTC for

HIV and Hepatitis C consults.  (CMS SMF ¶94; Tritch Dep. at 50:7-51:17.) Leavitt notes that the

only reason given by Tritch on Leavitt's chart for the referral was that Leavitt "Wants to go to

Virology for discussion of HIV/HEP C treatment."  (Resp. SMF ¶ 94; Kesteloot Dep. Ex. 7.)

On December 19, 2007, Leavitt was seen again at the VTC, more than six months after his May 9, 2007, visit there. (SAMF ¶ 72; Resp. SAMF ¶ 72; CMS SMF ¶ 95; Resp. SMF ¶ 95.) Symptoms exhibited by Leavitt at his VTC visit of December 19, 2007, including thrush and leukoplakia, were suggestive of a "declining" and "riskier" immune system. (CMS SMF ¶ 96; Resp. SMF ¶ 96.)  Leavitt reported chronic fatigue and noted symptoms which were interpreted as symptomatic of immunological decline from HIV, namely recurrent thrush (a yeast infection in his mouth), leukoplakia (a precancerous condition manifested by white protrusions on the lateral side of the tongue) and seborrheic dermatitis. (SAMF ¶ 74; Resp. SAMF ¶ 74.)   Leavitt gave VTC a history of having suffered from thrush for several months (SAMF ¶ 75; Smith Dep at 41; Ex. 6), a period of time Smith took to mean two or three months (Resp. SAMF ¶ 75; Smith Dep. at 41: 20-24).  VTC noted in a Provider Consultation report to CMS that Leavitt met the criteria for starting antiretroviral therapy for HIV, requested a repeat viral load as a baseline for treatment, a repeat CD4, as well as a test to determine his HIV genotype, and asked for a follow-up appointment in one month so it could recommend antiretroviral therapy. (SAMF ¶ 76; Smith Dep 41-42; Ex. 6;  CMS SMF ¶ 97; Provider Consultation Report Form 12-19-07; SAMF ¶ 73; Resp. SAMF ¶ 73.)[15]   The defendants add that the VTC plan was to "likely make recommendations for therapy" at a follow-up visit in four to six weeks.  (Resp. SAMF ¶ 76; Smith Dep. at 39, 41-42; CMS SMF ¶ 98; Resp. SMF ¶ 98.)

Leavitt insists that if the May 9, 2007, recommendation for a follow-up in four to six weeks had been followed by CMS, this VTC recommendation, including the genotype request, would have been made earlier. (Resp. SMF ¶ 97; SAMF ¶ 73; Resp. SAMF ¶ 73.)

---

[15]     The handwritten note of Leavitt's December 19, 2007, VTC consult stated in part: (1) "Patient meets criteria for starting antiretroviral therapy to treat HIV. Need a repeat viral load . . . to give us a baseline to start [treatment]"; (2) "Will obtain records to see other meds patient has been on and likely make recommendations for therapy at that time"; and (3) "F/U 1 month."

As of December 19, 2007, it was the plan of the Virology Treatment Clinic to request additional records, showing the medications Leavitt had taken in the past, before making a recommendation for treatment. (CMS SMF ¶ 99; Resp. SMF ¶ 99.)   The VTC's December 19, 2007, recommendation that a genotype be obtained was its first such recommendation. (CMS SMF ¶ 100; Resp. SMF ¶ 100.) [16] CMS states, the reason there had been no prior request for a genotype was that genotypes from prior records, obtained when a patient was under treatment, are more useful than a genotype obtained while he was not in treatment; therefore, the VTC would have preferred to see genotypes that were obtained on prior treatment regimens. (CMS SMF ¶ 101; Smith Dep. at 36:24-37:10.) Leavitt  qualifies, explaining that VTC recommended a genotype test on Leavitt to determine his resistance to HIV medications, but, if Leavitt had been seen within six weeks of his May 9, 2007, VTC appointment, as requested on May 9, a genotype would probably have been recommended by VTC at the time of that appointment. (Resp. SMF ¶ 101; SAMF ¶ 73; Resp. SAMF ¶ 73.) Although VTC had some information from the records it had previously obtained about the antiretroviral medications Leavitt previously had taken, that information was not sufficient to guide the choice of a new treatment regimen. (CMS SMF ¶ 102; Smith Dep. at 23:13-24:9.) [17]   Despite its plan to obtain additional treatment records, the VTC did not in fact request any. (CMS SMF ¶ 103; Resp. SMF ¶ 103.)

On December 25, 2007, Woodward reviewed the December 19, 2007, VTC note; ordered an HIV viral load and an immune function panel for Leavitt; requested that the results of

---

[16]   Leavitt cites his Paragraph 74 of his additional facts but this statement, admitted by the defendants (Resp. SAMF ¶ 74), only summarizes the document contents.  It does not support the qualifications of Paragraphs 97 and 100 of CMS's statements of fact.

[17]   Without record citation, Leavitt notes that VTC already had the records from Positive Health Care which indicated that Leavitt had been on Truvada and Kaletra "as of April 2006."   (Resp. SMF ¶ 102.)

Leavitt's lab work be sent directly to the Virology Treatment Center; and ordered follow-up with the Virology Treatment Center in one month. (CMS SMF ¶ 104; Resp. SMF ¶ 104.)

On January 9, 2008, Woodward saw Leavitt, performed a physical exam, noted that his only subjective HIV-related complaint was a complaint of dermatitis, ordered a medication for his thrush, and also ordered a visit with a physician for a complaint unrelated to Leavitt's HIV. (CMS SMF ¶ 105; Resp. SMF ¶ 105.) On January 9, 2008, the dictated VTC note of December 19, 2007, was electronically signed by Dr. Robert Smith. It says: "Repeat VL [viral load] to provide baseline. Obtain a genotype. Obtain more records from Positive Health regarding prior genotypes and meds pt has been on. Likely start ART next visit in one month." (CMS SMF ¶ 106; Resp. SMF ¶ 106.) On January 9, 2008, Woodward entered an order to: "add genotype to . . . labs" which had been ordered on December 25, 2007. (CMS SMF ¶ 107; Resp. SMF ¶ 107.) Woodward's order is noted "Done," indicating that a nurse had carried it out. (CMS SMF ¶ 108; Resp. SMF ¶ 108.) The labs Woodward ordered on January 9, 2008, were drawn the same day and reported on January 18, 2008. (CMS SMF ¶ 109; Resp. SMF ¶ 109.) The labs reported on January 18, 2008, did not include a genotype, as ordered. (CMS SMF ¶ 110; Resp. SMF ¶ 110.) The January 18, 2008, Bio Reference report stated that there had been a technical problem with the processing of the request for testing, without identifying that problem, and further stated that Bio Reference would contact the prison for additional information. (CMS SMF ¶ 111; Resp. SMF ¶ 111.)

CMS indicates that it is likely that the technical problem had something to do with the genotype test Woodward had requested. (CMS SMF ¶ 112; Woodward Aff. ¶14.) Woodward assumed that Bio Reference would contact the prison and that the technical problem, whatever it was, would be corrected. (CMS SMF ¶ 113; Woodward Aff. ¶14.) In response Leavitt points out

30

Woodward does not know why Leavitt's genotype report was not produced until April 2008. (Resp. SMF ¶¶ 112, 113; SAMF ¶ 80; Resp. SAMF ¶ 80.)

Contact between Bio Reference and prison medical personnel would typically occur at the nursing level. (CMS SMF ¶ 114; Resp. SMF ¶ 114.)    There is no evidence in Leavitt's chart of any subsequent communication between Bio Reference and CMS concerning this problem. (CMS SMF ¶ 115; Resp. SMF ¶ 115.)

On January 23, 2008, Woodward again reviewed the December 19, 2007, VTC report and observed in her progress notes that the follow-up office visit to the VTC was supposed to have occurred one month from December 19, 2007, and she reordered the follow-up. (SAMF ¶ 77; Resp. SAMF ¶ 77; CMS SMF ¶ 116; Resp. SMF ¶ 116.)    A follow-up VTC consult was scheduled for February 27, 2008.  (CMS SMF ¶ 119; Resp. SMF ¶ 119.)

In February 2008 Woodward stopped working full-time at the Maine State Prison and transferred to the Cumberland County Jail, although she continued to work per diem at the prison. (CMS SMF ¶ 117; Resp. SMF ¶ 117.)    Woodward's only involvement with Leavitt's care between January 23, 2008, and early July 2008, when he began receiving his HIV medications, was when she wrote an order in February related to Hepatitis C treatment. (CMS SMF ¶ 118; Resp. SMF ¶ 118.)

Charlene Watkins was a CMS nurse practitioner at the Maine State Prison, who filled Woodward's position when the latter resigned in early 2008. (SAMF ¶ 82; Resp. SAMF ¶ 82.) Watkins first saw Leavitt on February 26, 2008. (SAMF ¶ 83; Resp. SAMF ¶ 83; CMS SMF ¶ 120; Resp. SMF ¶ 120.)    On February 26, 2008, Watkins was aware that Leavitt had a diagnosis of HIV. (SAMF ¶ 84; Resp. SAMF ¶ 84.)  Leavitt complained to Watkins about a rash. (SAMF ¶ 85; Resp. SAMF ¶ 85.)  Watkins was aware that the rash could have been a fungal infection and

31

that fungal infections could be symptomatic of HIV.  (SAMF ¶ 86; Resp. SAMF ¶ 86.)  In Watkins's note of her February 26, 2008, encounter with Leavitt, she observed that he had not been seen recently at the VTC and that he "need[ed] follow-up visit at Virology Center."  (CMS SMF ¶ 121; Resp. SMF ¶ 121.)   On February 27, 2008, Leavitt's appointment at VTC was canceled due to weather. (CMS SMF ¶ 122; Resp. SMF ¶ 122.)

Leavitt's follow-up visit to VTC did not take place until March 12, 2008. (SAMF ¶ 78; Resp. SAMF ¶ 78; CMS SMF ¶ 123; Resp. SMF ¶ 123.)   There is no handwritten note of Leavitt's March 12, 2008, VTC consult. (CMS SMF ¶ 124; Resp. SMF ¶ 124.) At the time of Leavitt's March 12, 2008, visit to VTC, VTC had not received Leavitt's genotype results. (SAMF ¶ 79; Resp. SAMF ¶ 79.)  Woodward is unable to explain why it took so long to re-initiate HIV medication therapy for Leavitt. (SAMF ¶ 81; Resp. SAMF ¶ 81.)

Charlene Watkins saw Leavitt again on April 14, 2008, at the chronic care clinic. (CMS SMF ¶ 125; Resp. SMF ¶ 125; SAMF ¶ 87; Resp. SAMF ¶ 87.)  Watkins, finding no record of a visit to the VTC since December 2007, commented to Leavitt that he was "way overdue" to be seen there. (CMS SMF 126; Watkins Dep. at 23:24-24:7.) When Leavitt responded that he had been seen at the VTC a month earlier, Watkins called the VTC to ask for a dictated note, which she received via fax that day. (CMF SMF ¶ 127; Watkins Dep. at 29:6-30:10.) Watkins believes she actually received this report after this clinic visit with Leavitt.  (SAMF ¶ 88; Resp. SAMF ¶ 88; Watkins Dep. at  23 -30.) Leavitt counters that he initiated the conversation with Watkins, asking her why his medications had not been restarted following his March 12, 2008, visit to VTC.  Watkins told him that it was her fault for not sending a fax to VTC, asking what the dosage would be.  (Resp. SMF ¶¶ 126, 127; Leavitt Dep. at 102:3-103:5.)

The dictated note of Leavitt's March 12, 2008 , VTC visit said: "HIV disease. Needs to restart HIV therapy. Has been on many agents prior and likely has some resistance. Unfortunately we do not have his genotype at this time. Will need to start him back on Truvada/Kaletra now. Will recommend they obtain a CD4, VL and a genotype. F/U in 1 month." (CMS SMF ¶ 128; Resp. SMF ¶ 128; SAMF ¶ 89; Resp. SAMF ¶ 89.) Watkins interpreted that note to mean that treatment would actually be restarted after the VTC had received the results of lab tests, particularly the genotype test to determine whether Leavitt was resistant to any antiretroviral medications. (CMS SMF ¶ 125; Resp. SMF ¶ 125.)[18]

Watkins ordered the blood work recommended by VTC, asked that results be faxed to the VTC, and ordered follow-up with VTC. (CMS SMF ¶ 132; Resp. SMF ¶ 132; SAMF ¶ 90; Resp. SAMF ¶ 90.)   Watkins could have called VTC to get clarification from VTC as to what was meant by starting therapy "now," but she chose not to do so.   (SAMF ¶ 91; Resp. SAMF ¶ 91.) Leavitt's CD4, viral load and genotype results were obtained by Watkins on April 26, 2008, within ten days of being ordered. (SAMF ¶ 92; Resp. SAMF ¶ 92; CMS SMF ¶¶ 133, 135; Resp. SMF ¶¶ 133, 135.)   Watkins claims she did not start Leavitt's medications after she obtained the test results, because she expected Leavitt to revisit VTC in a short period of time. (SAMF ¶ 93; Resp. SAMF ¶ 93.)

Dr. Robert Smith, the Medical Director of VTC, who signed the dictated note of the March 12, 2008, consult in his capacity as preceptor for the infectious disease fellow who authored it, explained his understanding of the note as follows:

> Well, I would say that I wouldn't have used the word "now" because I don't think it is -- exactly because of the kind of question you're asking me, is

---

[18]     Leavitt responds with the single word: "Qualified."

> what does now mean. I think that the -- in the overall world of treating HIV and treating – starting antiretroviral therapy we -- it is a pace that is different than in, say, using  antibiotics to treat, an obvious example, pneumonia. We're treating a chronic infection. We're dealing with years of treatment.
>
> Personally, I would not use the word "now" ever in saying we need to treat HIV because I don't know whether I would be implying one hour or two months, and I think my difficulty in interpreting that is, first of all, that I didn't dictate it or write it. I signed it but did not write it. And I'm not sure I -- my – my sense is that the reason that that word is in there is that we thought, okay, it's time for us to get him on treatment; we'd like to get a genotype. Whether that happens, frankly, in one month or two months I don't think matters in this case, if you're asking that -- if you're asking my opinion on that, but I wouldn't have used the word "now."

(CMS SMF ¶ 130; Smith Dep. at 6:25-7:3, 45:9 -46:5; Valenti Dep. at 113:23-114:21, 115:13-116:17,  118:9-119:3.) In response to this factual outlay, Leavitt  states that Dr. Smith contradicted himself several times in his testimony and finally admitted he didn't know what was meant by the word "now."  (Resp. SMF ¶ 130; Smith Dep. at 30:6- 31:20. 46:6-12.)[19]  There is no dispute that Dr. Smith is an excellent AIDS physician whom the plaintiff's expert, Dr. August Valenti, goes to with HIV questions. (CMS SMF ¶ 131; Resp. SMF ¶ 131.)

The April 26, 2008, lab reports on Leavitt indicated a viral load of 297,562 and a CD4 of 296, and Watkins signed off on the results. (SAMF ¶ 94; Resp. SAMF ¶ 94; CMS SMF ¶ 134; Resp. SMF ¶ 134.) After receiving the viral load and genotype lab reports on April 26, 2008, Watkins did not take any steps to check to see if a follow-up visit at VTC had been arranged for Leavitt. (SAMF ¶ 95; Watkins Dep. at  62.)  However, on April 14, 2008, she had ordered follow-up with VTC. (Resp. SAMF ¶ 95; Watkins Dep. at 30-31, 62-64.)   Watkins is unable to explain why Leavitt did not return to VTC for a follow-up until June 25, 2008. (SAMF ¶ 96; Resp. SAMF ¶ 96.)   Although Watkins was not an HIV expert, she understood that an immunocompromised person with an abnormally low CD4 count would be at higher risk of

---

[19]     Leavitt also refers to an objection to Smith's answering the question as to what he meant by the word "now" because Smith had indicated he did not remember.  (Smith Dep. at 45:3-8.)

opportunistic infections, malignancy and cardiovascular disease, a more rapid progression of Hepatitis "C", and liver function decline.  (SAMF ¶ 97; Resp. SAMF ¶ 97.)

On April 1, 2007, Leavitt wrote a letter to Janna Dinkel, then CMS Health Services Administrator assigned to the Maine State Prison, in which he complained about being deprived of his HIV medications from the time of his arrest and incarceration at York County Jail on September 6, 2006, and stressed his fear that he would develop resistance to these drugs, which are "what keeps me alive."  (SAMF  ¶ 134; Resp. SAMF ¶ 134.) Dr. Tritch does not recall ever having seen or heard about Leavitt's letter to Dinkel. (SAMF ¶ 135; Resp. SAMF ¶ 135.)

In April 2008 Leavitt filed a administrative grievance with the prison, complaining that he was not receiving his HIV medications. (CMS SMF ¶ 136; Resp. SMF ¶ 136.)  Teresa Kesteloot received the grievance no later than May 1, 2008, and by that date had completed her investigation of it. (SAMF ¶ 140; Resp. SAMF ¶ 140; CMS SMF ¶ 137; Resp. SMF ¶ 137.) Kesteloot who succeeded Dinkel in September 2007, as CMS Health Services Administrator for the Maine State Prison, became aware of Leavitt's letter at some point after she assumed her position but does not know if Dinkel ever acted on Leavitt's complaint. (SAMF ¶ 136; Resp. SAMF ¶ 136.)  But there is no dispute that Leavitt attached a copy of the April 1, 2007, letter to Dinkel to his grievance. (SAMF  ¶ 137; Resp. SAMF ¶ 137.)  At the time Leavitt filed his grievance, Kesteloot was responsible for reviewing complaints and grievances relating to health care which were brought by prisoners. (SAMF ¶ 138; Resp. SAMF ¶ 138.)  If a prisoner complained about a delay in getting medical treatment, Kesteloot claims it was her practice to review the patient's chart and speak to the provider who directed the care of the patient. (SAMF ¶ 139; Resp. SAMF ¶ 139.)

35

On May 1, 2008, Kesteloot spoke with Leavitt and reviewed his chart. (CMS SMF ¶ 138; Kesteloot Dep. at 41:24-42:15.) Leavitt responds that Kesteloot's investigation was limited to speaking with Leavitt, examining part of his medical chart, and learning from Violet Hanson, a CMS nursing supervisor, that Leavitt's labs had recently been drawn and that he had been scheduled for an HIV clinic visit, but Kesteloot did not concern herself at all as to why Leavitt's antiretroviral therapy had been delayed to that point. (Resp. SMF ¶ 138; SAMF ¶ 143; Resp. SAMF ¶ 143.) Kesteloot understood that HIV was a very serious health condition which could develop into a fatal disease. (SAMF ¶ 144; Resp. SAMF ¶ 144.) In preparing her memorandum, Kesteloot did not review Leavitt's admission health screening, dated February 12, 2007, or his physical assessment, dated February 20, 2007, indicating that he was HIV Positive, that he had Hepatitis B and C, and that he reported having been on HIV medications at the time of his incarceration. (SAMF ¶ 145; Resp. SAMF ¶ 145.) Although Kesteloot would have been concerned by Leavitt's CD4 count of 262 and viral load of 60,440, lab results which were noted in Watkins's progress note of April 14, 2008, she did not look at those lab results in the course of preparing her memorandum. (SAMF ¶ 146; Kesteloot Dep. at 63 -65.) The defendants respond that Kesteloot was concerned with what was currently being done for Leavitt; she would likely not have reviewed old records toward that end. They reiterate that she did not regard herself as an HIV expert or as someone who could assess the quality of HIV care. (Resp. SAMF ¶ 146; Kesteloot Dep. at 64-65.)

Kesteloot reports that she took Leavitt's grievance seriously. (CMS SMF ¶ 139; Kesteloot Dep. at 42:20-21.)[20]   Upon inquiry, Kesteloot learned that Leavitt had been seen by

---

[20]   Once again, Leavitt cites to his statement of additional facts, Paragraphs 137-148, and asserts a jury might not find Kesteloot credible on this score. (Resp. SMF ¶ 139.)

providers in the Chronic Care Clinic and in the VTC; and that since Leavitt's last visit to the VTC labs had been drawn and a follow-up visit had been scheduled. (CMS SMF ¶ 140; Resp. SMF ¶ 140.)   Kesteloot's focus in investigating Leavitt's complaint was not on trying to determine whether past treatment had been appropriate – a determination that she, as a nurse, was not qualified to make – but solely whether Leavitt's current concerns were being addressed. (CMS SMF ¶ 141; Resp. SMF ¶ 141; Resp. SAMF ¶ 141; Kesteloot Dep. at 43-44.)  As a result of her investigation, Kesteloot wrote a memorandum to Bob Costigan, stating that Mr. Leavitt "appears to have been followed appropriately," and that his labs had been drawn and he was scheduled to be seen in follow-up by an infectious disease specialist. (CMS SMF ¶ 142; Resp. SMF ¶ 142.)  She based this judgment on the fact that he had been seen in the chronic care clinic at the prison, that he had been seen in the past by outside infectious disease specialists, and that his labs had recently been drawn and an appointment had been made for him at the HIV clinic. (SAMF  ¶ 141; Kesteloot Dep. at . 41 -44; Ex. 1.)  Although Kesteloot did not consider herself an HIV expert, she does not recall having sought the opinion of an HIV expert as to whether Leavitt's HIV care prior to the date of her memorandum had been appropriate. (SAMF  ¶ 142; Kesteloot Dep. at  44, 64; Kesteloot An. Interrog.  No.  21.)[21]   After writing her memorandum, Kesteloot did not investigate whether the delay in Leavitt's treatment was part of a broader problem in the treatment of HIV patients at the Maine State Prison, nor did she follow up on Leavitt to insure that there would be no further delays in his treatment.  (SAMF ¶ 147; Resp. SAMF ¶ 147.) [22]

---

[21]      The defendants ask that this statement be stricken insofar that it is offered to suggest Kesteloot had an obligation to make this consultation.  (Resp. SAMF ¶ 142.)  Naturally, the Court takes the statement for what it is, and its materiality is limited.

[22]      I am not considering the content of Statement of Additional Fact 148 as I do not think this paragraph fairly characterizes the testimony of the deponent on which it relies.

Costigan did not issue a written ruling on Leavitt's grievance until May 23, 2008, 23 days after Kesteloot's memorandum to him, at which time he denied it. (SAMF ¶ 151; Resp. SAMF ¶ 151.) Leavitt filed an appeal of Costigan's ruling to Jeffrey Merrill, the chief administrative officer of the Maine State Prison, on May 28, 2008. (SAMF ¶ 152; Resp. SAMF ¶ 152.) Merrill issued a denial of the appeal on July 1, 2008. (SAMF ¶ 153; Resp. SAMF ¶ 153.)[23]  During the time that Leavitt was incarcerated at the Maine State Prison, both state employees and CMS contract employees worked in the medical department of the prison. (SAMF ¶ 155; Resp. SAMF ¶ 155.)

On May 20, 2008, a scheduled visit with VTC was cancelled. (CMS SMF ¶ 143; Resp. SMF ¶ 143.)  On June 25, 2008, Leavitt was seen at VTC, at which time an order was given for antiretroviral medications at specified dosages. (CMS SMF ¶ 144; Resp. SMF ¶ 144.)  After Leavitt's visit to VTC on June 25, 2008, VTC sent a Consultation Provider Report, dated that date, to CMS in which it noted that "Pt close to AIDS dx + VL is very high," that the patient had thrush on his tongue and swollen nodes in his neck, and that he needed to "start HIV antiviral meds ASAP." (SAMF ¶ 98; Resp. SAMF ¶ 98.)

On June 26, 2008, which was the occasion of Dr. Tritch's first involvement in Leavitt's care since he had referred Leavitt to VTC in November 2007 (he had last seen him on August 10, 2007), he ordered the HIV medications that VTC had recommended, Kaletra and Truvada. (CMS SMF ¶ 145; Tritch Dep. at 53-55; SAMF ¶ 99; Resp. SAMF ¶ 99.) When Dr. Tritch reviewed Leavitt's chart on June 26, 2008, he concluded that his HIV medications should have been

---

[23]     Leavitt states that Commissioner Magnusson, whose duties include oversight of the prison system, including prison health care, does not know why it took approximately one month for Costigan to respond to Leavitt's level-one grievance and more than a month for Merrill to respond to his level-two grievance. (Resp. SAMF ¶ 154). However, the cited part of the Magnusson deposition -- Page 6, lines 6 -18 -- does not support this statement and I could not locate any such support in the portions of the deposition filed by Leavitt (or the defendants).

started sooner. (SAMF ¶ 100; Resp. SAMF ¶ 100.)  Leavitt finally began receiving his HIV medications, Truvada and Kaletra, on July 7, 2008. (SAMF ¶ 101; Resp. SAMF ¶ 101.)

Besides the thrush for which he treated Leavitt in August 2007, Dr. Tritch was never made aware of any other symptoms of HIV (leukoplakia, chills, night sweats, or fatigue) he experienced.   (CMS SMF ¶ 146; Tritch Dep. at 90:4-14.) Leavitt further notes that Tritch was the physician who was CMS's medical director for the Maine State Prison and he approved all requests to refer patients to outside consultations. (Resp. SMF ¶¶ 145, 146; SAMF ¶ 42; Resp. SAMF ¶ 42.)

Dr. Tritch now denies knowing why the initiation of antiretroviral therapy for Leavitt was delayed so long. (SAMF ¶ 102; Resp. SAMF ¶ 102.)  In responding to a complaint brought against him by Leavitt to the Maine Board of Licensure of Medicine on September 25, 2008, however, Dr. Tritch blamed the delays in Leavitt's care in part on a "chronic shortage of providers" and a "substantial ongoing turnover in the correctional medical system" at the Maine State Prison.  (SAMF ¶ 103; Resp. SAMF ¶ 103; Tritch Dep. at  107 -08, Tritch Dep. Ex. 2, Doc. No. 129-20 at 23-24.)

In his letter to the Board of Licensure in Medicine, Dr. Tritch also stated that Leavitt's "HIV viral load was undetectable" as of August 2007 and that his viral load did not become detectable until January 2008. (SAMF ¶ 104; Resp. SAMF ¶ 104.)[24]  Dr. Tritch now claims he does not recall why he thought Leavitt's viral load was undetectable at that time of his September 25, 2008, letter to the Board and that he believed it to be true when he wrote it, but he is unable to point to any test in 2007 in which Leavitt had an undetectable viral load.  (SAMF ¶

---

[24]        I deny the defendants' request to strike this statement on relevancy grounds.

105; Resp. SAMF ¶ 105.)[25]   Leavitt's viral load, which was reported to CMS on August 22, 2007, was over 100,000, representing what Tritch would consider a "substantial" increase from Leavitt's previous viral load. (SAMF ¶ 106; Resp. SAMF ¶ 106; Tritch Dep. at 43.)[26] Dr. Tritch has never corrected this inaccurate assertion to the Board.  (SAMF ¶ 107; Resp. SAMF ¶ 107; Tritch Dep. at  94 -95.)

CMS maintained a computerized offsite referral log which showed unusual delays in Leavitt's referral to an HIV specialist between March 2007 and June 2008. (SAMF ¶ 149; Resp. SAMF ¶ 149.)  The defendants add that the referral log shows the time intervals between referrals and actual consults retrospectively only.  (Resp. SAMF ¶ 149; Amberger Dep. at 31-36.)  Larry D. Amberger, regional manager for CMS for the State of Maine, the liaison between CMS and the Maine Department of Corrections, and the person responsible for overseeing site administrators, including Kesteloot, is unaware of any corporate investigation or audit which was conducted in response to Leavitt's April 24, 2008, grievance to determine if CMS personnel were adhering to protocols, policies, and standards of compliance.  (SAMF ¶ 150; Resp. SAMF ¶ 150.)

On August 10, 2007, January 6, 2008, and July 4, 2008, Leavitt submitted sick-call slips to the Department of Corrections expressly for HIV, and on July 26, 2007, August 5, 2007, August 10, 2007, October 9, 2007, October 15, 2007, October 25, 2007, November 6, 2007, January 6, 2008, March 3, 2008, May 29, 2008, May 29, 2008, and July 2, 2008, and July 4, 2008, Leavitt submitted sick-call slips to the Department of Corrections for HIV for thrush,

---

[25]      I deny the defendants' request to strike this statement on relevancy grounds.

[26]      The defendants add that the expert testimony establishes that the viral load is less useful than the CD4 count as an indication of the progression of HIV (Resp. SAMF ¶ 106; Pinsky Dep. at 22) but is used primarily as a 'baseline' to assess the effectiveness of treatment once it has started (Resp. SAMF 106; Smith Dep. at 12).

rashes or diarrhea.  (SAMF ¶ 156; Resp. ¶ 156;  Koenig Aff., Doc. 118 & Ex. 1, Doc. 118-2; Resp. SAMF ¶ 156.)

<u>Raymond Leavitt's Current State of Health and Long-Term Prognosis</u>

Leavitt first began suffering from thrush in July 2007 and it continued – waxing and waning --  until after he started on his HIV medications in July 2008.  (SAMF ¶ 108; Resp. SAMF ¶ 108; Leavitt Dep. at 52, 90, 91, 105 -06.) Leavitt reports that his night sweats and chills continued on and off until after he started taking his HIV medications again. (SAMF ¶ 109; Leavitt Dep. at  90 - 92.) Leavitt also reports that he still has warts on his fingers and rashes on his stomach and arms, continues to suffer from worsening fatigue and malaise and has great fear and uncertainty regarding his future as a result of his HIV drug interruption.  (SAMF ¶ 110; Leavitt Dep. at 92 -93, 106, 108; Am. Compl.  ¶ 37, Doc. 33.)[27]  After his incarceration at Maine State Prison, Leavitt's self-described HIV symptoms got worse, in that he suffered from thrush, warts and rashes, which he never had before.  (SAMF 37; Leavitt Dep. at 52: 8 – 13, 90 – 93.) The defendants add that the thrush waxed and waned because it was effectively treated with medication.  (Resp. SAMF ¶ 37; Leavitt Dep. at 91.)

Between August 2008 and December 2008, Leavitt lost some weight. (CMS SMF ¶ 147; Resp. SMF ¶ 147.)    Leavitt cannot say how much weight he lost or when he started to regain it. (CMS SMF ¶ 148; Resp. SMF ¶ 148.)    Leavitt's current weight is 170 pounds. (CMS SMF ¶ 149; Resp. SMF ¶ 149.)  Within a week after starting HIV medications, Leavitt's thrush went away. (CMS SMF ¶ 150; Resp. SMF ¶ 150.)   By July 2008 Leavitt's CD4 count had rebounded to 479. (CMS SMF ¶ 151; Resp. SMF ¶ 151.)

---

[27]        In response to Leavitt's description of his recurring problems, the defendants argue that there is no foundation for the suggestion that these symptoms are related to his HIV or immunological status. (Resp. SAMF ¶¶ 109, 110.)

In September 2008 Leavitt's CD4 count was 485. (CMS SMF ¶ 152; Resp. SMF ¶ 152.) In October 2008 Leavitt's CD4 count was 463. (CMS SMF ¶ 153; Resp. SMF ¶ 153.)   By October 2008 Leavitt's viral load was undetectable. (CMS SMF ¶ 154; Resp. SMF ¶ 154.)   In December 2008 Leavitt's CD4 count was 550. (CMS SMF ¶ 155; Resp. SMF ¶ 155.)   The fact that Leavitt's CD4 count was 550 in December 2008 is evidence of the reconstitution of his immune system. (CMS SMF ¶ 156; Resp. SMF ¶ 156.)   In January 2008 Leavitt's viral load was 434. (CMS SMF ¶ 157; Resp. SMF ¶ 157.)

Leavitt started Hepatitis C treatment on February 3, 2009. (CMS SMF ¶ 158; Resp. SMF ¶ 158; Resp. SAMF ¶ 159; Pinsky Aff. ¶ 4.)   The BioReference Lab Report issued March 1, 2009, with regard to a specimen collected February 27, 2009, indicates an absolute CD4 count of 252, but a percentage of CD4 cells of 36.6% which is not a decrease from the previous report of October 22, 2008, which reported a CD4 count of 463 but a CD4 percentage of 26%.  (Resp. SAMF ¶ 159; Pinsky Aff. ¶ 6; CMS SMF ¶ 159; Resp. SMF ¶ 159; Smith Dep. at  54:5 -9; Ex. 11.)  According to CMS, Leavitt's "absolute" CD4 count in February 2009 was low because Hepatitis C treatment was lowering his total white blood cell count:  The lower CD4 count reported in February 2009 was the result of Leavitt's treatment for Hepatitis C as opposed to reflecting any progressive impairment of his immune function as the result of his HIV drug interruption.  (Resp. SAMF ¶ 159; Pinsky Aff. ¶ 7; CMS SMF ¶ 160; Smith Dep. at 54:12-20.) The treatment for Hepatitis C can affect CD4 counts by lowering the total lymphocyte count which results in proportional lowering of the absolute CD4 count. However, one would expect the CD4 percentages to remain the same. There is no evidence that this change in the absolute CD4 count reflects a true decline in immune function. (Resp. SAMF ¶ 159; Pinsky Aff. ¶ 5.) The 36% ratio of CD4 cells to total white blood cells (in February 2009) actually represented an

increase from previous studies, and was evidence that Leavitt's immune system was "better than

it looks based on the absolute count." (CMS SMF ¶ 161; Smith Dep. at 54:23-55:1.)   Leavitt

responds that this is expert opinion and he had objected to Smith testifying as an expert.  (Resp.

SMF ¶¶ 160, 161.)  He also cites to the following two paragraphs of Valenti's post-deposition

affidavit:  While this low count may be the result of Leavitt's Hepatitis C treatment at the time, it

may also be consistent with his being at greater risk for immune recovery from his HIV drug

interruption. (Valenti Aff. ¶ 17.)  At the time this affidavit was executed by Valenti, Leavitt was

due for another blood test in September 2009 and Valenti believed that the results of that test, if

still low, would indicate to Valenti that he has likely suffered damage to his immune system,

which will take longer to reconstitute itself, if it does at all, than if he had remained continuously

on HAART from the time he was incarcerated at the York Jail in September 2006 or if his

therapy had been re-initiated shortly thereafter.  (Id. ¶ 18.)[28]

There is no dispute that, as of February 2009 Leavitt's HIV was described as having had

a "viral load blip." (CMS SMF ¶ 162; Resp. SMF ¶ 162.) As of June 2009 Leavitt's HIV disease

was stable, and he was feeling better since stopping Hepatitis C treatment, which had made him

ill.  (CMS SMF ¶ 163; Resp. SMF ¶ 163.)  It is impossible to say what subpopulations of

Leavitt's CD4 cells, if any, have been permanently destroyed or lost. (CMS SMF ¶ 164; Resp.

SMF ¶ 164.)  According to CMS, Leavitt's immune system is adequate to deal with any of the

opportunistic infections that tend to infect persons who are HIV positive. (CMS SMF ¶ 165;

Valenti Dep. at 40:12-41:7.) Leavitt responds that Valenti testified that Leavitt would probably

---

[28]      With respect to this affidavit statement/ responsive statement of fact and Leavitt's motion to  strike the
affidavit of Pinsky setting forth this result, Leavitt cannot have it both ways here with respect to the admissibility of
that September 2009 test result. It is material  to the key question of injury and it seems clear that if the results had
shown a decline in his immunity Leavitt would be pressing for the Court's consideration of these test results. I have
addressed this concern in a separate order on the motions to strike and to exclude.

have enough CD4 cells at 550 (his level in December 2008) to deal with common HIV

conditions.  (Resp. SMF ¶165; Valenti Dep. at 39:14-41:17.)

Leavitt stopped treatment for Hepatitis C in April of 2009. (Resp. SAMF ¶ 159; Pinsky

Aff. ¶ 8.)  The BioReference Lab Report issued September 10, 2009, regarding a blood sample

collected on September 9, 2009, indicates an absolute CD4 count of 510 and a CD4 percentage

of 33.8%. (Resp. SAMF ¶ 159; Pinsky Aff. ¶ 9.)  If the decrease in the CD4 count was due to the

treatment for Hepatitis C then it would rebound to normal levels once that treatment had ceased

and that is what happened in Leavitt's case. (Resp. SAMF ¶ 159; Pinsky Aff. ¶ 10.)  A CD4

count of 510 falls within the normal range and indicates that Leavitt has achieved full immune

recovery. (Resp. SAMF ¶ 159; Pinsky Aff. ¶ 11.)

Leavitt maintains that the long delay in the re-initiation of Leavitt's antiretroviral therapy

for HIV, starting with his incarceration at York County Jail on September 6, 2007, and

continuing through his incarceration at Maine State Prison, constituted a continuum of harm,

which led to Leavitt's becoming immunecompromised and suffering a dramatic drop in his CD4

count by April of 2008.  (SAMF ¶ 36; Valenti Dep. at  91 - 95, 98.)[29]  As a result of not

receiving HIV medication during his incarceration at the Maine State Prison between February

17, 2007, and July 7, 2008, Leavitt suffered immunological decline and damage to his CD4 cells

and CD 4 subsets, became ill, and suffered a number of symptoms, including thrush, fatigue,

malaise and night sweats, which were probably the result of that decline. (SAMF ¶ 122; Valenti

Dep. at 44, 91 -95, 98, 140, 164 --66, 167 -69, 171 -72; Pinsky Dep. at  33, 49; Smith Dep. at 39

-41; Ex.  6 at 48 -49; Ex.  9.)  The defendants respond that the cited testimony of Dr. Valenti

---

[29]     The defendants respond that this statement should be stricken. Whether an insult to the immune system,
including symptoms of the kind reported by Leavitt, insisting that what constitutes "harm" actionable under the
Eighth and Fourteenth Amendments and Section 1983 is an issue of law.  (Resp. SAMF ¶ 36.)  I have not stricken
the statement as it refers to a medical harm, not a legal one.

does not distinguish between the effects of the treatment interruption which occurred before Leavitt was incarcerated at the Maine State Prison and the effects of the interruption that occurred while he was in the Maine State Prison.  (Resp. SAMF ¶ 122; Cichon SMF ¶ 25; Resp. SMF ¶ 25.) Valenti acknowledges that Leavitt's  noncompliance with HIV medication regimen while outside prison would have had an impact on his immune system.  (Resp. SAMF ¶ 122; Valenti Dep. at 42-43.)  Furthermore, the cited testimony of Dr. Pinsky supports only the proposition that some of the symptoms Leavitt experienced, not all of them, were caused by the treatment interruption. (Resp. SAMF ¶ 122.)

According to the defendants, there are too many variables to make a definitive statement with regard to the amount of time it would take to place a patient back on therapy. It depends upon whether the patient has a straightforward history, it may take longer for the patient to be ready to begin treatment, medical records may take months to acquire, in a patient with a complicated history and where the CD4 count is high it might be appropriate to wait several months to obtain the appropriate data to begin treatment.  (Resp. SAMF ¶ 113; Pinsky Dep. at 140 -43.)  Although Dr. Pinsky would not have advocated a planned treatment interruption for Leavitt, by the time P.A. Cichon first saw Leavitt at the York County Jail he had been off medications for at least one month, (Resp. SAMF ¶ 114; Cichon SMF ¶ 10; Resp. SMF ¶ 10) and another 167 days elapsed before Leavitt was transferred to the Maine State Prison.  (Resp. SAMF ¶ 114; Pl.'s Doc. No. 54-4 ¶¶ 2-10.)  This presented his caregivers with a "completely different scenario" than would have existed if Leavitt had been continuously taking HIV medication and, even by May 2008, approximately nine months after Leavitt' s HIV medications were interrupted, there was no urgent indication to re-start treatment. (Resp. SAMF ¶ 114; Pinsky Dep. at 41-43; Smith Dep. at 32:6-23, 34:6-14.)

Leavitt could be harmed in the future if he is exposed to a pathogen or infectious agent that his body has at least partially lost the ability to fight.  (CMS SMF ¶ 166; Resp. SMF ¶ 166.) We do not know what subpopulations of Leavitt's CD4 cells have been destroyed.  (CMS SMF ¶ 167; Resp. SMF ¶ 167;  Resp. SAMF ¶ 36.)  We do not know which pathogens those destroyed subpopulations of CD4 cells would have been effective to fight, if they had not been destroyed. (CMS SMF ¶ 168; Resp. SMF ¶ 168.)  We do not know what pathogens or infectious agents Leavitt is likely to be exposed to in the future. (CMS SMF ¶ 169; Resp. SMF ¶ 169.) Today Leavitt's HIV disease is stable, (Resp. SAMF ¶ 36; Smith Dep. at 17:1-14) and his immune system is adequate to deal with any of the opportunistic infections that tend to infect persons who are HIV positive. (Resp. SAMF ¶ 36; Valenti Dep.  at 40:12-41:7). According to CMS it is impossible to quantify Leavitt's increased risk of disease. (CMS SMF ¶ 170; Valenti Dep. at 41:8-42:5; Resp. SAMF ¶ 36;.)   Leavitt responds with an unexplained denial.  He does cite to Valenti's deposition at 41: 18 through 42:5 and Valenti's post-deposition affidavit paragraphs 1 through 15. I have already set forth these paragraphs above in setting forth Leavitt's responses to CMS's  Paragraphs 16,18 20, 22, 24, 25.

There is no dispute that the opinion of the Leavitt's expert, Valenti, that Leavitt's life expectancy is shortened, is predicated on the statistically heightened risk that Leavitt will contract an infection or cancer. (CMS SMF ¶ 171; Resp. SMF ¶ 171.) There is no basis, other than speculation, that Leavitt may have become resistant to any medication. (CMS SMF ¶ 172; Resp. SMF ¶ 172.)  Since being incarcerated at the Maine State Prison in February 2007, Leavitt has worked continuously as a pod cleaner, with duties that include mopping, sweeping, wiping tables, and washing windows.  (CMS SMF ¶ 173; Resp. SMF ¶ 173.)    The only time Leavitt's

physical activities have been limited at the prison was when he was being treated for Hepatitis C in late 2008 and early 2009.  (CMS SMF ¶ 174; Resp. SMF ¶ 174.)

### *Recommended Disposition of Leavitt's Eighth Amendment Claims against the CMS Defendants*

It is fair to summarize the key dates in this record as really starting with the first consult with the VTC on May 9, 2007, when it was determined that there was no need for immediate action vis-à-vis restarting Leavitt's HIV medications again. There is no dispute that Leavitt had been off his HIV medications for quite some time when he was transferred to the prison and that it was medically necessary for him to see a specialist prior to the re-initiation of his HIV medications.  CMS's response to Leavitt's health needs from the time of his February intake screening and this consummated referral is not entirely irrelevant to the deliberate indifference analysis in terms of evaluating the state of mind of the CMS employees involved in Leavitt's care.  However, as the VTC specialist determined that follow-up would be appropriate somewhere between one and three months, it cannot be said that the failure of CMS employees to assure an earlier outside consultation would have accelerated the restarting of his antiretroviral medications.   Also, with respect to Leavitt's attempts to discredit the defendants' reliance on the studies they cite, there is no dispute that in 2007-2008, the VTC used the same information and recommendations that had been developed in the study of "drug naïve" patients to guide their treatment decisions for patients who had been on medications for a time and then stopped.

So proceeding chronologically from the May 9, 2007, VTC consultation, on May 24, 2007, Turner ordered the follow-up with Dr. York and the order form was placed in Leavitt's chart. There is no dispute that when Woodward saw Leavitt on June 10, 2007, she thought that the follow-up with Dr. York had been scheduled. The next activity was Leavitt's August 10,

2007, sick-call slip complaining of an inadequate response to his HIV related needs; Leavitt was seen by Tritch on that very day. Tritch treated Leavitt's thrush and ordered updated blood work to evaluate his HIV and a follow-up in one month, specifically to be scheduled with Tritch for September but this did not happen for reasons unknown to Tritch. The record contains no evidence that Tritch intentionally avoided this follow-up. The labs ordered by Tritch were drawn on August 15, 2007, and reported on August 22, 2007, showing a CD4 count of 424 and a viral load greater than 100,000. CMS providers had enough information to make a referral to VTC by September 1, 2007, but Tritch did not approve a referral until November 6, 2007, when he noted as the reason for the referral on Leavitt's chart that Leavitt "wants to go to Virology for discussion of HIV/HEP C treatment." Leavitt has produced no evidence that Tritch received information about Leavitt's August 2007 lab tests prior to November 6, 2007, at which point he immediately referred Leavitt for follow-up at VCT. It may well be that Tritch had an affirmative duty to proactively review Leavitt's file in the aftermath of the August 10, 2007, exam before November 6, 2007. However, the Eighth Amendment standard is not met by laxness, it requires evidence from which a fact-finder could infer a wanton disregard.

Woodward did see Leavitt on September 1, 2007, noted that a referral to VTC was called for, and made an assumption that the September 2007 follow-up with Tritch would occur. Leavitt does not produce any evidence that this is an inaccurate description of Woodward's state of mind. He stresses only her awareness of the file and the fact that Woodward took no steps to investigate although she had an opportunity to do so. Again Woodward saw Leavitt on October 22, 2007, and that the topic of this exam was Leavitt's thrush and rash and his desire for HIV and Hepatitis C treatment; Woodward ordered medications, lab testing including a Hepatitis C genotype and viral load and a follow-up with Tritch in view of his August 10 order.

48

As a consequence of Tritch's November 6, 2007, review of Leavitt's chart and his order for a referral, Leavitt was seen by the VTC on December 19, 2007.  VTC noted in a Provider Consultation report to CMS that Leavitt met the criteria for starting antiretroviral therapy for HIV, requested a repeat viral load as a baseline for treatment, a repeat CD4, as well as a test to determine his HIV genotype, and asked for a follow-up appointment in one month – meaning four to six weeks -  so it could recommend antiretroviral therapy.  This was VTC's first recommendation that a genotype be obtained.

Within six days of the December 19, 2007, consult Woodward had ordered an HIV viral load and an immune function panel for Leavitt; requested that the results of Leavitt's lab work be sent directly to the Virology Treatment Center; and ordered follow-up with the Virology Treatment Center in one month.  On January 9, 2008, Woodward saw Leavitt, reviewed the VTC note dictated on December 19, 2007, and entered an order to add genotype to the lab work.  The labs were drawn on January 9, but did not include the ordered genotype apparently because of some trouble on the Bio Reference end. Woodward made an assumption that Bio Reference would contact the prison about the problem and she does not know why the genotype report was not produced until April 2008.  With respect to the follow-up visit with VTC there is no dispute that Woodward reviewed the December 19, 2007, note again on January 23, 2008, and took the step of re-ordering the follow-up since it had not occurred per her prior order.  Woodward was taking steps consistent with the information she found in the file, was intent on having the necessary lab work done, and the follow-up with VTC arranged, and this is all evidence of an intent to treat Leavitt's HIV and is inconsistent with the subjective state of mind necessary to attach liability for a failure to treat under the Eighth Amendment cruel and unusual punishment clause.

49

A follow-up was scheduled with VTC for February 27, 2008,[30] this appointment was canceled due to the weather and Leavitt was again seen on March 12, 2008, and at this point VTC had not received Leavitt's genotype.  The dictated note of Leavitt's March 12, 2008, VTC visit said: "HIV disease. Needs to restart HIV therapy. Has been on many agents prior and likely has some resistance. Unfortunately we do not have his genotype at this time. Will need to start him back on Truvada/Kaletra now. Will recommend they obtain a CD4, VL and a genotype. F/U in 1 month."  This note, which Watkins received on April 14, 2008, said that Leavitt needed to be started back on medications "now" and Watkins interpreted that note to mean that treatment would actually be restarted after the VTC had received the results of lab tests, particularly the genotype test to determine whether Leavitt was resistant to any antiretroviral medications. Leavitt has through his deposition testimony created some evidence that Watkins accepted fault for not faxing a quest for dosage amounts to VTC.  Watkins could have called VTC to get clarification from VTC as to what was meant by starting therapy "now," but she chose not to do so.  Watkins claims she did not start Leavitt's medications after she obtained the test results because she expected Leavitt to revisit VTC in a short period of time.    Watkins signed off on the April 26, 2008, lab reports.  After receiving the viral load and genotype lab reports, Watkins did not take any steps to check to see if a follow-up visit at VTC had been arranged for Leavitt although on April 14, 2008, she had ordered follow-up with VTC.    Watkins is unable to explain why Leavitt did not return to VTC for a follow-up until June 25, 2008.  Thus, with respect to the treatment provided to Leavitt by Watkins Leavitt has generated evidence of what might be described as a lack of due diligence in following-up with Leavitt's treatment needs during this

---

[30]    Watkins saw Leavitt the day before for a rash and observed in her note that he needed a VTC follow-up.

period after she received the April lab reports and ordered the VTC consult. However, as with

Woodward's actions or inactions, there is simply no evidence that this was more than negligence,

particularly in light of the evidence that Watkins intended for Leavitt to be seen by the VTC for a

follow-up.  Leavitt has not set forth in this record any evidence that had Watkins called VTC in

April to get clarification that VTC would have immediately prescribed a resumption of

medications without a follow-up or insisted that it was imperative that Leavitt be seen for a

consult with heightened immediacy.

     A follow-up visit with VTC was scheduled for May 20, 2008, but was cancelled for

reasons that do not appear on this record and Leavitt was seen on June 25, 2008, at VTC.  The

next day Tritch ordered the HIV medications—Kaletra and Truvana – and at this review of

Leavitt's chart he concluded that the HIV medications should have been started earlier.  Leavitt

began receiving his medications on July 7, 2008.

     Leavitt does not dispute that Kesteloot's focus in investigating Leavitt's April grievance

was not on trying to determine whether past treatment had been appropriate – a determination

that she, as a nurse, was not qualified to make – but solely whether Leavitt's current concerns

were being addressed.  The fact that Kesteloot did not attempt to follow-up on Leavitt's

treatment after her early May report is of little moment given that there is no record evidence that

suggests that any of the CMS employees identified by Leavitt as responsible for his care were

responsible for the cancellation of the May 20, 2008, consult. That is, Leavitt has not explained

how things would have transpired more advantageously had Kesteloot done this follow-up.

     "In evaluating the quality of medical care in an institutional setting, courts must fairly

weigh the practical constraints facing prison officials."  DesRosiers v. Moran, 949 F.2d 15,

19 (1st Cir. 1991) (citing Wilson v. Seiter, 501 U.S. 294, 302 (1991)). And it is worth repeating

that the precedent is clear that "inadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference." Id. (citing Whitley v. Albers, 475 U.S. 312, 319 (1986),  Layne v. Vinzant, 657 F.2d 468, 471 (1st Cir.1981), and Ferranti v. Moran, 618 F.2d 888, 890-91 (1st Cir.1980)).  With respect to the liability of the individual CMS defendants, taking the facts that are not disputed, at most Leavitt has made a case of negligence. See Daniels, 474 U.S. at 666; Estelle, 429 U.S. at 105-06.  Leavitt's effort to cite a multitude of his additional statements of fact as grounds for believing that a fact-finder could doubt the credibility of the CMS Defendants is not sufficient to carry his burden in view of the facts in this record that demonstrate an intent to test and refer for outside consultation, however ineffectually they followed up on this intent. Even after Leavitt has had a full opportunity at discovery, he has not made a case that the medical providers purposefully ignored Leavitt's HIV condition; rather, the record reveals that there was repeated examination, testing, and orders for referrals. These efforts do not support an inference of deliberate indifference but suggest an intent to evaluate and refer to outside consultants spanning from the time of Leavitt's February 2007 intake evaluation through to his placement on medication in July 2008.   This case underscores the difference between ordinary negligence that would sustain a medical malpractice claim and deliberate indifference that would be required to support an Eighth Amendment claim.

As for CMS's liability as an entity, Leavitt's theory of recovery could only be premised on a custom and policy theory.[31] See Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978); Pembaur v. City of Cincinnati, 475 U .S. 469, 478 (1986); City of Canton v. Harris, 489 U.S. 378, 385 (1989); see also Whitfield v. Melendez-Rivera, 431 F.3d 1, 9 -14 (1st Cir. 2005);

---

[31]     CMS concedes that, as a private entity operating in its capacity at the Maine State Prison in the time in question, it can be held liable in the same way that a municipality could.  (CMS Mot. Summ. J. at 10 & n. 1.)  See, e.g, Mracna v. Correctional Medical Services, No. 1:07-cv-1071, 2009 WL 3060423, 2 -3 (W.D.Mich. Sep 22, 2009)

Gaudreault v. Municipality of Salem, 923 F.2d 203, 209 (1st Cir. 1990); Choate v. Merrill, Civ.

No. 08-49-B-W, 2009 WL 3487750, 5 (D. Me. Oct. 20, 2009) (recommended decision); see cf

Sanchez v. Pereira-Castillo, __ F.3d. __, __-__, 2009 WL 4936397, 12 -13 (1st Cir.  Dec. 23,

2009).  First, there has to be an underlying constitutional violation for Leavitt to proceed against

CMS and I have already concluded that Leavitt has not created a genuine dispute of material fact

sufficient to warrant proceeding to trial against any of the CMS employees named as defendants.

Second, Leavitt has entirely failed to brief a custom or policy theory of liability against CMS[32]

and has presented precious few facts that could possibly support such a claim.  There is no

dispute that Tritch denies knowing why the initiation of antiretroviral therapy took so long and

he did blame the chronic shortages of providers and staff turnover in his letter responding to

Leavitt's Board of Licensure complaint.[33] There is no dispute that from July 7, 2007, through

July 30, 2008, there were staffing shortfalls vis-à-vis physician and mid-level providers. Leavitt

also includes the statement that CMS has a computerized tracking system to monitor referrals but

the record does not include evidence that this system was a form of proactively alerting

personnel to the need for follow-up.  The factual assertion is that this database showed unusual

delays of orders referring to Leavitt.  In order for these facts to be material Leavitt would have

needed to present the court with further evidence, such as of systemic problems with inmate

medical care at the prison involving other inmates prior to or concurrent with Leavitt's treatment

period.  Leavitt states that CMS had no pathway, protocol, or guideline for HIV treatment at the

Maine State Prison but beyond this conclusory statement Leavitt has not explained what these

alleged deficiencies mean with respect to Leavitt's care.  The fact that CMS did not institute a

---

[32]     In his consolidated brief Leavitt suggests that CMS as a corporation can be held liable for deliberate indifference.  (Consolidated Mem. Opp'n Mots. Summ. J. at 21.)

[33]     Tritch also made inaccurate statements that Leavitt's viral load was undetectable until January 2008.

corporate investigation or audit after the Leavitt grievance is not material to whether his rights were violated prior to that grievance.

## CONCLUSION

For these reasons I recommend that the Court grant the motion for summary judgment (Doc. No. 111).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 31, 2009

54