UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RAYMOND LEAVITT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civ. No. 8-132-B-W |
| | ) |
| CORRECTIONAL MEDICAL SERVICES, | ) |
| INC., et al., | ) |
| | ) |
| Defendants | ) |
| | ) |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**
**(Doc. No. 113)**

Raymond Leavitt has filed a civil rights action seeking remedy for alleged denial of

adequate medical care during the time he was an inmate at the Maine State Prison.  Leavitt's

complaint has a count under the Eighth Amendment of the United States Constitution and a

count under Title II of the Americans with Disability Act (ADA).  This recommended decision

addresses a motion for summary judgment filed by Defendants Martin Magnusson, Jeffery

Merrill, and Robert Costigan.[1]  I recommend that the Court grant the motion.

*Discussion*

I.      **Summary Judgment Standard**

"At the summary judgment stage," the United States Supreme Court explained in <u>Scott v.</u>

<u>Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a

'genuine' dispute as to those facts." 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil

Procedure 56(c)).  <u>Scott</u> reemphasized: "'When the moving party has carried its burden under

Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt

---

[1]      At times I refer to these defendants as the "State Defendants."   Martin Magnusson is also a named
defendant, but only on the ADA count and only in his official capacity.  The other defendants have also moved for
summary judgment, one motion being pressed by Albert Cichon who worked at the York County Jail and the other
advanced by Correctional Medical Services and their employees who were responsible for medical care at the Maine
State Prison during the times relevant to Leavitt's claims.

as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

## II.     Facts[2]

The parties think that the following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Raymond Leavitt is currently an inmate at the Maine State Prison (Maine State Prison). (State SMF ¶ 1; Resp. SMF ¶1.)  He was diagnosed with Human Immunodeficiency Virus (HIV) in 1991. (State SMF ¶ 2; Resp. SMF ¶2.)  From September 2004 through September 6, 2006, Leavitt was prescribed two medications for the treatment of his HIV infection: Truvada and Kaletra. (State SMF ¶ 3; Resp. SMF ¶3.)

---

[2]     In a separate order I have denied a motion to strike filed by Leavitt that implicated the defendants' reliance on an affidavit of Dr. Pinsky reporting results from a September 20, 2009, test on Leavitt.

Leavitt was incarcerated at the York County Jail from September 6, 2006, until February 12, 2007. (State SMF ¶ 4; Resp. SMF ¶ 4.)  He did not receive his HIV medication for the time-period he was at the York County Jail. (State SMF ¶ 5; Resp. SMF ¶ 5.)

Leavitt was transferred to Maine State Prison on February 12, 2007.  (State SMF ¶ 6; Resp. SMF ¶ 6.)   When Leavitt arrived he had not been on HIV medication for approximately 167 days. (State SMF ¶ 7; Resp. SMF ¶ 7.)  When an HIV patient who has been on medication for an HIV condition stops their medication for a period of time, a series of laboratories should be performed to assess the status of the HIV infection before re-initiating antiretroviral medications. (State SMF ¶ 8; Resp. SMF ¶ 8.)   Additionally, prior to re-initiating HIV medications, a history of treatment should be requested, including a history of prior medical regimes. (State SMF ¶ 9; Resp. SMF ¶ 9.)

According to the moving defendants, there is never an "emergency need to initiate antiretroviral therapy" as the risks of withholding HIV treatment in the short run are negligible to zero.  (State SMF ¶ 10; Pinsky Dep. at 44.)  Leavitt responds that the "short run" for re-initiating therapy should be no more than one month and that such a delay is only justified by the need to obtain CD4 results, viral counts, genotypes, and records of prior treatments.  (Resp. SMF. ¶ 10; SAMF ¶ 113; Valenti Dep. at  99 - 102; Pinsky Dep. at  41 -42.) Leavitt does concede that seeing an HIV patient currently on their medication is a completely different scenario than seeing an HIV patient whose medications are stopped for a period of time. (State SMF ¶11; Resp. SMF ¶ 11.)  This is because one of the unique concerns in HIV management is the potential to develop resistance to the medications; this resistance is a major concern in initiating medications as well as in re-initiating medications. (State SMF ¶ 12; Resp. SMF ¶ 12.)

The primary tests normally used for HIV patients are a CD4 count and a viral load. (State SMF ¶ 13; Resp. SMF ¶ 13.)  A CD4 count is a measure of the state of the immune system of the patient. (State SMF ¶ 14; Resp. SMF ¶ 14.)   The CD4 count is the best estimate of an individual's

risk of at least short term progression to develop clinical symptoms and the risk of HIV complications such as opportunistic infections and opportunistic malignancy. (State SMF ¶ 15; Resp. SMF ¶ 15.)

In 2006 the Department of Health and Human Services (DHHS) issued guidelines regarding the use of antiretroviral therapy in HIV patients.  (State SMF ¶ 16;  Valenti Dep. at 28 – 30; Resp. SMF ¶ 16.)   These guidelines indicated that a patient who has never previously been on HIV medication could defer the initiation of treatment while their CD4 count was above 350, as long as the patient did not suffer from any AIDS defining illness or severe HIV symptoms. (State SMF ¶ 17; Resp. SMF ¶ 17.)

According to the State Defendants, there was a debate in the medical community whether this "deferred treatment approach" could be applied to HIV patients with CD4 counts greater than 200 and less than 350. (State SMF ¶ 18; Valenti Dep. at  36:5-23.)  They maintain that the DHHS guidelines, although addressing individuals not yet treated with HIV medications, are also useful in determining the appropriate treatment for HIV patients who have been on antiretroviral medication previously. (State SMF ¶ 19; Pinsky Dep. at  24: 16-22.)  Leavitt responds that deferred treatment – also known as drug holidays --  are practiced in highly supervised research settings.  The standard of care in 2006 was that the only reason for deferring the re-initiation of HIV drug treatment in an experienced patient was to get information and select the best regime.  (Resp. SAMF ¶ 18; Valenti Dep. at 25-35, 176.)  These guidelines did not apply to the re-initiation of therapy for experienced patients, and the standard of care in 2006 was that the only reason for deferring the re-initiation of HIV drug treatment in an experienced patient was to get information and select the best regime. (Resp. SAMF ¶ 19; Valenti Dep. at 29-33, 34-35, 176.)

According to the State Defendants, the viral load is most helpful to assess the response to treatment.  (State SMF ¶ 20; Pinsky Dep. at 22.)  Leavitt qualifies by asserting that HIV RNA (viral

load) may also be helpful in determining when to initiate antiretroviral therapy.  (Resp. SMF ¶ 20; Valenti Dep. Ex. 3 at 4; Pinsky Dep. at 22.)  There is no dispute that a genotype test determines whether an HIV patient has acquired resistance to particular medications. (State SMF ¶ 21; Resp. SMF ¶ 21.)

Leavitt received medical treatment at the Maine State Prison from Correctional Medical Services. (State SMF ¶ 22; Resp. SMF ¶ 22.)   According to the Medical Director for Correctional Medical Services at the Maine State Prison, Dr. Todd Tritch, inmates with HIV were referred to an outside specialist for treatment of their HIV. (State SMF ¶ 23; Resp. SMF ¶ 23.)   This treatment would include the initiation or re-initiation of antiretroviral medications. (State SMF ¶ 24; Resp. SMF ¶ 24.)  Dr. Tritch did not, himself, initiate or re-initiate medications for inmates with HIV. (State SMF ¶ 25; Resp. SMF ¶ 25.)  Leavitt's expert, Doctor Valenti, agrees that a primary care doctor should refer an HIV patient to an outside HIV specialist for treatment. (State SMF ¶ 26; Resp. SMF ¶ 26.)

Shortly after his arrival at Maine State Prison, laboratory tests, including a CD4 count and a viral load, were done on Leavitt on February 26, 2007. (State SMF ¶ 27; Resp. SMF ¶ 27.)  Leavitt's medical treatment included several visits to an outside facility, the Virology Treatment Center. (State SMF ¶ 28; Resp. SMF ¶ 28.)  From February 2007 through July 2008 Leavitt was seen by the Virology Treatment Center four times. (State SMF ¶ 29; Resp. SMF ¶ 29.)

 On May 9, 2007, Leavitt was seen by the Virology Treatment Center by a team including Dr. Robert Smith. (State SMF ¶ 30; Resp. SMF ¶ 30.)   At the time of the May 9, 2007, visit, Smith was aware that Leavitt had not been on his medication as of September 2006. (State SMF ¶ 31; Resp. SMF ¶ 31.)  Smith noted that Leavitt denied having symptoms of active HIV at that time, including fever, chills, and weight loss.  Smith also noted at this visit that Leavitt did not have other outward physical symptoms of active HIV, such as thrush.  (State SMF ¶¶ 32, 33; Smith Dep. at 10 -20.)

Leavitt responds that Smith was not able to say whether Leavitt was referring to just his present symptoms or his symptoms since the time he stopped taking HIV medications in September 2006 (Resp. SMF ¶ 32; Smith Dep. at 10:8:14) and Smith did not testify that Leavitt had no outward physical symptoms of active HIV, including thrush, on May 9, 2007, only that there were none noted by the VTC team (Resp. SMF ¶ 33; Smith Dep. at 11:17-20).

Smith reviewed Leavitt's laboratory results from February 26, 2007.  (State SMF ¶ 34; Resp. SMF ¶ 34.) These laboratory results indicated a CD4 count of 460 and a viral load of 97,548. (State SMF ¶ 35; Resp. SMF ¶ 35.)  Smith ordered new laboratory tests, including a new CD4 count and viral load, as a predicate to re-initiating antiretroviral therapy. (State SMF ¶ 36; Resp. SMF ¶ 36.) He ordered the tests to get a more current baseline and to see if his CD4 count put Leavitt at risk for opportunistic infections or complications. (State SMF ¶ 37; Resp. SMF ¶ 37.)   The consultation notes from the May 9, 2007, visit also indicated that the Virology Treatment Center wanted to review Leavitt's prior medical records. (State SMF ¶ 38; Resp. SMF ¶ 38.) Smith's purpose for requesting additional information prior to re-initiating antiretroviral medications at this visit was his understanding that when treating a patient with HIV for a long period of time it is important to have specific information regarding the state of his immunological status over the years, including prior medication regimes and any prior resistance. (State SMF ¶ 39; Resp. SMF ¶ 39.) Smith would not start a medication regime without this information as it would be perilous because of the possibility of an inadequate regime and the possibility of resistance. (State SMF ¶ 40; Resp. SMF ¶ 40.)

At this time, it appeared to Smith that Leavitt had a good buffer in terms of immunological reserve to protect him and his CD4 count indicated that there was no urgency to start treatment. (State SMF ¶ 41; Smith Dep. at 34:2-14.) A provider consultation report from the May 9, 2007, visit indicated that "treatment is not needed urgently" based on Leavitt's laboratory results and the absence of symptoms of HIV.  (State SMF ¶ 42; Smith Dep. Ex. 4; HIV Initial consultation report,

6

VTCA, 5/9/07.)  Leavitt qualifies these statements by cross-referencing Paragraph 52 of his statement of additional fact.  (Resp. SMF ¶¶ 41, 42.)  That statement of additional fact asserts that though the VTC May 9, 2007, Provider Consultation Report on Leavitt stated that there was "[n]o urgent indication for RX with CD4 at 460," the phrase was not intended to mean it was acceptable to wait six months to reexamine the patient and determine whether to start his antiretroviral therapy, but meant, at most, a follow-up based on lab results within about three months to determine whether therapy should be re-initiated. (SAMF ¶ 52; Resp. SAMF ¶ 52(qualification); Smith Dep. at  34 -35.)

On August 15, 2007, a laboratory was drawn on Leavitt indicating his CD4 count was 424. (State SMF ¶ 43; Resp. SMF ¶ 43.)  Leavitt was next seen at the Virology Treatment Center on December 19, 2007. (State SMF ¶ 44; Resp. SMF ¶ 44.)  At that visit, Leavitt began exhibiting some symptoms such as fatigue and thrush. (State SMF ¶ 45; Resp. SMF ¶ 45.)   A genotype was requested by the Virology Treatment Center for the first time on this date. (State SMF ¶ 46; Resp. SMF ¶ 46.) A genotype was not requested until that date because the Virology Treatment Center was waiting for previous records for Leavitt as it is more useful to review genotypes from when the patient was on HIV medications. (State SMF ¶ 47; Resp. SMF ¶  47.)  According to the consultation report from the December 19, 2007, visit, the Virology Treatment Center also wanted to review Leavitt's past medical record prior to re-initiating treatment. (State SMF ¶ 48; Resp. SMF ¶ 48.)

Leavitt was next seen at the Virology Treatment Center on March 12, 2008. (State SMF ¶ 49; Resp. SMF ¶  49.)  At that time it was again noted that a genotype test should be obtained to determine Leavitt's resistance prior to re-initiating treatment. (State SMF ¶ 50; Resp. SMF ¶ 50.) The consultation report from this visit indicated that Leavitt had two symptoms, fatigue and occasional thrush. (State SMF ¶ 51; Resp. SMF ¶ 51.)   The consultation report from this visit also indicated that Leavitt did not suffer from any other symptoms such as malaise, swollen glands, rash,

7

fever, chills, night sweats, vision changes, gastrointestinal problems, etc. (State SMF ¶ 52; Resp. SMF ¶ 52.)

On April 14, 2008, Charlene Watkins, a nurse practitioner at Maine State Prison ordered laboratories for Leavitt, including a CD4 count, a viral load, and a genotype. (State SMF ¶ 53; Resp. SMF ¶ 53.)   On April 23, 2008, a laboratory was drawn indicating that Leavitt's CD4 count was 296. (State SMF ¶ 54; Resp. SMF ¶ 54.)   The laboratory results also indicated a viral load of 297,562. (State SMF ¶ 55; Resp. SMF ¶ 55.)

Leavitt was again seen at the Virology Treatment Center on June 25, 2008.   (State SMF ¶ 56; Resp. SMF ¶ 56.)   According to a consultation report from that visit, Leavitt was exhibiting some symptoms of HIV, namely thrush, fatigue, malaise, and night sweats. (State SMF ¶ 57; Smith Dep. Ex. 10, Consultation report, VTCA, 6/25/08; Smith Dep. at  49:18-24.)   This report also noted that Leavitt had swollen glands and athralgias.   (Resp. SMF ¶ 57; Smith Dep. Ex. 10.)     The laboratory results from April 23, 2008, were reviewed at this visit. (State SMF ¶ 58; Resp. SMF ¶ 58.)   The results suggested to Smith that there was a change for the worse in Leavitt's immune system.  (State SMF ¶ 59; Resp. SMF ¶ 59; Smith Dep. at  48 -49.)   The consultation report from this visit included a recommendation to the prison to re-start Truvada and Kaletra for HIV management. (State SMF ¶ 60; Resp. SMF ¶ 60.)

On June 26, 2008, Dr. Tritch ordered a prescription for Leavitt for Truvada and Kaletra. (State SMF ¶ 61; Resp. SMF ¶ 61.)  Leavitt began taking his medication for his HIV condition on July 7, 2008. (State SMF ¶ 62; Resp. SMF ¶ 62.)   Since Leavitt began receiving his medication on July 7, 2008, his symptoms have receded. (State SMF ¶ 63; Resp. SMF ¶ 63.) Leavitt self-reports that he still has warts on his fingers and rashes on his stomach and arms, continues to suffer from worsening fatigue and malaise and has great fear and uncertainty regarding his future as a result of

his HIV drug interruption.  (SAMF ¶ 110; Leavitt Dep. at 92 -93, 106, 108; Am. Compl.  ¶ 37, Doc. 33.)[3]

 A laboratory was done on July 21, 2008, after Leavitt began taking his medication on July 7, 2008. (State SMF ¶ 64; Resp. SMF ¶ 64.)  This laboratory result indicated that Leavitt's CD4 count was 479. (State SMF ¶ 65; Resp. SMF ¶ 65.)  A laboratory was also drawn on Leavitt on July 29, 2008. (State SMF ¶ 66; Resp. SMF ¶ 66.)  This laboratory result indicated that Leavitt's viral load dropped to 1,087. (State SMF ¶ 67; Resp. SMF ¶ 67.)

Leavitt was seen at the Virology Treatment Center on August 13, 2008. (State SMF ¶ 68; Resp. SMF ¶ 68.)   According to the consultation report from that visit, Leavitt had a good response for three weeks of treatment. (State SMF ¶ 69; Resp. SMF ¶ 69.)   By October 2008 Leavitt's viral load was undetectable. (State SMF ¶ 70; Resp. SMF ¶ 70.)  A laboratory was also drawn on Leavitt in December 2008. (State SMF ¶ 71; Resp. SMF ¶ 71.)  Leavitt's CD4 count rose to 550 in December 2008. (State SMF ¶ 72; Resp. SMF ¶ 72.)  Leavitt's viral load in December 2008 stayed at an undetectable level.  (State SMF ¶ 73; Resp. SMF ¶ 73.)

According to Leavitt's current treating physician at the Maine Virology Clinic, Dr. Smith, as of his last visit in June of 2009, he was "stable, status quo" and his HIV was under control. (State SMF ¶ 74; Resp. SMF ¶ 74; Smith Dep. at 17-18.)[4]  Leavitt's expert, Dr. Valenti, reports that it appears Leavitt is "doing very well" and is responding well to treatment and is not resistant to Truvada and Kaletra.  (State SMF ¶ 75; Valenti Dep. at  146 -47.)

A laboratory result from February 27, 2009, indicated that Leavitt's CD4 count was 252 and 36 percent. (State SMF ¶ 76; Resp. SMF ¶ 76.)  Leavitt's CD4 count dropped to 252 because he

---

[3]     In response to Leavitt's description of his recurring problems, the defendants argue that there is no foundation for the suggestion that these symptoms are related to his HIV or immunological status. (Resp. SAMF ¶¶ 109, 110.)
[4]     Leavitt asserts in response to this statement that Smith is not designated as an expert witness and that Leavitt's prognosis should be subject to expert testimony.  .

began receiving Hepatitis C treatment which lowered his total white blood cell count and subsequently his absolute CD4 count. (State SMF ¶ 77; Resp. SMF ¶ 77.)   The percent CD4 count of 36 percent actually was an increase from Leavitt's previous CD4 percent. (State SMF ¶ 78; Resp. SMF ¶ 78.)  Dr. Smith interpreted the results to mean that Leavitt's immune system was "better than it looks based on the absolute count." (State SMF ¶ 79; Resp. SMF ¶ 79.)

In addition to being seen at the Virology Treatment Center, Maine State Prison inmates with HIV were also seen every three months at the Chronic Care Clinic at Maine State Prison. (State SMF ¶ 80; Resp. SMF ¶ 80.)  According to Dr. Tritch, the Correctional Medical Services guidelines were that an inmate with HIV should be seen every three months at these clinics. (State SMF ¶ 81; Resp. SMF ¶ 81.)  During the relevant period, Leavitt was seen at the Chronic Care Clinic or Infectious Disease Clinic on March 25, 2007, June 10, 2007, October 22, 2007; January 1, 2008, and April 14, 2008. (State SMF ¶ 82; Resp. SMF ¶ 82.)

Between his arrival and the time he received his prescription for his medication, Leavitt submitted 23 sick call slips regarding various complaints. (State SMF ¶ 83; Resp. SMF ¶ 83.)  The complaints included ailments ranging from thrush to requests for denture cream. (State SMF ¶ 84; Resp. SMF ¶ 84.)  Leavitt was treated for these complaints and received treatment, such as cream for an on-going rash.  (State SMF ¶ 85; Koenig Aff.)[5]  None of Leavitt's sick call slips indicated serious illness requiring any hospitalization. (State SMF ¶ 86; Koenig Aff.)[6]

Leavitt resided in the general population since arriving at Maine State Prison in February 2007 and did not require special housing.  (State SMF ¶ 87; Resp. SMF ¶ 87.)  Leavitt has earned good time consistently while at the Maine State prison and worked in various jobs including as a pod

---

[5]       Leavitt purportedly qualifies this statement by arguing that he was treated for lesser complaints but was not appropriately treated for the HIV itself through the re-initiation of anti-retroviral therapy. (Resp. SMF ¶ 85; PSAMF ¶ 56.)

[6]       Leavitt qualifies this statement by asserting that while none of these complaints required hospitalization, they were serious illnesses.  (Resp. SMF ¶ 85; SAMF ¶¶ 56, 156.)

cleaner and kitchen worker and did not have any physical activity limitations until he began to receive treatment for his Hepatitis C. (State SMF ¶ 88; Resp. SMF ¶ 88.)

From the date of his incarceration at the Maine State Prison on February 12, 2007, through July 28, 2008, Leavitt filed only one grievance – consolidating two complaints – concerning HIV medication with Department of Corrections personnel. (State SMF ¶ 89; Costigan Aff. ¶¶ 1-4; Resp. SMF ¶ 89; SAMF ¶¶ 134, 137.) That grievance (08-Maine State Prison-166) was filed with Robert Costigan, the Grievance Review Officer, on April 24, 2008. (State SMF ¶ 90; Resp. SMF ¶ 90.) This was the first time that Leavitt came forward with a complaint to Department of Corrections officials. (State SMF ¶ 91; Resp. SMF ¶ 91.) In that grievance, Leavitt alleged that he was not receiving medication for his HIV condition (State SMF ¶ 92; Costigan Aff. ¶ 5) and this grievance also described the absence of medication since his incarceration at the York County Jail (Resp. SMF ¶ 92; Costigan Aff., Doc. 114-3 at 6.) On April 24, 2008, Costigan also received a copy of a memorandum to Leavitt from Violet Hanson, a registered nurse employed by Correctional Medical Services to work at Maine State Prison, stating that his grievance letter had been submitted. (State SMF ¶ 93; Resp. SMF ¶ 93.) The memorandum also stated that a follow-up appointment with the HIV clinic had been scheduled and that his chart would be reviewed for possible medication recommended by the clinic after that visit. (State SMF ¶ 94; Resp. SMF ¶ 94.) The memorandum from Hanson further indicated that the results for labs drawn on Leavitt on the previous day would be forwarded to the HIV clinic. (State SMF ¶ 95; Resp. SMF ¶ 95.) Laboratories to determine Leavitt's HIV status were drawn on April 23, 2008. (State SMF ¶ 96; Resp. SMF ¶ 96.)

By May 1, 2008, Teresa Kesteloot, R.N., Prison Health Services Administrator, had received Leavitt's April 24, 2008, grievance and completed her investigation of it. (SAMF ¶ 140; Resp. SAMF ¶ 140.) As Health Services Administrator, Kesteloot reviewed Leavitt's chart and spoke with Leavitt in response to the grievance he filed regarding his HIV medications. (State SMF ¶ 102;

Kesteloot Dep. at 43: 8 -10.)  Leavitt complains that Kesteloot's review was "very limited."  (Resp.

SMF ¶ 102; SAMF ¶¶ 141-147.)   In a May 1, 2008, memorandum, Kesteloot reported to Costigan

that Leavitt had been "followed appropriately," a judgment she based on the fact that he had been

seen in the chronic care clinic at the prison, that he had been seen in the past by outside infectious

disease specialists, and that his labs had recently been drawn and an appointment had been made for

him at the HIV clinic. (SAMF  ¶ 141; Kesteloot Dep. at . 41 -44; Ex. 1.)   The defendants add that

Kesteloot understood that her role in the grievance process was to ascertain whether Leavitt's

concerns were being dealt with currently, not to evaluate whether appropriate care had been rendered

in the past.  (Resp. SMF ¶ 141; Kesteloot Dep. at 43-44.)  Although Kesteloot did not consider

herself an HIV expert, she does not recall having sought the opinion of an HIV expert as to whether

Leavitt's HIV care prior to the date of her memorandum had been appropriate. (SAMF  ¶ 142;

Kesteloot Dep. at  44, 64; Kesteloot An. Interrog.  No.  21.)[7]  Kesteloot's investigation was limited to

speaking with Leavitt, examining part of his medical chart, and learning from Violet Hanson, a

Correctional Medical Services nursing supervisor, that Leavitt's labs had recently been drawn and

that he had been scheduled for an HIV clinic visit, but Kesteloot did not concern herself at all as to

why Leavitt's antiretroviral therapy had been delayed to that point. (SAMF ¶ 143; Resp. SAMF ¶

143.)  Kesteloot understood that HIV was a very serious health care condition which could develop

into a fatal disease. (SAMF ¶ 144; Resp. SAMF ¶ 144.) In preparing her memorandum, Kesteloot did

not review Leavitt's admission health screening, dated February 12, 2007, or his physical assessment,

dated February 20, 2007, indicating that he was HIV Positive, that he had Hepatitis B and C, and that

he reported having been on HIV medications at the time of his incarceration. (SAMF ¶ 145; Resp.

SAMF ¶ 145.)  Although Kesteloot would have been concerned by Leavitt's CD4 count of 262 and

---

[7]      The defendants ask that this statement be stricken insofar that it is offered to suggest Kesteloot had an
obligation to make this consultation.  (Resp. SAMF ¶ 142.)  Naturally, the Court takes the statement for what it is,
and its materiality is limited.

viral load of 60,440, lab results which were noted in Watkins's progress note of April 14, 2008, she

did not look at those lab results in the course of preparing her memorandum. (SAMF ¶ 145;

Kesteloot Dep. at . 63 -65.)  The defendants add that Kesteloot was concerned with what was

currently being done for Leavitt; she would likely not have reviewed old records toward that end.

They reiterate that she did not regard herself as an HIV expert or as someone who could assess the

quality of HIV care. (Resp. SAMF ¶ 146; Kesteloot Dep. at 64-65.)  After writing her memorandum,

Kesteloot did not investigate whether the delay in Leavitt's treatment was part of a broader problem

in the treatment of HIV patients at the Maine State Prison, nor did she follow up on Leavitt to insure

that there would be no further delays in his treatment.  (SAMF ¶ 147; Resp. SAMF ¶ 147.)   In

reviewing the file, Kesteloot saw that Leavitt was being seen at the Virology Treatment Center.

(State SMF ¶ 103; Resp. SMF ¶ 103.) According to her deposition testimony, Kesteloot believed at

that time that Leavitt was being appropriately followed by the Virology Treatment Center.  (State

SMF ¶ 104; Kesteloot Dep. at  43.)[8]

On May 1, 2008, Costigan received Kesteloot's memorandum.   (State SMF ¶ 97; Resp. SMF

¶ 97.) The memorandum stated that Leavitt had been seen by the HIV clinic several times since his

arrival in February 2007 (State SMF ¶ 98; Resp. SMF ¶ 98) and that Leavitt was scheduled for a

follow-up visit with the clinic (State SMF ¶ 99; Resp. SMF ¶ 99).  The memorandum explained that

consult notes indicated that medication should be started at the next visit at the HIV clinic. (State

SMF ¶ 100; Resp. SMF ¶ 100.)  Kesteloot's memorandum further stated that it appeared Leavitt had

been followed appropriately. (State SMF ¶ 101; Resp. SMF ¶ 101.)

---

[8]     Leavitt's response is that, on view of the serious allegations in Leavitt's grievance, Kesteloot's very limited
investigation of the grievance (which excluded any inquiry into the reasons for long delay in re-starting Leavitt's
HIV medications), Kesteloot's admitted lack of expertise in the treatment of HIV, her failure to get any advice from
an HIV specialist, and Dr. Tritch's belief that her report was inaccurate, the fact finder would be entitled to
disbelieve her testimony that she felt Leavitt was being appropriately followed by the Virology Treatment Center.
(Resp. SMF ¶ 104; SAMF ¶¶ 141-147.)

13

The information received from Hanson and Kesteloot formed the basis of Costigan's response to Leavitt's grievance. (State SMF ¶ 105; Resp. SMF ¶ 105.)    Costigan did not issue a written ruling on Leavitt's grievance until May 23, 2008, twenty-three days after Kesteloot's memorandum to him, at which time he denied it. (SAMF ¶ 151; Resp. SAMF ¶ 151.)

According to Costigan it was clear to him that Leavitt's HIV condition was being monitored by health care professionals and that the issue of medication was being addressed.  Costigan relied on their professional judgment, which he had no reason to question.  (State SMF ¶¶ 106, 107; Costigan Aff. ¶ 7.)  Leavitt responds that Costigan's purported reliance solely on the assurances of Correctional Medical Services personnel, who Leavitt had accused of failing to re-initiate his HIV medications for 15 months coupled with his unexplained 23-day delay in responding to Leavitt's complaint, would entitle the fact finder(s) to disbelieve his testimony as to his state of mind.  (Resp. SMF ¶¶ 106, 107: SAMF ¶ 151.)

Leavitt filed an appeal of Costigan's ruling to Jeffrey Merrill, who was then the warden and chief administrative officer of the Maine State Prison, on May 28, 2008. (SAMF ¶ 152; Resp. SAMF ¶ 152.) Merrill issued a denial of the appeal on July 1, 2008.  (SAMF ¶ 153; Resp. SAMF ¶ 153[9]; State SMF ¶ 108; Resp. SMF ¶ 108.)  The appeal, along with the grievance documents, including related correspondence, was forwarded to Deputy Warden Leida Dardis, who typically reviews second level grievance appeals at Maine State Prison and drafts a response to the appeal. (State SMF ¶ 109; Resp. SMF ¶ 109.)  In Merrill's experience, Dardis does an excellent job reviewing grievance appeals and does not hesitate to raise questions about the first level response, if appropriate. (State SMF ¶ 110; Resp. SMF ¶ 110.)  As well, Merrill always reviews the grievance documents and any

---

[9]    Leavitt states that Commissioner Magnusson, whose duties include oversight of the prison system, including prison health care, does not know why it took approximately one month for Costigan to respond to Leavitt's level-one grievance and more than a month for Merrill to respond to his level-two grievance. (Resp. SAMF ¶ 154.) However, the cited portion of the Magnusson Deposition, Page. 6, lines 6 -18, does not support this statement and I could not locate any such support in the portions of the deposition filed by Leavitt (or the defendants), which does not necessarily mean that this testimony is not somewhere in this complicated docket.

related correspondence forwarded to Dardis, as well as any additional information she has obtained. (State SMF ¶ 111; Resp. SMF ¶ 111.)  Merrill goes over the draft response and, if he has any questions, he directs them to Dardis or another appropriate person. (State SMF ¶ 112; Resp. SMF ¶ 112.)    If the grievance concerns a health care issue he makes sure that there is documentation showing that it has been brought to the attention of and been addressed by the appropriate health care professionals. (State SMF ¶ 113; Resp. SMF ¶ 113.)   In addition to reviewing the grievance documents and the related correspondence, Merrill also reviewed two updates to Costigan from Violet Hanson, dated June 24, 2008, and June 30, 2008, regarding Leavitt. (State SMF ¶ 114; Resp. SMF ¶ 114.)    These updates stated that Leavitt was scheduled for a follow-up visit at the HIV clinic on June 25, 2008, and that at that visit he was prescribed two antiretroviral medications for his HIV condition. (State SMF ¶ 115; Resp. SMF ¶ 115.)

In this case, Merrill insists that he believed the responses from the health care professionals, as reflected in both the response from Costigan and the draft second level response, was appropriate. (State SMF ¶ 116; Merrill Aff.  ¶ 5.)  Therefore, on July 1, 2008, he signed the second level response in reliance on their professional judgment. (State SMF ¶ 117; Merrill Aff. ¶ 5 and the second level response attached to the Costigan affidavit.)[10]

On July 14, 2009, Leavitt filed a third level appeal to Martin Magnusson, Commissioner for the Department of Corrections.  (State SMF ¶ 118; Resp. SMF ¶ 118.)  He denied the appeal on August 4, 2009. (State SMF ¶ 119; Resp. SMF ¶ 119.)  Magnusson maintains that he believed that Leavitt's grievance was resolved because he was receiving his HIV medication.   (State SMF ¶ 120; Magnusson Dep. at 36:2 -5.)[11]

---

[10]        Leavitt denies these two paragraphs by asserting that Merrill's reliance on the Correctional Medical Services personnel assurances coupled with his un-explained thirty-three day delay in responding to Leavitt's complaint would entitle the fact finder to disbelieve this belief.

[11]        Leavitt insists that a fact finder could conclude -- based upon the prolonged, unexplained, repeated, and inappropriate failures of the medical department to treat Leavitt for HIV, the lack of clinical pathway or protocol for

There is no dispute that Magnusson believed that by the time he received the grievance that Leavitt was receiving his medications and being taken care of appropriately. (State SMF ¶ 121; Resp. SMF ¶ 121.)  The treatment of HIV with antiretroviral therapy is a rapidly changing and complicated field. (State SMF ¶ 122; Resp. SMF ¶ 122.)    The decision to prescribe medicine or initiate treatment is a highly specialized area of medicine which would not be within the knowledge of a lay person. (State SMF ¶ 123; Resp. SMF ¶ 123.)   The medical director for Correctional Medical Services responsible for the Maine State Prison at the relevant time in the complaint, Dr. Tritch, would defer the decision to initiate HIV medicine to the experts in the community. (State SMF ¶ 124; Resp. SMF ¶ 124.)[12]

Leavitt does not believe that he was singled out by the medical department at the Maine State Prison. (State SMF ¶ 125; Resp. SMF ¶ 125.)   Leavitt was never told by any of the moving defendants that he was not receiving medication because he had HIV.   (State SMF ¶ 126; Leavitt Dep. at 110:20 -24; Resp. SMF 126.)[13]  Leavitt does not have "a direct personal" basis to believe that

---

treating HIV, and the DOC's failure to investigate the cause of the delays – that Magnusson disregarded the underlying problems which lead to Leavitt's delayed receipt of his HIV medications.  (Resp. SMF ¶ 120; SAMF ¶¶132-33, 154-58.)

[12]    According to Leavitt, the Department of Corrections investigates critical incidents relating to the health and safety of inmates, which can include improper denial of medications, and, where warranted, the investigation can lead to disciplinary actions against state employees and penalties against a contractor like Correctional Medical Services.  (SAMF ¶ 157; Magnusson Dep. at 7-9.) Magnusson does not recall if any investigation was done by the Department of Corrections with respect to Leavitt's grievance to determine why his medication had been withheld. (SAMF ¶ 158; Magnusson Dep. at 30 - 31.) The defendants respond that  Magnusson was not asked whether an "improper denial of medication" constitutes a critical incident that would lead to an investigation but rather he was asked "could the failure to provide medication to an inmate over an extended period of time where failure to medicate could result in serious illness or death trigger an investigation?" (Resp. SAMF ¶ 157; Magnusson Dep. at 8:20-25.) Magnusson stated that he did not remember whether any follow-ups to Leavitt's grievance were done generally and he was not asked whether an investigation was done "to determine why his [Raymond Leavitt's] medications were withheld." (Resp. SAMF ¶ 158; Magnusson Dep. at 30:35-31:14.)

[13]    Leavitt maintains that, when he was at the York County Jail, he was told by Albert Cichon:  "We don't give away [HIV] medications here at this jail because the jail is so small and we are not equipped financially to hold the burden of providing expensive medication, and … [you will] have to wait until you [get] to the Maine State Prison where they are able to pay for these medications."  (Leavitt Dep. at 42, Verified Sec. Am. Compl. ¶ 6, Doc, No.  44-4.) Cichon also purportedly told Leavitt, "You don't need to stay on the [HIV] medications to be healthy, and just as soon as you get to the Maine State Prison they'll fix you right up."  (SAMF ¶ 11; Leavitt Dep. at 43; Verified Sec. Am. Compl.  ¶ 8.)  I have addressed this factual dispute in my recommended decision on Cichon's motion for summary judgment.

the medical department acted with prejudice because he had HIV.  (State SMF ¶ 127; Leavitt Dep. at 111:20 - 22.) [14]   The Department of Corrections has made it clear to Correctional Medical Services that they want care decisions directed by medical necessity and community standard of care. (State SMF ¶ 128; Amberger Dep. at 72: 14-17.)[15]

According to Leavitt's expert, Dr. Valenti, when there is a significant interruption in antiretroviral treatment there is a detriment to subpopulations of CD4 cells and some may be destroyed forever. (State SMF ¶ 129; Resp. SMF ¶ 129.)  However, there is no way to determine which CD4 subpopulations have been destroyed, if any, except for perhaps in a laboratory setting. (State SMF ¶ 130; Resp. SMF ¶ 130.)  There is no way to determine what diseases these CD4 cells would have protected Leavitt from in the future or what diseases Leavitt will be exposed to in the future. (State SMF ¶ 131; Resp. SMF ¶ 131.)   It is impossible to quantify Leavitt's increased risk of disease. (State SMF ¶ 132; Resp. SMF ¶ 132.) .

A laboratory drawn (well over ten years ago)  on February 7, 1999, indicated that Leavitt's CD4 count went down to 230 and his viral load went up to over 160,000, when he was not taking his HIV medications as prescribed. (State SMF ¶ 133; Resp. SMF ¶ 133.)  According to Dr. Valenti, this interruption would have the same impact as the interruption at the Maine State Prison. (State SMF ¶ 134; Resp. SMF ¶ 134.)   There is no basis to believe that Leavitt has developed resistance to particular HIV medications. (State SMF ¶ 135; Resp. SMF ¶ 135.)  Leavitt was also diagnosed with Hepatitis C. (State SMF ¶ 136; Resp. SMF ¶ 136.)   Leavitt's symptoms such as fatigue, weight loss,

---

[14]     Leavitt responds that he does not have a personal basis for believing that the medical department acted with prejudice vis-à-vis his HIV, but insists that a fact-finder could conclude - based upon the prolonged, unexplained, repeated, and inappropriate failures of the medical department to treat Leavitt for HIV, the lack of clinical pathway or protocol for treating HIV, and the DOC's failure to investigate the cause of the delays – that Leavitt was discriminated against because of his HIV.  (Resp. SMF ¶ 127; SAMF ¶¶132-33, 154-58.)

[15]     Leavitt qualifies this statement by asserting that the DOC's  "did not behave in Leavitt's case as though it was paying more than lip service as to whether medical necessity and community standard of care dictated the medical care."  (Resp. SMF ¶ 128; SAMF ¶¶ 151-58.)

and gastrointestinal problems could also be caused by his Hepatitis C infection. (State SMF ¶ 137; Resp. SMF ¶ 137.)

According to, Dr. Valenti, any alleged damage to Leavitt had already occurred by the date the laboratory was drawn on April 23, 2008, and Leavitt's CD4 count fell to 262 and his viral load increased to that 297,000. (State SMF ¶ 138; Valenti Dep. at 140 -41.) Leavitt responds that Valenti testified that the damage to Leavitt's immune system was a continuum which lasted from his incarceration at the York County Jail in September 2006 until the re-institution of retroviral therapy in July 2008. (Resp. SMF ¶ 138.) He relies on the following statement of additional fact: The long delay in the re-initiation of Leavitt's antiretroviral therapy for HIV, starting with his incarceration at York County Jail on September 6, 2006,[16] and continuing through his incarceration at Maine State Prison, constituted a continuum of harm, which led to Leavitt's becoming immunocompromised and suffering a dramatic drop in his CD4 count by April 2008. (SAMF ¶ 36; Valenti Dep. at 91:10 - 95:4; p. 98; 9 - 14.)

To summarize the timeline of these three defendants' responses to Leavitt's healthcare needs, Costigan became involved with Leavitt's case when Leavitt filed his one and only grievance regarding this issue on April 24, 2008. (State SMF ¶ 139; Resp. SMF ¶ 139.) Jeffrey Merrill became involved with Leavitt's case when Leavitt filed his second level appeal of his grievance on May 28, 2008. (State SMF ¶ 140; Resp. SMF ¶ 140.) Martin Magnusson became involved with Leavitt's case when he received his third level appeal on July 14, 2008. (State SMF ¶ 141; Resp. SMF ¶ 141.)

III.　　　　**Eighth Amendment Claim**

**A.  Eighth Amendment Denial of Adequate Medical Care Standard**

---

[16]　　　This statement contains a typographical error, identifying the year as 2007.

As an inmate at the Maine State Prison, Leavitt was entitled to "'the minimal civilized measure of life necessities,'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), and the denial of necessary medical care can arise to the level of an Eighth Amendment violation, see generally Farmer v. Brennan, 511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (citation omitted). However, negligence and medical malpractice are not actionable. Daniels v. Williams, 474 U.S. 327 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence); accord Estelle, 429 U.S. at 105-06.

### B. My Prior Recommendation on Leavitt's Eighth Amendment Claim against Costigan and Merrill

In my January 13, 2009, recommended decision on Costigan's and Merrill first motion for summary judgment I reasoned as follows given the limited record before me:

> The picture that this case presents is a disturbing one. Costigan and Merrill were presented with a grievance in which Leavitt reported being denied his HIV medications for over a year. The defendants have not introduced any evidence disputing this fact or suggesting that they were not aware of the length of time that Leavitt's HIV medications were disrupted.

Leavitt v. Corr. Med. Servs., Inc., 08-132-B-W, 2009 WL 103549, 4-5 (D. Me. Jan. 13, 2009) (recommended decision), adopted, 2009 WL 465813 (D. Me. Feb. 24, 2009) (footnote omitted).

In a footnote I observed:

> The objective seriousness of Leavitt's medical condition was not the subject of the instant motion for summary judgment, which these defendants filed well in advance of the dispositive motions deadline. It may be that summary judgment will be called for against all of the claims at issue, depending on the showing that Leavitt can make with respect to the medical side of his case, but the instant motion is about deliberate indifference and the defendants' response to

19

> Leavitt's plea for administrative intervention, given the circumstances, could
> fairly be described as deliberately indifferent.

Id. at 5 n.3.

I now have before me a more extensive record on which to base this recommended

decision.

### C. Recommended Resolution of Leavitt's Eighth Amendment Claim Against Merrill and Costigan on the Current Summary Judgment Record

There is a relatively small universe of facts on which to focus with regards to Leavitt's

claims against Merrill and Costigan.[17] From the date of his incarceration at the Maine State Prison

on February 12, 2007, through July 28, 2008, Leavitt filed only one consolidated grievance

concerning HIV medications.  That grievance was filed with Costigan on April 24, 2008.  This was

the first time that Leavitt came forward with a complaint to Department of Corrections officials.

Merrill became involved with Leavitt's case when Leavitt filed his second level appeal of his

grievance on May 28, 2008. Magnusson became involved with Leavitt's case when he received his

third level appeal on July 14, 2008.

Laboratories to determine Leavitt's HIV status were drawn on April 23, 2008.  On May 1,

2008, Costigan, received the memorandum from Kesteloot stating that Leavitt had been seen by the

HIV clinic several times since his Maine State Prison arrival in February 2007 and indicating that

Leavitt was scheduled for a follow-up visit with the clinic. This memorandum stated that consult

notes indicated that medication should be started at the next visit at the HIV clinic and stated that it

appeared Leavitt had been followed appropriately.   Merrill received the May 28, 2008, second level

grievance appeal from Leavitt concerning the issue of his HIV along with the grievance documents.

Merrill also reviewed two updates to Costigan dated June 24, 2008 and June 30, 2008.  These

---

[17]     I have been thorough in setting forth the facts because of the need to place the facts relevant to both
Correctional Medical Services and the State defendants into a meaningful context.

updates stated that Leavitt was scheduled for a follow-up visit at the HIV clinic on June 25, 2008. Leavitt was seen at the Virology Treatment Center on June 25, 2008.  According to a consultation report from that visit, Leavitt was exhibiting some symptoms of HIV and noted that Leavitt had swollen glands and athralgias.  The consultation report from this visit included a recommendation to the prison to re-start Truvada and Kaletra for HIV management.

On June 26, 2008, Dr. Tritch ordered a prescription for Leavitt for Truvada and Kaletra. Leavitt began taking his medication for his HIV condition on July 7, 2008.   Since Leavitt began receiving his medication on July 7, 2008, his symptoms receded.

On July 14, 2009, Leavitt filed a third level appeal to Magnusson and that appeal was denied on August 4, 2009.  Magnusson maintains that he believed that Leavitt's grievance was resolved because he was receiving his HIV medication.   There is no dispute that Magnusson believed that by the time he received the grievance that Leavitt was receiving his medications and being taken care of appropriately.

Leavitt insists that reliance on the Correctional Medical Services personnel assurances coupled with unexplained delays in responding to Leavitt's grievance would entitle the fact finder to disbelieve these assertions by the state defendants and that a fact finder could conclude -- based upon the prolonged, unexplained, repeated, and inappropriate failures of the medical department to treat Leavitt for HIV, the lack of clinical pathway or protocol for treating HIV, and the DOC's failure to investigate the cause of the delays – that Merrill and Costigan disregarded the underlying problems which lead to Leavitt's delayed receipt of his HIV medications.   Given the contours of this fully developed summary judgment record, these suppositions may warrant the filing of a complaint but they do not warrant sending this case to trial after all parties have had a full opportunity for discovery and presentation of the summary judgment evidence.

My recommendation, thus, is to grant summary judgment on the Eighth Amendment claim because Leavitt has failed to create a genuine dispute of fact that these defendants were temporally affirmatively linked to the alleged cruel and unusual punishment. That is, on this record there is no triable affirmative link between the alleged rights violation and these defendants' subsequent responsibility for reviewing Leavitt's grievance after-the-fact, i.e., after his April 23, 2008, testing which triggered reinitiating his HIV medication course. See Iqbal, 129 S.Ct. at 1948; Sanchez v. Pereira-Castillo, __ F.3d. __, __-__, 2009 WL 4936397, 12 -13 (1st Cir.  Dec. 23, 2009;  Maldonado v. Fontanes, 568 F.3d 263, 274 -75 & n.7 (1st Cir. 2009); Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005); Choate v. Merrill, 08-49-B-W, 2009 WL 3487768, 2 -4  (D. Me. Oct. 20, 2009) (pending recommended decision); see also Kwanzaa v. Brown, No. 05-5976 (RMB), 2009 WL 4139393, 11 (D.N.J. Nov. 17, 2009) ("Defendants, however, cannot be held liable under § 1983 for merely failing to respond to Plaintiff's grievances. Bobko v. Lavan, 157 Fed.Appx. 516, 518 (3d Cir.2005). And 'knowledge' of a subordinate's alleged wrongful conduct does not establish § 1983 liability for a supervisor absent some personal involvement in the alleged wrong by the supervisor. A plaintiff must establish 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948-49 (2009). In other words, 'Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.' Id. At 1948.").

I add that there is also a possible alternative ground for granting judgment in favor of these defendants and that is because of Leavitt's insubstantial proof of injury caused by the treatment time-line at the Maine State Prison.  Since beginning antiretroviral therapy in July of 2008, Leavitt's CD4 count has recovered into the normal range.  Leavitt attempts to make much

of the fact that his CD4 count has dropped to 252 as of February 27, 2009, (a drop in CD4 levels

the defendants link to Leavitt's treatment for Hepatitis C). Even if I were to conclude that there

was a genuine dispute vis-à-vis long-term damage to Leavitt, Dr. Valenti has testified that the

damage was done by the time that the laboratory blood test was drawn on April 23, 2008. As

stressed above, Leavitt's first contact with this set of defendants was April 24, 2008. And while

the grievance process may not have been laser quick, the evidence is that the individuals

involved were collecting and reviewing information and reports during this post April 24 time-

frame. If, as Leavitt suggests, those involved in the grievance response should have sought

outside expertise, the response to the grievances would have been even further delayed and to

what end? Indeed, Leavitt concedes that the treatment of HIV with antiretroviral therapy is

rapidly changing and is a complicated field and that the decision to prescribe medicine or initiate

treatment is a highly specialized area of medicine which would not be within the knowledge of a

lay person. There is no genuine dispute of fact that Leavitt has been put on an appropriate course

of treatment as of July 7, 2008.

And, while on the topic of damages, there is a substantial question that even if these

defendants were affirmatively linked to the course of treatment during the operative time-frame,

Leavitt lacks proof of sustained injury. According to Leavitt's expert, Dr. Valenti, when there is a

significant interruption in antiretroviral treatment there is a detriment to subpopulations of CD4 cells

and some may be destroyed forever. There is no way to determine what diseases these CD4 cells

would have protected Leavitt from in the future, or what diseases Leavitt will be exposed to in the

future and it is impossible to quantify Leavitt's increased risk of disease. There is no basis to believe

that Leavitt has developed resistance to particular HIV medications. Nor is there a dispute that

Leavitt was also diagnosed with Hepatitis C and that his symptoms such as fatigue, weight loss, and

gastrointestinal problems could also be caused by his Hepatitis C infection. The only support for Leavitt's claim of long-term injury is Dr. Valenti's generalized supposition that the long delay in the re-initiation of Leavitt's antiretroviral therapy for HIV, starting with his incarceration at York County Jail on September 6, 2006, and continuing through his incarceration at Maine State Prison, constituted a continuum of harm, which led to Leavitt's becoming immune-compromised and suffering a dramatic drop in his CD4 count by April 2008.  However, Leavitt has conceded that this April 2008 drop was a result of his treatment for Hepatitis C and that his symptoms such as fatigue, weight loss, and gastrointestinal problems could also be caused by his Hepatitis C infection. According to Leavitt's current treating physician Dr. Smith, as of his last visit in June of 2009, he was "stable, status quo" and his HIV was under control.  Leavitt's expert, Dr. Valenti, reports that it appears Leavitt is "doing very well" and is responding well to treatment and is not resistant to Truvada and Kaletra.

### IV.    ADA Claim

In my January 12, 2009, recommended decisions on Merrill and Costigan's first motion for summary judgment and Magnusson's motion to dismiss I narrowed the ADA claims to official capacity claims requiring a showing that not only was Leavitt denied services due to his disability, but also that the relevant state officials harbored discriminatory intent.  Leavitt, 2009 WL 103549 at 6.   In the context of the full record now before me, Leavitt has not generated a triable issue of fact on this claim.

In his consolidated response to the three dispositive motions filed in this case, Leavitt asserts that there is "a genuine issue of material fact as to whether Costigan and Merrill acted with discriminatory intent by failing to expedite action on Leavitt's April 24, 2008 petition" and whether Magnusson "condoned their conduct by failing to question the handling of the

grievance."  (Consolidated Resp. Mots. Summ. J. at 25.)  "There is also a genuine issue of material fact," Leavitt expands, "as to whether Magnusson …. acquiesced in a system in which, through a contractual arrangement with Correctional Medical Services, the Department failed to afford HIV-infected inmates like Leavitt, the same service, *i.e.,* medical care, afforded to other prisoners with disabling chronic conditions." (Id.)

With regards to Leavitt's ADA claim, Magnusson, Merrill, and Costigan summarize their argument for judgment at this juncture as follows:

> As stated in the plaintiff's original memorandum, defendants Costigan and Merrill believed the plaintiff was receiving treatment by the specialists in the community who were making the medical decision whether to re-initiate antiretroviral therapy, and by the time Magnusson received the grievance, the plaintiff was actually taking his medication and the issue resolved. There is no evidence that these defendants denied the plaintiff's grievance because he had "HIV" or for some other discriminatory purpose.
>
> Perhaps for this reason, the plaintiff now claims a different theory of liability under the ADA. Namely that somehow the defendants condoned a systematic discrimination against HIV inmates so that they did not receive the same treatment as other prisoners with disabling chronic conditions. There is absolutely no evidence on the record that Correctional Medical Services or the Department of Corrections acquiesced in a system that failed to afford inmates with HIV the same medical services as other inmates. There is no evidence on the record regarding other HIV inmates presented at all. There is no evidence regarding standards or any other foundation for an allegation that there should have been a clinical pathway as opposed to a referral to an outside specialist, nor is there any foundation for the suggestion that such a pathway was required by any national guidelines.  There is simply no basis for this argument in the record. Moreover, the plaintiff himself stated that he did not believe he was discriminated against or singled out because of his HIV condition and there is no evidence that antiretroviral therapy was not started earlier because of some discriminatory purpose on the part of any defendants.
>
> The plaintiff cites 28 CFR 35.130 in support of this argument that somehow there was a systematic discrimination of HIV infected inmates and their medical treatment but that is simply not applicable in this case. There is absolutely no evidence of systematic discrimination or that the Department of Corrections contracted with Correctional Medical Services to engage in policies or practices that discriminated against patients with HIV.

(Reply Mem. at 6-7.)

With regards to the summary judgment record, Leavitt concedes that he does not have a personal basis for believing that the medical department acted with prejudice vis-à-vis his HIV,

but insists that a fact-finder could conclude - based upon the prolonged, unexplained, repeated, and inappropriate failures of the medical department to treat Leavitt for HIV, the lack of clinical pathway or protocol for treating HIV, and the DOC's failure to investigate the cause of the delays – that Leavitt was discriminated against because of his HIV.

Taking into account the discussion of these three defendants' lack of involvement in the treatment decisions made with respect to Leavitt's medical conditions in the review of the Eighth Amendment claim, it is hard to fathom how these three administrators could be held liable under an official capacity ADA theory.  On the summary judgment record currently before the court, there is not a scintilla of evidence that the Department of Corrections has countenanced inadequate treatment of HIV positive inmates in a systematic or even a simplistic way.[18]  I acknowledge, having waded through the record as it pertains to Correctional Medical Services's liability, that Leavitt's medical needs could be described as having slipped through the cracks. However, after there has been a full opportunity for discovery and even though Leavitt is now assisted by able counsel, there is not a triable issue as to the official capacity liability of Magnusson, Merrill, and Costigan, on Leavitt's ADA discrimination claim against the State defendants.

**CONCLUSION**

For these reasons I recommend that the Court grant the motion for summary judgment (Doc. No. 113).

---

[18]      For instance, it is undisputed that in addition to being seen at the Virology Treatment Center, Maine State Prison inmates with HIV were also seen every three months at the Chronic Care Clinic at Maine State Prison; the Correctional Medical Services guidelines were that an inmate with HIV should be seen every three months at these clinics; and during the relevant period, Leavitt was seen at the Chronic Care Clinic or Infectious Disease Clinic on March 25, 2007, June 10, 2007, October 22, 2007, January 1, 2008, and April 14, 2008.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 31, 2009